## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL; EMMA RUTH BLANCO,
in her personal capacity, and as Personal
Representative of the ESTATE OF ALFREDO
BLANCO ROSELL, JR; HEBE BLANCO
MIYARES, in her personal capacity, and as Personal
Representative of the ESTATE OF BYRON
BLANCO ROSELL; SERGIO BLANCO DE LA
TORRE, in his personal capacity, and as
Administrator *Ad Litem* of the ESTATE OF
ENRIQUE BLANCO ROSELL; EDUARDO
BLANCO DE LA TORRE, as Administrator *Ad
Litem* of the ESTATE OF FLORENTINO
BLANCO ROSELL; LIANA MARIA BLANCO;
SUSANNAH VALENTINA BLANCO; LYDIA
BLANCO BONAFONTE; JACQUELINE M.
DELGADO; BYRON BLANCO, JR.;
MAGDALENA BLANCO MONTOTO;
FLORENTINO BLANCO DE LA TORRE; JOSEPH
E. BUSHMAN; CARLOS BLANCO DE LA
TORRE; and GUILLERMO BLANCO DE LA
TORRE;

      Plaintiffs,

      v.

CMA CGM S.A. (a/k/a CMA CGM THE FRENCH
LINE; a/k/a CMA CGM GROUP); CMA CGM
(AMERICA) LLC;

      Defendants.

_____ /

## **COMPLAINT**

    Odette Blanco de Fernandez *née* Blanco Rosell ("Odette Blanco Rosell"); Emma Ruth

Blanco, in her personal capacity, and as Personal Representative of the Estate of Alfredo Blanco

Rosell, Jr; Hebe Blanco Miyares, in her personal capacity, and as Personal Representative of the Estate of Byron Blanco Rosell; Sergio Blanco, in his personal capacity, and as Administrator *Ad Litem* of the Estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as Administrator *Ad Litem* of the Estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Blanco, Jr.; Magdalena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre ("Plaintiffs"), by and through counsel, as and for their Complaint against CMA CGM S.A. (a/k/a CMA CGM The French Line; a/k/a/ CMA CGM Group) ("CMA CGM" or "Defendant") and CMA CGM (AMERICA) LLC ("CMA CGM America") hereby state:

## PRELIMINARY STATEMENT

1. Plaintiffs bring this action to recover damages and interest under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, *et seq.* (the "Helms-Burton Act" or "Act") against Defendants for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959 and as to which Plaintiffs own claims.

2. On September 29, 1960, the Cuban Government published the announcement of the confiscation without compensation of the following property of Plaintiff Odette Blanco Rosell and her siblings, all of whom are deceased:  Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell (collectively, the "Blanco Rosell Siblings")[1]:

> One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

---

[1] As stated above, the Estates of Alfredo Blanco Rosell, Jr.; Florentino Blanco Rosell; Enrique Blanco Rosell; and Byron Blanco Rosell, respectively are Plaintiffs.

Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23405 - 23406 (English translation).

3.     The "persons listed in the first Whereas" in Resolution No. 436 above is a reference to the Blanco Rosell Siblings, who had been the subject of "investigations" carried out by the Cuban Government.  *See id*. at 23405 (first Whereas clause) ("Whereas: Having considered cases number 3-2-3143, 3-2-8990 and 3-2-9832, regarding the investigations carried out on the following persons:  Alfredo, Enrique, Florentino, Byron, and Odette Blanco Rosell.").

4.     The Blanco Rosell Siblings' property confiscated by the Cuban Government included all of their "property and rights, whatever their nature," including but not limited to:

(a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and

(b) their wholly owned companies, Central San Ramón and Compañía Azucarera Mariel S.A., including those companies' extensive land holdings (approximately 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities

*See* Resolution No. 436 published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation) ("Confiscated Property").

5.     The Blanco Rosell Siblings were not U.S. citizens when the Cuban Government confiscated their Confiscated Property in 1960.  They fled Cuba after the confiscation and became U.S. citizens before March 12, 1996, the date the Helms-Burton Act was signed into law.  The

3

Blanco Rosell Siblings were not eligible to, and therefore did not file claims with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949. Today, only Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, age 91, is alive.

6.      In 1996, the U.S. Congress passed the Helms-Burton Act, and President Bill Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban Government on or after January 1, 1959, the claims to which are owned by persons who became U.S. nationals after the confiscation of their property and before March 12, 1996.

7.      Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action for Title III violations had been suspended by several Presidents (pursuant to authority granted in the Act) [mainly in six-month increments] until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed.

## PARTIES

### I.      Plaintiffs

8.      Plaintiff Odette Blanco de Fernandez, *née* Blanco Rosell, is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She acquired ownership of her claim to the Confiscated Property before March 12, 1996, which claim she still owns.  She became a naturalized U.S. citizen on September 8, 1971.  She resides in Miami-Dade County, Florida.

9.      Plaintiff Estate of Alfredo Blanco Rosell, deceased, is represented through its Personal Representative, Emma Ruth Blanco.  Alfredo Blanco Rosell was a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on August

26, 1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.
Prior to his death on December 10, 2006, he resided in Miami-Dade County, Florida.

10.    Plaintiff Estate of Byron Blanco Rosell, deceased, is represented through its
Personal Representative, Hebe Blanco Miyares.  Byron Blanco Rosell was a United States national
within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in or around
1972.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.
Prior to his death on February 25, 2001, he resided in Miami-Dade County, Florida.

11.    Plaintiff Estate of Enrique Blanco Rosell, deceased, is represented through its
Administrator *Ad Litem* Sergio Blanco.  Enrique Blanco Rosell was a United States national within
the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen on September 23,
1970.  He acquired ownership of his claim to the Confiscated Property before March 12, 1996.
Prior to his death on November 27, 2014, his last known place of residence was San Juan, Puerto
Rico.

12.    Plaintiff Estate of Florentino Blanco Rosell, deceased, is represented through its
Administrator *Ad Litem* Eduardo Blanco de la Torre.  Florentino Blanco Rosell was a United States
national within the meaning of 22 U.S.C. § 6023(15)(A).  He became a naturalized U.S. citizen in
or around 1975.  He acquired ownership of his claim to the Confiscated Property before March 12,
1996.   Prior to his death on March 18, 2005, his last known place of residence was Baldrich,
Puerto Rico.

13.    Plaintiff Emma Ruth Blanco is a United States national within the meaning of 22
U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco
Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim. She
became a naturalized U.S. citizen on January 4, 1973.  She resides in Miami-Dade County, Florida.

14.     Plaintiff Liana Maria Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's daughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

15.     Plaintiff Susannah Valentina Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Alfredo Blanco Rosell's granddaughter.  To the extent that Alfredo Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  Upon knowledge, information and belief, she became a naturalized U.S. citizen prior to March 12, 1996.  She resides in Miami-Dade County, Florida.

16.     Plaintiff Hebe Blanco Miyares is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on September 23, 1970.  She resides in Miami-Dade County, Florida.

17.     Plaintiff Lydia Blanco Bonafonte is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on November 17, 1971.  She resides in Miami-Dade County, Florida.

18.     Plaintiff Jacqueline M. Delgado is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Byron Blanco Rosell's daughter.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She

became a naturalized U.S. citizen on February 18, 1970.  She resides in Miami-Dade County, Florida.

19.     Plaintiff Byron Blanco, Jr. is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Byron Blanco Rosell's son.  To the extent that Byron Blanco Rosell's claim does not remain with his Estate, Byron Blanco, Jr. inherited and owns a portion of that claim. He became a naturalized U.S. citizen before March 12, 1996.  He resides in Orange County, California.

20.     Plaintiff Magdalena Blanco Montoto is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  She is Florentino Blanco Rosell's daughter.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, she inherited and owns a portion of that claim.  She became a naturalized U.S. citizen on June 21, 1977.   She resides in Miami-Dade County, Florida.

21.     Plaintiff Sergio Blanco is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son and Enrique Blanco Rosell's nephew.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns a portion of that claim.  In addition, to the extent Enrique Blanco Rosell's claim does not remain with his Estate, Sergio Blanco inherited and owns all of that claim.  He became a naturalized U.S. citizen on January 25, 1983.  He resides in Guaynabo, Puerto Rico.

22.     Plaintiff Florentino Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Florentino Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 1, 1978.  He resides in Gauynabo, Puerto Rico.

23.     Plaintiff Joseph E. Bushman is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is the surviving husband of Florentino Blanco Rosell's daughter, Maria Elena Blanco.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Joseph E. Bushman inherited and owns a portion of that claim.  He was born a U.S. citizen on March 14, 1947 and has remained a U.S. citizen his entire life.  He resides in Sumter County, Florida.

24.     Plaintiff Carlos Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Carlos Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on February 26, 1985.  He resides in Guaynabo, Puerto Rico.

25.     Plaintiff Guillermo Blanco de la Torre is a United States national within the meaning of 22 U.S.C. § 6023(15)(A).  He is Florentino Blanco Rosell's son.  To the extent that Florentino Blanco Rosell's claim does not remain with his Estate, Guillermo Blanco de la Torre inherited and owns a portion of that claim.  He became a naturalized U.S. citizen on August 3, 1982.  He resides in San Juan, Puerto Rico.

**II.     Defendants**

26.     Defendant CMA CGM S.A. (**"CMA CGM" or "Defendant"**)[2] is a Société Anonyme organized under the laws of France with its principal place of business at Boulevard Jacques Sandé, 4 Quai d'Arenc, 13235 Marseille Cedex 2.  The marine transportation company is one of the world's leading container carriers. Through subsidiaries (including U.S. Lines, Progeco, and

---

[2] For clarity, wherever the term "Defendant" (singular and by itself) is used herein, it refers to Defendant CMA CGM S.A. (a/k/a CMA CGM The French Line; a/k/a/ CMA CGM Group).  As defined below, all references to co-Defendant CMA CGM (AMERICA) LLC appear as CMA CGM America.

Traveller's Club), it operates a fleet of around 540 vessels that serve more than 420 ports around the globe and maintains a network of about 600 facilities in some 160 countries.  Other services, provided by Defendant through subsidiaries, including relevant non-party CEVA Logistics (also known in Cuba as CMA CGM LOG), which operates a logistics platform at the Port of Mariel on land that Cuba confiscated from the Blanco Rosell Siblings.

27.     According to its website, Defendant CMA CGM is the self-described "U.S. Leader".

The U.S. Leader

CMA CGM Group holds the United States' top slot in combined import and export market share thanks to the expertise of our staff and our focus on the complete customer experience. Our innovative solutions make our services smarter and more efficient across our portfolio of maritime, inland and logistics offerings, providing our customers with the best end-to-end services in the country. Contact our sales team to book your next shipment with CMA CGM![3]

28.     CMA CGM's website displays the following Key Metrics about its first place position in the United States market:[4]



---

[3] https://www.cma-cgm.com/local/united-states (last visited July 22, 2021).

[4] *Id.*

29.     CMA CGM's offices are spread out across the United States in Newport Beach, CA, New York, NY, Houston, TX, Chicago, IL, Alpharetta, GA and Norfolk, VA.[5]

30.     CMA CGM's website list 21 US ports where it is active: Freeport, TX, Savannah, GA, New York, NY, Norfolk, VA, Dutch Harbor, AK, Port Everglades, FL, Philadelphia, PA, Los Angeles, CA, Long Beach, CA, Tacoma, WA, Oakland, CA, Seattle, WA, Miami, FL, Charleston, SC, Honolulu, HI, Baltimore, MD, Mobile, AL, Port Huenne, CA, Tampa, FL, Houston, TX, Los Angeles, CA, and New Orleans, LA.[6]

31.     CMA CGM tailors its global network for the United States market and solicits customers and shipping business in Florida, including in Miami-Dade County, Florida, and throughout the United States for its commercial container shipping business from Florida.[7]

32.     As discussed more fully below (*infra* at ¶¶ 97 - 136), CMA CGM has trafficked and continues to traffic in the Confiscated Property, the claims to which are owned by Plaintiffs, since the opening of the Port of Mariel, more than 6 years ago.  According to the International Maritime Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, vessels operated and directed by CMA CGM have repeatedly trafficked in the Confiscated Property by "calling" at the Terminal de Contenedores del Mariel ("TCM" or "Container Terminal"), which is part of the Port of Mariel within the Zona Especial de Desarrollo

---

[5] https://www.cma-cgm.com/local/united-states/offices-contacts (last visited on July 22, 2021).

[6] https://www.cma-cgm.com/ebusiness/schedules/port/detail?CountryCode=US&PortCode=&CountryName=UNITED+STATES&PortName=&ActualPOLDescription=UNITED+STATES+%3B+US&POLDescription=UNITED+STATES+%3B+US&POLCountryCode=&POLPortCode=&IsDeparture=True&DelayFrom=2&DelayTo=14&search=Search (last visited on July 22, 2021).

[7] https://www.cma-cgm.com/local/united-states (last visited on July 22, 2021).

Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone) and within the Bay of Mariel,[8] and while calling at the Container Terminal, engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, Almacenes Universales S.A. (also known as "AUSA"),[9] and/or the ZEDM.  CMA CGM profits by, from and through the business activities of the CMA CGM operated vessels that call at the Port of Mariel.

33.    "Calling" at a port in the container shipping industry means that containers are either offloaded or loaded at a Port of Call. See https://www.marineinsight.com/life-at-sea/what-does-the-term-port-of-call-means/ (last visited July 21, 2021).  While calling at the Port of Mariel, Defendant's ships dock and utilize wharf space, offload and/or load containers, hook up to water and electricity, utilize crane service, container storage yards, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads.  CMA CGM contracts for and pays for these and other services at the Port of Mariel with the TCM, AUSA, and/or the ZEDM.

34.    As discussed more fully below (*infra* at ¶¶ 44 - 45, 97 - 108, 127 - 136), Defendant's trafficking includes Defendant, through its wholly-owned subsidiary CEVA Logistics (known in Cuba as CMA CGM LOG), entering into an agreement with AUSA to operate and develop a

---

[8] As used in this Complaint, the "Port of Mariel" comprises more than 2,300 feet of wharf space, four super Post-Panamax cranes, and the capacity to handle 820,000 cargo containers annually through the Port's Container Terminal which is the single largest user of the ZEDM. *See* Mariel is Cuba's big industrial gamble. Could U.S. companies be among investors? Miami Herald, Oct. 23, 2017, available at https://www.miamiherald.com/article180057406.html (last visited July 21, 2021). Exhibit A hereto.  *See also* Port of Mariel New Transport Hub for the Americas, https://www.caribbeanshipping.org/images/CSEC2016/Presentation_TC_Mariel_English_170516.pdf (last visited July 21, 2021) Exhibit B hereto (redacted to remove data regarding other Cuban ports).

[9] AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

logistics platform on the Port of Mariel and to operate a 17 hectare logistics platform with AUSA which includes 12,000 square meters of warehouses and 5,000 cubic meters of reefer (refrigerated) warehouses.[10]   The logistics platform is known as CARILOG.   CEVA Logistics handles export consolidation, container distribution, import and export warehousing, storage of full and empty containers, and unbundling of other goods for distribution across Cuba.   CARILOG, and the warehouses located thereon, as pictured on the ZEDM's website,[11] occupies, utilizes and exploits land that is part of the ZEDM that was confiscated by Cuba from the Blanco Rosell Siblings.

35.     As discussed more fully below (*infra* at ¶¶ 117 – 126), Defendant's trafficking includes Defendant acting as the carrier for cargo shipments from multiple U.S. Ports, including PortMiami in Miami-Dade County, Florida, to the Port of Mariel.   According to Bills of Lading on file with U.S. Customs and Border Protection, Defendant has served as the carrier for at least 602 cargo shipments from various U.S. Ports to the Port of Mariel, the final destination declared. Defendant first carries the containers to Kingston, Jamaica, where the containers are off-loaded and then loaded onto other ships (including some ships owned by Defendant) and are then carried to the Port of Mariel, the declared final destination.

36.     For example, Defendant was the "Carrier" on Bill of Lading No. CMDUNAM3935482, dated June 26, 2020, a cargo shipment from PortMiami on the vessel CONTSHIP ICE (IMO 9517422) to the Port of Mariel as the "Final Destination Declared." Defendants' U.S. subsidiary, CMA CGM America (defined in the next paragraph below), signed for "Carrier CMA CGM SA … as agent for the Carrier."

---

[10]     *See*     https://www.cmacgm-group.com/en/news-medias/the-cma-cgm-group-signs-an-agreement-to-operate-a-logistics-platform-in-cooperation-with-a-cuban-company-in-the-presence-of-the-president-of-the-french-republic- (last visited on July 22, 2021).

[11] https://www.zedmariel.com/en/infrastructure (last visited July 22, 2021).



37.     Defendant CMA CGM (AMERICA) LLC ("CMA CGM America") is a limited liability company organized and existing under the laws of the State of New Jersey with a principal place of business in the State of Virginia. CMA CGM America is authorized to – and does – transact business in the State of Florida.  CMA CGM America first obtained authorization to transact business in Florida in 2008 and has filed an annual report with the Florida Department of State every year for the past 13 years so that it may continue to transact business in Florida.  The business that CMA CGM America transacts in Florida includes trafficking in the Confiscated Property by acting as Defendant's agent for Defendant's carrying of containers from PortMiami to the Port of Mariel.  The Bill of Lading No. CMDUNAM3935482, referred to above in Paragraph 36 and signed by CMA CGM America, is one example of CMA CGM America trafficking in the Confiscated Property.

**III.     Relevant Non-Parties**

38.     The Terminal de Contenedores del Mariel ("TCM" or "Container Terminal") is a 100% Cuban state-owned entity.

39.     Non-party Almacenes Universales S.A. (also known as "AUSA") is a 100% Cuban state-owned entity that is a comprehensive logistics operator that, *inter alia,* runs the container storage yard in the ZEDM.  AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.  On November 9, 2017, the U.S. State Department listed GAESA, AUSA, and the TCM as Restricted Entities and Subentities Associated with Cuba.  *See* The State Department's List of Entities and Subentities Associated with Cuba (Cuba Restricted List), 82 Fed. Reg. 52089 (Nov. 9, 2017).

40.     In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  *See* Notice of OFAC Sanctions Action, 85 Fed. Reg. 84468 (Dec. 28, 2020).

41.     The TCM and AUSA container storage yard are physically located in the Port of Mariel.  As described more fully herein (*infra* ¶¶ 97 - 108), the ZEDM is a special economic zone created by Cuban statute.  The TCM and AUSA are physically located in the Port of Mariel which is within and part of the ZEDM.  TCM, AUSA and ZEDM are all agencies or instrumentalities of the Republic of Cuba as defined in 28 U.S.C. § 1603(b).

42.     TCM, AUSA and the ZEDM, while aware that the Confiscated Property had been confiscated from the Blanco Rosell Siblings, knowingly and intentionally traffic in the Confiscated Property because they each individually and collectively, "transfer[], distribute[], dispense[], broker[], manage[] … lease[], receive[], possess[], obtain[] control of, manage[], use[], or otherwise acquire[] or hold[] an interest in" the Confiscated Property. See 22 U.S.C. § 6023(13)(A)(i). In plain terms, the TCM, AUSA and/or the ZEDM manage the land, concessionaires and users of the ZEDM and contract with companies, including CMA CGM, that

do business in the ZEDM and with the TCM and AUSA–for example by offloading and/or loading containers from CMA CGM ships at the TCM and parking/storing them at the container storage yard operated by AUSA.

43.     TCM, AUSA and the ZEDM also engage in commercially beneficial transactions and commercial activities in which they use and benefit from the land that was confiscated from the Blanco Rosell Siblings that underlies the ZEDM and from the 70-year Concession rights to execute, maintain, and exploit the docks, wharves, warehouses and storage areas in the Port of Mariel which is within the Bay of Mariel.

44.     CEVA Logistics AG (also known in Cuba as CMA CGM LOG) ("CEVA Logistics") is a corporation organized and existing under the laws of Switzerland, with its principal place of business at Grabenstrasse 25 Baar, 6340 Switzerland.  CEVA Logistics is a wholly-owned subsidiary of CMA CGM and provides global supply chain solutions for large and medium-size national and multinational companies, offering customers complete supply chain design and implementation in contract logistics and freight management, alone or in combination.  Together with CEVA Logistics (known in Cuba as CMA CGM LOG), CMA CGM offers end-to-end logistics solutions. In Cuba, CEVA Logistics (known in Cuba as CMA CGM LOG), in partnership with AUSA, operates a commercial logistics platform (known as CARILOG) in ZEDM sector A5, on land that that is part of the ZEDM and that was confiscated by Cuba from the Blanco Rosell Siblings.  In 2015, CMA CGM signed an agreement in Cuba to develop and operate a logistics platform on the port of Mariel.  *See* https://www.cmacgm-group.com/en/news-medias/the-cma-cgm-group-signs-an-agreement-to-operate-a-logistics-platform-in-cooperation-with-a-cuban-company-in-the-presence-of-the-president-of-the-french-republic- (last visited on July 22, 2021).

45.     CMA CGM's Mariel deal put CMA CGM in business with a firm (GAESA) and its subsidiaries that have been identified by U.S. authorities as subverting international trade restrictions. GAESA is a conglomerate that plays a vital role in the island's economy and propping up the Cuban government. It is headed by Gen. Luis Alberto Rodriguez Lopez Calleja, who was married to one of Raul Castro's daughters.

46.     CMA CGM's logistics platform (known as CARILOG) on the Port of Mariel in the ZEDM includes warehouses as pictured on the ZEDM's website,[12] and occupies, utilizes and exploits land that is part of the ZEDM that was confiscated by Cuba from the Blanco Rosell Siblings.

47.     Double Ace Cargo, Inc. ("Double Ace"), a company organized under the laws of Florida, with its principal place of business at 2175 NW 115th Ave., Miami, Florida, 33172-4920, is primarily engaged in furnishing shipping information and acting as agents in arranging transportation for freight and cargo.  Double Ace is listed as the "Exporter" on the Bills of Lading on which CMA CGM was the carrier for multiple cargo shipments from PortMiami in Miami-Dade County, Florida to the Port of Mariel during 2017 – 2021.  *See infra* ¶¶ 117 – 126.

**<u>JURISDICTION AND VENUE</u>**

48.     Defendants are subject to the personal jurisdiction of this Court as follows:

a.     Defendant CMA CGM America is subject to personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and pursuant to Fla. Stat. § 48.193 including subsections § 48.193(1)(a)1, 2 and 6 and § 48.193(2) thereof, because (a) CMA CGM America committed and continues to commit acts of trafficking as defined in the Helms-Burton Act, 22 U.S.C. § 6023(13) within the state of Florida and within this judicial District and thus is

---

[12] https://www.zedmariel.com/en/infrastructure (last visited July 22, 2021).

subject to personal jurisdiction in the state courts of Florida and in this Court; and (b) because CMA CGM America, personally or through its agents, is operating, conducting, engaging in, or carrying on a business or business venture in Florida, and has an office or agency in Florida, and within this District.

        b.      Defendant CMA CGM is subject to personal jurisdiction of this Court pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) and pursuant to Fla. Stat. § 48.193 including §§ 48.193(1)(a)1, 48.193(1)(a)2, 48.193 (1)(a)6, and 48.193(2) thereof, because, *inter alia,* (a) Defendant is engaged in substantial and not isolated activity within this State; (b) Defendant committed and continues to commit acts of trafficking as defined in the Helms Burton Act, 22 U.S.C. § 6023(13) within the state of Florida and within this judicial District and thus is subject to personal jurisdiction in the state courts of Florida and in this Court; (c) Defendant, personally or through its agents, is operating, conducting, engaging in, or carrying on a business or business venture in Florida, including the business of carrying containers from PortMiami to the Port of Mariel (*see* ¶¶ 35 – 37; 117 – 126); and/or (d) Defendant is causing injury to persons who reside in this state arising out of acts or omissions by Defendant and/or its agents outside this State while Defendant and/or its agents were engaged in the solicitation of service activities within this State.

      49.     In the alternative, to the extent CMA CGM is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over CMA CGM by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claims arise under federal law; CMA CGM is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over CMA CGM based on its nationwide contacts is consistent with the U.S. Constitution and laws.

50.     Exercise of personal jurisdiction by this Court over Defendant pursuant to Federal Rule of Civil Procedure 4(k)(2) is consistent with the U.S. Constitution and U.S. laws because Defendant has systematic and continuous contacts with Florida and the United States, it has purposefully availed itself of the benefits and protections of Florida and the United States, and this action arises from or relates to such contacts and purposeful availment. *See* ¶¶ 27 – 31; 35 – 37; 117 – 126.

51.     In addition, in the alternative to personal jurisdiction alleged above, to the extent Defendant is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over Defendant by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claims arise under federal law; Defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over the Defendant for its conduct purposefully directed at the United States is consistent with the U.S. Constitution and laws. The exercise of personal jurisdiction by this Court over Defendant is consistent with the U.S. Constitution and U.S. laws because Defendant committed intentional torts purposefully directed at U.S. nationals in the United States which caused harm that Defendant knew or reasonably should have anticipated would be suffered in the United States by certain U.S. nationals.

52.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

53.     The amount in controversy in this action exceeds $50,000, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  22 U.S.C. § 6082(b). Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

54.     Contemporaneous with this filing, Plaintiffs have paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i).

## THE HELMS-BURTON ACT

### I.     Background

55.     The Helms-Burton Act, signed into law on March 12, 1996, had several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6).  Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban Government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban Government." 22 U.S.C. § 6081(6).

56.     Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

57.     Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).  The result was Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national (including property confiscated from a person who became a U.S. national before March 12, 1996) by the Cuban Government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

58.     The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

59.     Although President Clinton suspended the private right of action under Title III on July 16, 1996 for six months, the August 1, 1996 effective date was never suspended. Title III of the Act came into effect on August 1, 1996.  Starting on that date, traffickers in confiscated property were liable to U.S. nationals with claims to that property but could not be sued while the private right of action remained suspended.

60.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, typically for six months at a time, by decision of the President or Secretary of State.  There was never any guarantee that additional suspensions of the private right of action would be granted indefinitely into the future, and the operative provisions of the Act have remained in effect continuously since 1996.

61.     On April 17, 2019, Secretary of State Pompeo announced that the Trump Administration would no longer suspend the right to bring an action under Title III, effective May 2, 2019.  On May 2, 2019, upon the expiration of the last suspension, the right to bring an action under Title III was activated.

## II.     The Helms-Burton Act's Private Right of Action

62.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking. — (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages...

22 U.S.C. § 6082(a)(1).

63.     The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

64.     The Act defines "United States national" to include "any United States citizen[.]" 22 U.S.C. § 6023(15).

65.     The Act adopts the definition of "agency or instrumentality of a foreign state" under 28 U.S.C. § 1603(b), *see* 22 U.S.C. § 6023(1) ("Agency or Instrumentality of a Foreign State.— The term "agency or instrumentality of a foreign state" has the meaning given that term in section 1603(b) of title 28, United States Code.").

66.     A person "traffics" in confiscated property if that person "knowingly and intentionally":

   (i)      sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

   (ii)     engages in a commercial activity using or otherwise benefiting from confiscated property, or

   (iii)    causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

67.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any

present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

68.     The Act defines "confiscated" in relevant part as:

> [T]he nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —

> (i)     without the property having been returned or adequate and effective compensation provided; or

> (ii)    without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure.

22 U.S.C. § 6023(4)(A).

69.     The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

70.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

71.     Under the Act,

(A)  The term "Cuban Government" includes the government of any political subdivision of Cuba, and any agency or instrumentality of the Government of Cuba.

(B)  For purposes of subparagraph (A), the term "agency or instrumentality of the Government of Cuba" means an agency or instrumentality of a foreign state as defined in section 1603(b) of title 28, United States Code, with each reference in such section to "a foreign State" deemed to be a reference to "Cuba."

22 U.S.C. § 6023(5).

72.     Since August 1, 1996, when Title III of the Helms-Burton Act went into effect, it has been clear that companies doing business with Cuba or in Cuba incurred potential liability under the Helms-Burton Act if they knowingly and intentionally traffic in confiscated property.

73.     Companies doing business in and/or with Cuba have therefore been on notice since August 1, 1996 that they would face potential liability under the Helms-Burton Act for trafficking in confiscated property.

### III.     Remedies Under the Helms-Burton Act's Private Right of Action

74.     A person who "traffics" in a U.S. national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)     the amount which is the greater of —
                    …
        (II) the amount determined [by a court-appointed special master], plus interest; or

        (III) the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A)(i).

75.     Interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).  Interest is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

76.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for plaintiffs' court costs and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

77.     The Act provides for "Increased Liability"

… If the claimant in an action under this subsection… provides, after the end of the 3-month period described in paragraph (1) notice to —

(i)      a person against whom the action is to be initiated, or

(ii)     a person who is to be joined as a defendant in the action,

at least 30 days before initiating the action or joining such person as a defendant, as the case may be, and that person, after the end of the 30-day period beginning on the date the notice is provided, traffics in the confiscated property that is the subject of the action, then that person shall be liable to that claimant for damages computed in accordance with subparagraph (C).

*See* 22 U.S.C. §§ 6082(a)(3)(B) and 22 U.S.C. 6082(a)(3)(C)(ii) (allowing damages "3 times the amount determined applicable under paragraph (1)(A)(i)").

## FACTUAL ALLEGATIONS

### I.      The Confiscated Property

78.     Plaintiffs are U.S. nationals and/or representatives of the Estates of U.S. nationals as defined by 22 U.S.C. § 6023(15)(A), who own claims to the Confiscated Property, which includes a 70-year Concession to develop docks, warehouses and port facilities on Mariel Bay and land holdings.

#### A.      Maritima Mariel SA and the 70-Year Concession

79.     Maritima Mariel SA ("Maritima Mariel") was a Cuban corporation set up in 1954 and owned in equal parts by the Blanco Rosell Siblings, who are among the Plaintiffs in this case: Odette Blanco Rosell; the Estate of Alfredo Blanco Rosell, Jr; the Estate of Byron Blanco Rosell; the Estate of Enrique Blanco Rosell; and the Estate of Florentino Blanco Rosell.

80.     On August 15, 1955, the Cuban Government granted to Maritima Mariel a 70-year Concession:

'Maritima Mariel, SA' is hereby granted the concession to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works, without prejudice to the rights acquired by third persons or entities under previous concessions still in force, for the purposes stated in this paragraph.

Decree 2367 published in the Cuban Official Gazette dated August 15, 1955 at 13864 (English translation).   When the 70-Year Concession was granted to Maritima Mariel, there were no previous concessions in force for the purposes stated in the foregoing quoted paragraph.

81.     The 70-Year Concession also authorized Maritima Mariel to exercise a series of exceptional rights in the Bay of Mariel, including:

a)  The occupation and use, either temporary or permanent, of the lands and waters in the public domain or under private ownership and those of the State, province, or municipality, whenever they are essential for the execution and exploitation of the aforementioned projects and works.

b)  The right of mandatory expropriation, in accordance with Decree No. 595 of May 22, 1907 or any other later provision regarding ownership, possession, or use of any real estate or private property rights for land that must be occupied for the work, uses, and services mentioned in Section One, a procedure that may also be used with regard to any rights granted by the State, province, or municipality with regard to the maritime-land zone or public domain land or property of those entities of the Nation.

c)  The right to impose, on privately owned property, any class of easement for the construction of any type of roads, traffic, access, movement, and parking of vehicles, the establishment of power lines (either overhead or underground), pipes and ducts for water, gas, ventilation, or drainage and, in general, for anything that is inherent or deemed to be necessary for the purposes of carrying out, maintaining, and exploiting the works that the aforementioned paragraph one deals with, also with the power to attend those cases of forced expropriation, as provided for in the preceding subparagraph.

d)  The right to evict any tenants, sharecropper, squatter, or occupant of any other description from any property or facilities that must be occupied, either temporarily or permanently, for the projects referred to repeatedly in Section One, making a payment as compensation to the parties evicted equal to the amount of one year of rent paid in each case.

e)  The right to carry out the aforementioned acts by means of applying the provisions contained in Law-Decree No. 1015 of August 7, 1953 and No. 1998

of January 27, 1955, whereby the National Finance Agency of Cuba will
provide the financing of those projects.

*Id.* at 13865-13866 (English translation).

82.      These exceptional rights granted in the 70-year Concession gave Maritima Mariel
and the Blanco Rosell Siblings priority rights over any other rights in the Bay of Mariel, including
any such rights acquired by third persons or entities under previous concessions still in force at the
time the 70-year Concession was granted to Maritima Mariel. The 70-year Concession granted
Maritima Mariel the right to exclude any other person or entity from planning, studying, executing,
maintaining, or exploiting public docks and warehouses in the Bay of Mariel.

83.      Both Maritima Mariel and the 70-Year Concession are part of the Confiscated
Property and were specifically identified in Resolution 436 as being confiscated from the Blanco
Rosell Siblings by the Cuban Government.

### B.      Central San Ramón, Compañía Azucarera Mariel S.A., and Land

84.      In addition to the 70-year Concession and Maritima Mariel, the Blanco Rosell
Siblings owned several other companies, including the sugar mill then known as the Central San
Ramón, which they purchased in 1949.  Central San Ramón was owned and operated by Compañía
Azucarera Mariel S.A. ("Azucarera Mariel"), a company wholly owned by the Blanco Rosell
Siblings.

85.      The Blanco Rosell Siblings also had extensive land holdings (approximately 11,000
acres) southeast, south and west of Mariel Bay which they owned through Central San Ramón and
Azucarera Mariel.  Those approximately 11,000 acres included numerous improvements such as
roads, railways, buildings, and utilities.

86.     Azucarera Mariel, Central San Ramón and the 11,000 acres of land are part of the Confiscated Property that were specifically named and confiscated from the Blanco Rosell Siblings by the Cuban Government, in Resolution 436.

## II.     Cuba's Confiscation of The Confiscated Property and Plaintiffs' Claims to The Confiscated Property are Publicly Known

### A.     Cuba's Confiscation of The Confiscated Property was Publicly Announced in the Cuba Official Gazette on September 29, 1960

87.     On September 29, 1960, per Resolution 436, the Cuban Government announced the confiscation without compensation of all assets and rights, whatever their nature, then owned by the Blanco Rosell Siblings and which are herein defined as the Confiscated Property.  Such Confiscated Property includes, *inter alia*, Maritima Mariel, the 70-year Concession, Central San Ramón, Azucarera Mariel, as well as all the "all shares or stock certificates representing capital of the entities listed in the [other] Whereas of [Resolution 436]," which included, *inter alia*, the 70-Year Concession and all the lands owned by these entities.  *See* Resolution 436 at 23406.

88.     More specifically, on September 29, 1960, the Cuban Government published Resolution 436 in its Official Gazette on the confiscation without compensation of the following:

One: To confiscate, on behalf of the Cuban State, all of the property and rights, whatever their nature, forming the assets of the persons listed in the first Whereas, with the exception of property and rights that are strictly of a personal nature.

Two: To confiscate, on behalf of the Cuban State, all shares or stock certificates representing capital of the entities listed in the [other] Whereas of this resolution, along with all of their properties, rights, and shares that are issued and in circulation.

Three: To order the transfer of the properties, rights, and shares forming the assets of the legal entities listed in the preceding provision to the National Institute for Agrarian Reform (I.N.R.A.).

Four: This resolution to be published in the OFFICIAL GAZETTE of the Republic for purposes of notification and fulfillment of what is provided for by Law No. 715 of 1960.

Resolution No. 436(1) published in the Cuban Official Gazette dated September 29, 1960 at 23406 (English translation).

89.     In addition to expressly naming the 70-year Concession and the above-referenced legal entities, Resolution 436 also expressly named the five Blanco Rosell Siblings as owners of, *inter alia*, the 70-year Concession, Maritima Mariel, Central San Ramon, and Compania Azucarera Mariel.

90.     But for Cuba's confiscation in Resolution 436 published in the official Cuban Gazette on September 29, 1960, the 70-year Concession granted in Decree 2367 issued in 1955 would still be in force.  In any event, the 70-year Concession was cut short by Cuba's confiscation of the 70-year Concession.

91.     According to the Cuban Official Gazette as published on September 29, 1960, the confiscation of the Confiscated Property occurred on August 19, 1960. The story of the confiscation by the Cuban Government was reported by the Revolución newspaper on September 8, 1960.  Both the Cuban Official Gazette and the newspaper Revolución (now known as Granma following the merger of the Revolución and Hoy newspapers) are available to the public.

**B.     Plaintiffs' Claims to the Confiscated Property have Received Wide-Spread Media Coverage since 2019**

92.     The fact of the confiscation of the Blanco Rosell Siblings' property in Cuba was so well known that, on April 18, 2019, the day after the Trump Administration announced that it would allow Helms-Burton Act lawsuits under Title III to go forward, stories published on both Radio Marti and TV Marti identified Plaintiffs' claims to the Mariel Special Development Zone:

The Mariel Special Development Zone, the star Cuban project to attract investment, was built on nationalized land where the Carranza-Bernal, Carbonell-González and Blanco-Rosell families owned sugar and hemp processing plants.[13]

93.     Since December 20, 2020, Plaintiffs have sued two major U.S. container cargo shipping companies and the world's largest container cargo shipping company for trafficking in the Confiscated Property, the claims to which are owned by Plaintiffs.[14]

94.     Plaintiffs' lawsuits and Plaintiffs' claims to the Confiscated Property have received U.S. and international news coverage, including shipping company media news coverage, for example:

a.      On December 24, 2020, World News Today published a detailed story about Plaintiffs' first two lawsuits, wherein Plaintiffs' claims were discussed in detail.[15]

b.      On December 25, 2020, On Cuba News published a story titled "Two other lawsuits under Helms-Burton Act set sights on Port of Mariel."[16]

---

[13]   https://www.radiotelevisionmarti.com/a/propiedades-que-ya-podr%C3%ADan-reclamar-en-tribunales-de-eeuu/236777.html/ (last visited July 22, 2021).

[14]   *Odette Blanco de Fernandez, et al., v. Seaboard Marine, Ltd.*, Case 1:20-cv-25176-BB (S.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez, et al., v. Seaboard Corporation*, 1:21-cv-01052 (D. Del.); *Odette Blanco de Fernandez v. Crowley Maritime Corporation*, Case 3:20-cv-01426-BJD-PDB (M.D. Fla., Dec. 20, 2020); *Odette Blanco de Fernandez, et al., v. Crowley Maritime Corporation et al.,* Case 1:21-cv-20443 (S.D. Fla., Feb. 2, 2021); *Odette Blanco de Fernandez, et al. v. A.P. Moller-Maersk A/S et al.*, Case 2:21-cv-00339 (E.D. La., Feb. 17, 2021).

[15]   https://www.world-today-news.com/florida-companies-sued-for-doing-business-on-land-confiscated-by-cuban-regime/ (last visited on July 28, 2021).

[16]   https://oncubanews.com/en/cuba-usa/two-other-lawsuits-under-helms-burton-act-set-sights-on-port-of-mariel/ (last visited on July 21, 2021).

c.    On February 24, 2021, TradeWinds, the self-described "Global Shipping News Source ran an article titled "US-Cuba lawsuits show no signs of slowing down as Maersk sued."[17]

d.    The U.S. - Cuba Trade and Economic Council, Inc. publishes a widely-disseminated blog which reports each and every Helms-Burton lawsuit filing including Plaintiffs' pending lawsuits.[18]

95.    The Confiscated Property has never been returned nor has adequate and effective compensation ever been provided, including for the 70-Year Concession or any other property interests belonging to Plaintiffs.  Nor have the claims to the Confiscated Property been settled pursuant to an international claims settlement agreement or other settlement procedure.

96.    Plaintiffs never abandoned their claims to the Confiscated Property.

**III.    The Cuban Government Incorporated the Confiscated Property into The Zona   Especial de Desarrollo Mariel ("ZEDM") (a/k/a Mariel Special Economic Zone)**

97.    The Zona Especial de Desarrollo Mariel ("ZEDM") (*a/k/a* Mariel Special Economic Zone) is an agency or instrumentality of the Cuban Government.   Created by statute, the ZEDM is a special economic zone in Cuba with its own legal structure.

---

[17] US-Cuba lawsuits show no signs of slowing down as Maersk sued | TradeWinds (tradewindsnews.com) (last visited July 21, 2021).

[18] https://www.cubatrade.org/blog/2020/12/23/agdh6liz2sexx0emhpw0nrqaphmbnr Seaboard Marine Is 31st Libertad Act Lawsuit- Plaintiff Targets Mariel Special Economic Zone Operations (last visited on July 21, 2021).

https://www.cubatrade.org/blog/2020/12/23/5ms3f5lr8xytqozz63dfr176qxose9    (Crowley    Maritime Corporation Is 32nd Libertad Act Lawsuit- Plaintiffs Target Use Of ZEDM Port) (last visited on July 21, 2021).

https://www.cubatrade.org/blog/2021/2/18/maersk-worlds-largest-container-shipping-company-is-third-to-be-defendant-in-libertad-act-lawsuit (last visited on July 21, 2021).

98.     As stated above, the ZEDM has been referred to in the media as "the star Cuban project to attract investment."

99.     Cuba incorporated the Confiscated Property into the ZEDM without the authorization of Plaintiffs and therefore the ZEDM traffics in the Confiscated Property.

100.    Starting in or around 2009, the Government of Cuba and various non-Cuban corporate partners rebuilt the Port of Mariel and constructed a Container Terminal in the ZEDM.

101.    The ZEDM's Container Terminal subsumes the 70-year Concession rights, pursuant to which the Blanco Rosell Siblings possessed the right, among other things, "to plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio, and the construction of new buildings and works…"  *See* Decree 2367 at 13865.

102.    The Blanco Rosell Siblings' extensive land holdings on the southeast, south and west sides of Mariel Bay, all of which are part of the Confiscated Property, cover virtually every square meter of ZEDM sector A5, which the ZEDM operates as a logistics zone.

103.    The 70-year Concession encompasses all of Mariel Bay, including, but not limited to ZEDM Sector A5, where AUSA's container storage yard is located, and Sector A7, where the ZEDM's Container Terminal is located. CEVA Logistics (also known in Cuba as CMA CGM LOG), a subsidiary of CMA CGM has an agreement with AUSA to develop and operate a logistics platform (known as CARILOG) on the Port of Mariel in sector A5.

104.    CEVA Logistics (also known in Cuba as CMA CGM LOG) has planned and is operating a commercial, for profit, logistics platform (known as CARILOG) in ZEDM Sector A5. CMA CGM profits from CEVA Logistics' planning, development and operation of the logistics platform on the Port of Mariel in ZEDM Sector A5 by and through CEVA Logistics, because

CEVA Logistics is CMA CGM's subsidiary and because CMA CGM carries containers to the Port

of Mariel where they are offloaded and stored at the CEVA Logistics facility in ZEDM Sector A5.

105.    The following map illustrates that ZEDM Sector A5 where AUSA and CEVA

Logistics' (also known in Cuba as CMA CGM LOG) facilities are located, as well as ZEDM Sector

A7 which encompasses the shoreline of Mariel Bay and land adjacent to the shoreline, areas that

are subject to the 70-Year Concession:



106.    The ZEDM, Container Terminal, AUSA, and CEVA Logistics (also known in Cuba

as CMA CGM LOG) are trafficking in the Blanco Rosell Siblings' Confiscated Property within

the meaning of Title III because the ZEDM:

(i)      … transfers, distributes, dispenses, brokers, manages, or … leases,
         receives, possesses, obtains control of, manages, uses, or otherwise
         acquires or holds an interest in [the Confiscated Property];

(ii)     engages in a commercial activity using or otherwise benefitting
         from [the Confiscated Property],

(iii)  causes, directs, participates in, or profits from trafficking (as described clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii) through another person

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

107.   Those who "plan, study, execute, maintain and exploit public docks and warehouses in Mariel Bay, Pinar del Rio Province, and the construction of new buildings and works" (Decree 2367 at 13865) are trafficking in Plaintiffs' Confiscated Property, including the 70-year Concession.

108.   CMA CGM, as a result of its agreement signed in Cuba, by and through CEVA Logistics (also known in Cuba as CMA CGM LOG) has planned, studied, executed, and now maintains and exploits public docks and warehouses in Mariel Bay, Pinar del Rio Province, and has also constructed new buildings and works in Sector A5 of the ZEDM where it occupies, utilizes and exploits land that was confiscated by Cuba from the Blanco Rosell Siblings.  CMA CGM also profits from trafficking by CEVA Logistics in Mariel Bay.

**IV.    Defendants are Trafficking in the Confiscated Property Without Plaintiffs' Authorization**

    **A.    Defendant Traffics in the Confiscated Property by Operating Vessels that Call at the Port of Mariel Without Plaintiffs' Authorization**

109.   Since the opening of the Port of Mariel more than six years ago, Defendant has trafficked in the Confiscated Property, by knowingly and intentionally directing container ships to call at the Container Terminal—which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel in Cuba—either directly or by causing, directing, participating in, or profiting from trafficking by or through one or more other persons.

110.    "Calling" at a port in the container shipping industry means that containers are either offloaded or loaded at a Port of Call. See https://www.marineinsight.com/life-at-sea/what-does-the-term-port-of-call-means/ (last visited July 21, 2021).  While calling at the Port of Mariel, Defendant's ships dock and utilize wharf space, offload and/or load containers, hook up to water and electricity, utilize crane service, container storage yards, warehouses and other storage space to store the containers, as well as road, rail and wheeled means of conveyance for the containers it unloads.  CMA CGM contracts for and pays for these and other services at the Port of Mariel with the TCM, AUSA, the ZEDM and/or CEVA Logistics.

111.    According to the International Marine Organization ("IMO"), a specialized agency of the United Nations responsible for regulating shipping, the vessel CONTSHIP PRO, (IMO # 9235622), while being operated by CMA CGM called at the Port of Mariel on multiple occasions between May 2019 and June 2021.

112.    According to the IMO, the vessel CMA CGM VENTANIA, (IMO # 9376907), while being operated by CMA CGM called at the Port of Mariel on multiple occasions between January 2020 and June 2021.

113.    According to the IMO, the vessel CONTSHIP RAY, (IMO # 9388338), while being operated by CMA CGM called at the Port of Mariel on multiple occasions between August 2019 and January 2020.

114.    According to IMO, the vessel JPO ARIES, (IMO # 9220328), operated by CMA CGM, called at the Port of Mariel on multiple occasions between February 2019 and April 2020.

115.    According to IMO, the vessel PAVO J, (IMO # 9355458),  operated by CMA CGM, called at the Port of Mariel on multiple occasions between May 2019 and July 2020.

116.     According to IMO, the vessel IMEDGHASSEN, (IMO # 9459125), operated by CMA GGM called at the Port of Mariel in December 2020.

117.     Defendant further traffics in the Confiscated Property by serving as the carrier for several cargo shipments from U.S. Ports to the Port of Mariel.

118.     More specifically, Bills of Lading ("BOL") on file U.S. Customs and Border Protection, show that as of July 2, 2021, Defendant, beginning in 2014, has served as the carrier for 602 cargo shipments from various U.S. Ports to the Port of Mariel, the final destination declared.

119.     For example, according to the BOLs, CMA CGM was the carrier for the following cargo shipments from PortMiami in Miami-Dade County, Florida to the Port of Mariel, the final destination declared:

(a)     Bill of Lading No. CMDUNAM4470122, June 3, 2021

(b)     Bill of Lading No. CMDUNAM4384619, April 2, 2021

(c)     Bill of Lading No. CMDUNAM3935482, June 26, 2020

(d)     Bill of Lading No. CMDUNAM3657740, October 4, 2019

(b)     Bill of Lading No. CMDUNAM3636383, September 21, 2019

(c)     Bill of Lading No. CMDUNAM3458515, April 5, 2019

(d)     Bill of Lading No. CMDUNAM3415838, February 24, 2019

(e)     Bill of Lading No. CMDUNAM3288188, November 10, 2018

(f)     Bill of Lading No. CMDUNAM3278386, October 17, 2018

(g)     Bill of Lading No. CMDUNAM2935211, December 9, 2017

(h)     Bill of Lading No. CMDUNAM2922397, November 18, 2017

(i)     Bill of Lading No. CMDUNAM2874180, October 7, 2017

      (j)      Bill of Lading No. CMDUNAM2843196, September 17, 2017

Non-party Double Ace is listed as the "Exporter" for the aforementioned cargo shipments.

120.    Defendant CMA CGM carried the aforementioned containerized cargo from Miami-Dade County, Florida to the Port of Mariel in Cuba, the final destination declared *via* Kingston, Jamaica, where the cargo was then offloaded at the TCM and stored/warehoused/maintained by AUSA and/or CEVA Logistics in the ZEDM. *See e.g., supra,* ¶¶ 35 – 36.  CMA CGM America "signed [the Bills of Lading] for the Carrier CMA CGM SA … as agent for the Carrier." *Id.*  As one example, on June 26, 2020, CMA CGM America signed Bill of Lading No. CMDUNAM3935482 for a shipment loaded in Miami-Dade County, Florida destined for the Port of Mariel in Cuba.

121.    More specifically, Defendant CMA CGM carried the containers carrying the cargo identified in the above-referenced bills of lading from PortMiami to Kingston, Jamaica, where the containers were offloaded and then then loaded onto other ships that were owned or operated by Defendant on Defendant's "Indigo Service" route.  After Kingston, Defendant's Indigo Service calls at the Port of Mariel where the containers containing cargo identified in the above-referenced bills of lading cargo were off-loaded.[19]

122.    In essence, the cargo that Defendant carries is loaded onto ships at PortMiami in Miami-Dade County, Florida and then Defendant carries the cargo from PortMiami to the Port of Mariel utilizing a "bank shot" off of Kingston, Jamaica.

---

[19] Defendant's Indigo Service begins in Progreso, Mexico, and then includes the following Ports of Call: Santiago de Cuba, in southern Cuba, then to Kingston, Jamaica, then to the Port of Mariel, and back to Progreso.  This route runs roughly every week to 10 days and uses two ships: the CMA CGM VENTANIA and the CONTSHIP PRO, both of which are operated by CMA CGM.

123.    Defendant purposefully and repeatedly directed the CMA CGM VENTANIA, CONTSHIP PRO, CONTSHIP RAY, IMEDGHASSEN, JPO ARIES AND PAVO J to call at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, where each of them, for themselves and on behalf of and/or at the direction of Defendant, called at the Container Terminal (which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel) and while there engaged in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM including, but not limited to, offloading and loading containers, thereby using or otherwise benefiting from the Confiscated Property which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

124.    Defendant knowingly and intentionally directed the CMA CGM VENTANIA, CONTSHIP PRO, CONTSHIP RAY, IMEDGHASSEN, JPO ARIES AND PAVO J to call at the Port of Mariel to engage in commercially beneficial transactions and other commercial activities—including, but not limited to, calling at the Container Terminal, which is part of the Port of Mariel within the ZEDM and within the Bay of Mariel, and offloading and loading containers at the Container Terminal multiple times.

125.    As a result of the calls at the Port of Mariel by the CMA CGM VENTANIA, CONTSHIP PRO, CONTSHIP RAY, IMEDGHASSEN, JPO ARIES AND PAVO J, Defendant, caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

126.    When at the Port of Mariel, the container ships call at and/or otherwise use, benefit, and profit from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Containers from Defendant's ships are offloaded at the Container

Terminal in ZEDM Sector 7 and stored in the container storage yard operated by AUSA and/or CEVA Logistics in ZEDM Sector A5. Defendant also engages in commercially beneficial activities and arrangements using or otherwise benefitting from the Plaintiffs' Confiscated Property and acts of trafficking by the Container Terminal, AUSA and the ZEDM which make Defendant's container business at the Port of Mariel possible and profitable.

**B.    Defendant Traffics in the Confiscated Property By and Through Defendant's Subsidiary, CMA CGM LOG's (now CEVA Logistics) Operation of a Logistics Platform in the Port of Mariel Without Plaintiffs' Authorization**

127.    In 2015, CMA CGM signed an agreement with the Cuban government to operate a logistics platform in the Port of Mariel.

128.    As announced on Defendant's website:

> The CMA CGM Group is pleased to announce that Rodolphe Saadé, CMA CGM Group's Vice-Chairman, signed in Cuba in the presence of President François Hollande and of Mr Matthias Fekl the French Minister of State for Foreign Trade, on May 11th, an unprecedented agreement. This agreement covers the operation and development of a logistics platform on the port of MARIEL, in cooperation with the major Cuban logistics company: AUSA.

> CMA CGM LOG [now CEVA Logistics, but still known in Cuba as CMA CGM LOG],[20] the CMA CGM Group's subsidiary dedicated to logistics, will contribute to the operations of this new area.

> The platform will be part of MARIEL ZEDM – Zona Especial de Desarrollo Mariel, Cuba Special Economic Zone project. ZEDM is a strategic 4,600 ha logistics and industrial project area for Cuba. This agreement is symbolic regarding Cuba's goods and services development.

> CMA CGM LOG [now CEVA Logistics, but still known in Cuba as CMA CGM LOG] will operate a 17 ha logistics platform with AUSA, including:

> • 12,000 square meters warehouses

> • 5,000 cubic meters of reefer warehouses

> CMA CGM LOG [now CEVA Logistics, but still known in Cuba as CMA CGM LOG] will be in charge of:

---

[20] CMA CGM LOG became part of CEVA Logistics in 2019 after CMA CGM completed a corporate takeover of CEVA. *See*: https://www.cevalogistics.com/en/who-we-are/about-ceva-logistics/our-history (last visited on July 22, 2021). The name CMA CGM LOG is still used in Cuba.

- the goods unbundling and distribution on the island
- the exports consolidation
- the import and export goods warehousing
- containers distribution
- empty and full containers storage.

CMA CGM has been present in Cuba since 2000 and is one of the only three shipping companies to call the country. It is the first international company to sign such a logistics development agreement in Cuba.

Created in 2001, CMA CGM LOG [now CEVA Logistics, but still known in Cuba as CMA CGM LOG] is the CMA CGM Group's subsidiary specialized in freight forwarding and logistics solutions. Its 1,000 experts offer logistics solutions that are complementary to maritime services in 36 countries, including air freight, multimodal transport, custom clearance, warehousing and distribution… After a sustained growth in 2014 and the opening of offices in 6 new countries, CMA CGM LOG [now CEVA Logistics, but still known in Cuba as CMA CGM LOG] accelerates its development in 2015.

129. CMA CGM's Mariel deal put CMA CGM in business with a firm that has been identified by U.S. authorities as subverting international trade restrictions. AUSA is a subsidiary of Grupo de Administración Empresarial SA (or GAESA), an umbrella group controlled by the Cuban military.[21] In December 2020, the U.S. Treasury Department added GAESA to its "Specially Designated Nationals and Blocked Persons" list, barring American individuals and companies from doing business with the company.  The GAESA conglomerate plays a vital role in the island's economy and is an agency or instrumentality of the Cuban government.  GAESA is headed by Gen. Luis Alberto Rodriguez Lopez Calleja, who was married to one of Raul Castro's daughters.

130. The logistics platform known as CARILOG remains operational.

131. Defendants' subsidiary CEVA Logistics [known in Cuba as CMA CGM LOG] provided (and continues to provide) logistics services at the Port of Mariel within the ZEDM and

---

[21] Business filing database and https://diplomatictimes.net/2020/12/21/u-s-blacklists-cuba-military-owned-companies-gaesa-fincimex-kave-coffee-s-a/ (last visited on July 22, 2021).

within the Bay of Mariel, where it for itself and on behalf of and/or at the direction of Defendant engages in commercially beneficial transactions and other commercial activities with the Container Terminal, AUSA, and/or the ZEDM including, but not limited to providing logistics services, thereby using or otherwise benefiting from the Confiscated Property which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(ii).

132.    Defendant knowingly and intentionally directed its subsidiary CEVA Logistics to engage in commercially beneficial transactions and other commercial activities at the Port of Mariel—including, but not limited to, providing logistics services at the Port of Mariel within the ZEDM and within the Bay of Mariel, whereby Defendant, caused, directed, participated in, or profited from trafficking by another person, or otherwise engaged in trafficking through another person without the authorization of Plaintiffs which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

133.    CMA CGM, by and through CEVA Logistics [known in Cuba as CMA CGM LOG], has planned, studied, executed, and now maintains and exploits public docks and warehouses in Mariel Bay, Pinar del Rio Province, and has also constructed new buildings and works in Sector A5 of the ZEDM where it occupies, utilizes and exploits land that was confiscated by Cuba from the Blanco Rosell Siblings, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

134.    CMA CGM, by and through CEVA Logistics, has profited from trafficking by CEVA Logistics because CEVA Logistics planned, studied, executed, and now maintains and exploits public docks and warehouses in Mariel Bay, Pinar del Rio Province, and has also constructed new buildings and works in Sector A5 of the ZEDM where it occupies, utilizes and

exploits land that was confiscated by Cuba from the Blanco Rosell Siblings, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

135.     In addition, CMA CGM, by and through its subsidiary CEVA Logistic profits from CEVA Logistics' commercial, for profit operation of the logistics platform on the Port of Mariel in ZEDM Sector A5 because CMA CGM carries containers to the Port of Mariel where they are offloaded and stored at the CEVA Logistics facility in ZEDM Sector A5, which constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A)(iii).

136.     In sum, and as the facts demonstrate in Paragraphs 97 – 135, *supra*, CMA CGM and CMA CGM America traffic in the Confiscated Property because:

(a)     TCM, AUSA, ZEDM, CEVA Logistics (known in Cuba as CMA CGM LOG], and CARILOG all use an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(b)     TCM, AUSA, and ZEDM all manage, distribute, dispense, broker, possess, have obtained control of or otherwise have acquired an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(c)     TCM, CEVA Logistics (known in Cuba as CMA CGM LOG), and CARILOG all lease or have otherwise acquired or hold an interest in the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(i);

(d)     CMA CGM, CMA CGM America, CEVA Logistics (known in Cuba as CMA CGM LOG) and CARILOG all engage in business activities using or otherwise benefitting from the Confiscated Property pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(e)     CMA CGM, CMA CGM America, CEVA Logistics (known in Cuba as CMA CGM LOG) and CARILOG all engage in business activities with TCM, AUSA,

ZEDM and each other for the purpose of making money which they could not otherwise do if there were not ports, docks, and warehouses that had not been planned, studied, developed, built, maintained, and available to be used and exploited in the Bay of Mariel pursuant to 22 U.S.C. § 6023(13)(A)(ii);

(f)     CMA CGM and CMA CGM America profit from trafficking by TCM, AUSA, ZEDM, CEVA Logistics (known in Cuba as CMA CGM LOG), and CARILOG as described in (a) through (e) of this paragraph pursuant to 22 U.S.C. § 6023(13)(A)(iii);

(g)     CMA CGM and CMA CGM America profit from trafficking through CEVA Logistics (known in Cuba as CMA CGM LOG), and CARILOG as described in (a) through (e) of this paragraph 22 U.S.C. § 6023(13)(A)(iii);

(h)     CMA CGM and CMA CGM America cause, direct and/or participate in trafficking by CEVA Logistics (known in Cuba as CMA CGM LOG), and CARILOG as described in (a) through (e) of this paragraph 22 U.S.C. § 6023(13)(A)(iii);

(i)     CMA CGM and CMA CGM America cause, direct, participate in and/or engage in trafficking through CEVA Logistics (known in Cuba as CMA CGM LOG), and CARILOG as described in (a) through (e) of this paragraph 22 U.S.C. § 6023(13)(A)(iii);

(j)     All of the above (a) through (i) are done without the authorization of Plaintiffs.

**V.     Plaintiffs Notified Defendants that Defendants are Trafficking in the Confiscated Property, the Claims to Which are Owned by Plaintiffs**

137.     On September 17, 2020, Plaintiffs, through counsel, sent Defendants letters pursuant to 22 U.S.C. § 6082(a)(3)(D) ("CMA CGM Notice Letters") notifying Defendants that they are trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which

are owned by Plaintiffs, without the authorization of Plaintiffs.   The CMA CGM Notice Letters were delivered to Defendants.

138.    On November 16, 2020, Plaintiffs, through counsel, sent CEVA Logistics a letter pursuant to 22 U.S.C. § 6082(a)(3)(D) ("CEVA Notice Letter") notifying CEVA Logistics that it is trafficking in confiscated property as defined in the Helms-Burton Act, the claims to which are owned by Plaintiffs, without the authorization of Plaintiffs.   The CEVA Notice Letter was delivered to CEVA Logistics.

139.    Defendants' trafficking has continued since receipt of the Notice letters.

140.    According to the IMO, the vessel CONTSHIP PRO, (IMO # 9235622), while being operated by CMA CGM called at the Port of Mariel on multiple occasions between October 2020 and June 2021.

141.    According to IMO, the vessel CMA CGM VENTANIA, (IMO # 9376907), operated by CMA CGM, called at the Port of Mariel on multiple occasions between January 2021 and June 2021.

142.    According to IMO, the vessel IMEDGHASSEN, (IMO # 9459125), operated by CMA CGM, called at the Port of Mariel in December 2020.

143.    CMA CGM continues to traffic by and through its subsidiary CEVA Logistics [known in Cuba as CMA CGM LOG], which continues its operation of the logistics zone at the Port of Mariel today, well after receipt of the Notice Letters.

144.    CMA CGM America continues to traffic by carrying cargo from PortMiami to the Port of Mariel.

145.    Because Defendants did not obtain the authorization of Plaintiffs with regard to these acts of trafficking, Plaintiffs were injured by Defendants' acts of trafficking in the Confiscated Property to which Plaintiffs own claims.

146.    Plaintiffs have been injured by Defendants' unauthorized acts of trafficking in the confiscated property to which Plaintiffs own claims because, *inter alia*:

(a)     Defendants are profiting without obtaining consent from or paying adequate compensation to Plaintiffs;

(b)     Plaintiffs are not receiving the benefit of their interests in the Confiscated Property;

(c)     Defendants are profiting without obtaining authorization or paying adequate compensation to Plaintiffs for authorization to traffic in the confiscated property;

(d)     Defendants are profiting or otherwise benefiting from trafficking in the Confiscated Property by or through others without obtaining authorization from, or paying adequate compensation to, Plaintiffs;

(e)     Defendants' trafficking in the Confiscated Property has undermined Plaintiffs' rights to compensation for the Confiscated Property;

(f)     Defendants have profited from its use of the Confiscated Property at Plaintiffs' expense;

(g)     Defendants have denied Plaintiffs the ability to obtain economic rent that could have been negotiated for in exchange for their authorization to Defendants to traffic in the Confiscated Property;

(h)     Defendants have appropriated from Plaintiffs the leverage from the Helms-Burton Act that Plaintiffs would have had on the Cuban Government to negotiate compensation for their Confiscated Property;

(i)     Defendants have injured Plaintiffs by trafficking in the Confiscated Property without Plaintiffs' authorization and without making any payment of compensation to Plaintiffs because in the Helms-Burton Act, Congress provided the rightful owners of confiscated property with the right to be compensated from defendants who have economically exploited the confiscated property;

(j)     Defendants have injured Plaintiffs by trafficking in the particularized Confiscated Property to which Plaintiffs own claims without seeking or obtaining Plaintiffs' authorization to traffic in that particularized Confiscated Property and as a result Defendants' failure to do so has resulted in concrete and particularized monetary harm and injury to Plaintiffs; and

(k)     The harms and injuries suffered by Plaintiffs as a result of Defendants' failure to obtain Plaintiffs' authorization to traffic in the Confiscated Property have a close relationship to traditionally recognized common-law actions for unjust enrichment, trespass, trespass to chattels, and conversion.

**CLAIM FOR DAMAGES**
**TITLE III OF THE HELMS-BURTON ACT**

147.    Plaintiffs incorporate by reference all of the foregoing Paragraphs as if fully set forth herein.

148.    This case is brought pursuant to Title III of the Helms-Burton Act, 22 U.S.C. § 6082.

149.     Defendants did traffic, as the term "traffic" is defined in 22 U.S.C. § 6023(13)(A), in the Confiscated Property without authorization of Plaintiffs who own claims to the Confiscated Property.  Defendants are therefore liable to Plaintiffs under the Helms-Burton Act.

150.     Defendants have trafficked in the Confiscated Property, by knowingly and intentionally directing container ships to call at the Port of Mariel in Cuba, either directly or by causing, directing, participating in, or profiting from trafficking by or through another person. When in the Port of Mariel, the container ships call at and/or otherwise use, benefit, and profit from the Container Terminal in the ZEDM including the ZEDM's ports, docks, warehouses, and facilities.  Defendants also engage in commercially beneficial activities using or otherwise benefitting from the ZEDM and Plaintiffs' Confiscated Property.

151.     Defendants are therefore trafficking in Plaintiffs' Confiscated Property and benefit or profit from the trafficking of the Container Terminal, AUSA, and the ZEDM in Plaintiffs' Confiscated Property.

152.     Defendants also knowingly and intentionally participated in, benefitted from, and profited from the Container Terminal, AUSA, and the ZEDM's trafficking in the Confiscated Property including, but not limited to, the 70-year Concession, without the authorization of Plaintiffs.

153.     Defendants engage in commercially beneficial activities using or otherwise benefitting from the Confiscated Property, including, but not limited to, the 70-year Concession.

154.     Defendants also cause, direct, participate in, or profit from trafficking by the Container Terminal, AUSA, and the ZEDM in the Confiscated Property, including the 70-year Concession.

155.    Defendants have had actual knowledge of Plaintiffs' claims to the Confiscated Property since at least September 2020 due to Plaintiffs' Notice Letters mentioned above in Paragraphs 137 – 139, 143.

156.    Prior to Defendants' receipt of Plaintiffs' Notice Letters, Defendants knew or had reason to know that Plaintiffs own claims to the Confiscated Property.

157.    Prior to Defendants' receipt of Plaintiffs' Notice Letters, Defendants knew or had reason to know that the ZEDM was trafficking in the Confiscated Property.

158.    Defendants' continued trafficking in the Confiscated Property, including in the 70-year Concession, more than 30 days after its receipt of Plaintiffs' Notice Letters subjects Defendants to treble damages.  22 U.S.C. § 6082(a)(3).

159.    The Container Terminal, AUSA, and the ZEDM did not ever seek or obtain Plaintiffs' authorization to traffic in the Confiscated Property, including the 70-year Concession, the land, or any other Confiscated Property at any time.

160.    The Container Terminal, AUSA, and the ZEDM's knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined 22 U.S.C. § 6023(13).

161.    Defendants did not seek nor obtain Plaintiffs' authorization to traffic in the Confiscated Property, including in the 70-Year Concession or any other property interests at any time.

162.    Defendants' knowing and intentional conduct with regard to the Confiscated Property constitutes trafficking as defined in 22 U.S.C. § 6023(13).

163.    As a result of Defendants' trafficking in the Confiscated Property, Plaintiffs have been injured, as explained herein, including in Paragraph 146, *supra*.  Defendants are liable to

Plaintiffs for all money damages allowable under 22 U.S.C. § 6082(a) including, but not limited to, those equal to:

    a.    The amount which is the greater of: … (i) the amount determined by a special master pursuant to 22 U.S.C. § 6083(a)(2); or (ii) the current "fair market value" of the Confiscated Property, or the original fair market value of the Confiscated Property plus pre-filing interest;

    b.    Three times the amount determined above (treble damages);

    c.    Prejudgment interest; and

    d.    Court costs and reasonable attorneys' fees, and expenses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.    Awarding damages as allowed by law including treble damages and pre-filing interest as provided by the Act;

B.    Awarding  prejudgment interest as allowed by law on any amounts awarded;

C.    Awarding attorneys' fees, costs, and expenses; and

D.    Awarding such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable, and a trial pursuant to Rule 39(c), Federal Rules of Civil Procedure, as to all matters not triable as of right by a jury.

Dated:  July 30, 2021

Respectfully submitted,

David A. Baron (*pro hac vice* motion forthcoming)
dbaron@bcr-dc.com
Melvin White (*pro hac vice* motion forthcoming)
mwhite@bcr-dc.com
Laina C. Lopez (*pro hac vice* motion forthcoming)
lcl@bcr-dc.com

*s/ David J. Horr*
David J. Horr
Florida Bar. No. 310761
dhorr@admiral-law.com
William R. Boeringer
Florida Bar No. 347191
wboeringer@admiral-law.com
William B. Milliken
Florida Bar No. 143193

Berliner Corcoran & Rowe LLP
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Tel:  (202) 293-5555
Facsimile:  (202) 293-9035

Richard W. Fields (*pro hac vice* motion
forthcoming)
fields@fieldslawpllc.com
Martin Cunniff (*pro hac vice* motion
forthcoming)
MartinCunniff@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006
Tel:  (833) 382-9816

*Counsel for Plaintiffs*

wmilliken@admiral-law.com
Horr, Novak & Skipp, P.A.
Two Datran Center, Suite 1700
9130 S. Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 670-2525
Facsimile: (305) 670-2526

John S. Gaebe
Florida Bar No. 304824
Law Offices of John S. Gaebe P.A.
5870 SW 96 St.
Miami, Florida  33156
johngaebe@gaebelaw.com

*Counsel for Plaintiffs*