UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-CV-22778-COOKE/DAMIAN

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL, *et al.*,

      Plaintiffs,

v.

CMA CGM S.A. (a/k/a CMA CGM
THE FRENCH LINE, a/k/a CMA CGM
GROUP) and CMA CGM
(AMERICA) LLC,

      Defendants.

_____/

**ORDER ON**
**DEFENDANTS' MOTION TO STAY PROCEEDINGS**
**PENDING INTERNATIONAL REQUEST**

THIS CAUSE is before the Court on Defendant, CMA CGM (AMERICA) LLC's ("CMA America" or "Defendant"), Motion to Stay Proceedings Pending International Request, filed September 20, 2021 [ECF No. 32] (the "Motion to Stay"). This Motion was referred to the undersigned by the Honorable Marcia G. Cooke, United States District Judge, for appropriate resolution [ECF No. 47]. *See* 28 U.S.C. § 636(b)(1)(A).

The undersigned has reviewed the Motion, the Response and Reply thereto, the Notice of Joinder, the pertinent portions of the record, and the relevant legal authorities, and heard from the parties who appeared, through counsel, before the undersigned on June 16, 2022. As discussed below, Plaintiffs, Cuban exiles and their estates and heirs, sued Defendants, related French and American entities engaged in international shipping, for claims arising under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, known as the

Helms-Burton Act (22 U.S.C. § 6021, *et seq*.). Defendants seek a stay of these proceedings based on European Union and French Blocking Statutes. Defendants claim these blocking statutes prohibit the French entity from participating in these proceedings, and they claim it would be unfair and a waste of judicial resources to leave the American entity to defend itself without its French co-Defendant.

Plaintiffs have also requested that this Court compel Defendants to comply with the Court's procedural orders because the stay has not been granted, and, therefore, the parties are bound to comply but have not yet done so in light of the pending Motion to Stay. [ECF No. 42]. This Court addresses Plaintiff's motion by separate order.

For the reasons set forth below, the Court denies Defendants' Motion to Stay.

## I.      RELEVANT BACKGROUND AND FACTS

Plaintiffs' Complaint and the parties' pending motions set out lengthy and detailed facts regarding the merits of the underlying claims. The facts and background set forth below are limited to those relevant to the determination of the Motion now before the Court.

### A.  The Plaintiffs

Plaintiffs are fourteen individuals asserting claims on their own behalf, in their individual capacities, and in representative capacities as personal representatives and administrators of estates of decedents (collectively referred to as "Plaintiffs"). *See* Complaint [ECF No. 1]. One Plaintiff, Odette Blanco De Fernandez, is asserting claims individually on her own behalf (referred to herein as "Plaintiff De Fernandez"). The remaining thirteen Plaintiffs are asserting claims based on their representative capacities on behalf of Plaintiff De Fernandez's four siblings, all of whom are deceased (Ms. De Fernandez and her siblings are collectively referred to herein as the "Blanco Rosell Siblings").

2

According to the allegations in the Complaint, in 1960, the Cuban Government seized, without compensation, property and rights related to property which the Plaintiffs claim belonged to the Blanco Rosell Siblings. *See* Compl. at ¶¶ 2-4. After the seizure of their property in 1960, the Blanco Rosell Siblings all eventually fled from Cuba to the United States and became United States citizens. *See* Compl. at ¶ 5. All became United States Citizens prior to March 12, 1996, the effective date of the Helms-Burton Act. *Id*. With the exception of Plaintiff De Fernandez, all of the Blanco Rosell Siblings passed away after becoming United States citizens and prior to the filing of the Complaint in this case.

### 2. The Defendants

Defendant CMA CGM S.A. ("CMA CGM") is a French entity, a Société Anonyme, organized under French Law. CMA CGM is an international marine transportation company and, according to the Complaint, one of the world's leading container carriers. Compl. at ¶ 26. Plaintiffs allege Defendant CMA CGM, through subsidiaries and affiliates, calls at the Terminal de Contenedores del Mariel, which is part of the Port of Mariel in the Bay of Mariel, and has engaged in commercially beneficial transactions at the Port of Mariel and surrounding areas from which it has profited. *See id*. at 8-10, 33-42.

Defendant CMA CGM (AMERICA) LLC ("CMA America") is a United States entity organized in New Jersey with its principal place of business in Virginia. *Id*. at ¶ 37. According to the Complaint, CMA America has transacted business in Florida since 2008 and acts as CMA CGM's agent for the carrying of containers from the Port of Miami to the Port of Mariel by way of Jamaica. *See id*. Plaintiffs allege that CMA America works with and assists CMA CGM in carrying out its commercially beneficial transactions involving the Port of Mariel

and surrounding areas by acting as CMA CGM's agent and broker and signing bills of lading for CMA CGM containers heading to the Port of Mariel.

### 3. *The Confiscated Property*

According to the Complaint, the Blanco Rosell Siblings owned the Cuban Corporation Maritima Mariel SA ("Maritima Mariel"), which was established in 1954. *Id*. at ¶ 79. In August 1955, the Cuban Government granted Maritima Mariel a 70-year Concession to "plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel, province of Pinar del Rio Province, and the construction of new buildings and works[.]" *Id*. at ¶ 80. The Complaint details a series of exceptional rights which Maritima Mariel was authorized to exercise in the Bay of Mariel pursuant to the 70-Year Concession. *See id*. at ¶ 81. Plaintiffs also allege that, in addition to the 70-year Concession and Maritima Mariel, the Blanco Rosell Siblings owned the companies Central San Ramón and Compañía Azucarera Mariel, which held extensive land holdings surrounding Mariel Bay. *Id*. at ¶¶ 84-86.

Plaintiffs allege that when the Cuban Government seized their property in 1960, it seized Maritima Mariel and the 70-Year Concession rights, as well as Central San Ramón and Compañía Azucarera Mariel and all of their land holdings, all of which were previously owned by the Blanco Rosell Siblings. *Id*. at ¶¶ 83, 86. The property confiscated by the Cuban Government is described in Resolution No. 436 published in the Cuban Official Gazette, dated September 29, 1960, at 23405-23406, as follows:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and
> (b) their wholly owned companies, Central San Ramón and Compañía Azucarera Mariel S.A., including those companies' extensive land holdings (approximately

11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities.

*See* Resolution No. 436, published in the Cuban Official Gazette, September 29, 1960, at 23406 (English translation) ("Confiscated Property"); Compl. at ¶ 4.

According to Plaintiffs, the Cuban Government seized the Confiscated Property without the Blanco Rosell Siblings' permission and without providing adequate compensation. *See, e.g., id.* at ¶ 95. In the Complaint, Plaintiffs allege that Defendants have been trafficking in the Confiscated Property by operating vessels that call, directly or through related entities, at the Port of Mariel and otherwise engage in profitable business activities within and benefitting from the Confiscated Property without compensating the Blanco Rosell Siblings and without their authorization. *See generally id.* at 33-42.

## II.    RELEVANT PROCEDURAL HISTORY

Plaintiffs filed the Complaint on July 30, 2021, seeking damages pursuant to Title III of the Helms-Burton Act. [ECF No. 31]. On August 10, 2021, Plaintiffs filed a Return of Service indicating service of process on CMA America on August 6, 2021. [ECF No. 18]. On September 20, 2021, CMA America filed the Motion to Stay now before the Court. [ECF No. 32]. Although CMA America is not a French or European national directly subject to the EU or French Blocking Statutes, it argues in the Motion that the case should be stayed in its entirety because CMA CGM is subject to the Blocking Statutes, and it would be unfair for CMA America to proceed without its co-Defendant CMA CGM. *Id.* After CMA CGM was successfully served on November 9, 2021 [ECF No. 41], CMA CGM filed a Notice of Joinder in the Motion to Stay. [ECF No. 40].

### III.     RELEVANT STATUTES

#### A.  *The LIBERTAD Act, Also Known As The Helms-Burton Act*

As set forth in the Helms-Burton Act, since Fidel Castro seized power in Cuba in 1959, the communist Cuban Government has engaged in the systematic repression of the Cuban people through, among other things, "massive and systemic violations of human rights" and "deprivations of fundamental freedoms." *See* 22 U.S.C.  §§ 6021(4), (24). In response, the United States has undertaken various measures to impose sanctions against the Castro regime and to deter foreign investors from investing in Cuba while protecting the claims of United States nationals who had property confiscated by the Cuban Government. In 1996, Congress passed Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq*. (the "LIBERTAD Act," "Title III," or the "Helms-Burton Act"), "to strengthen international sanctions against the Castro government" and, relevant to the instant case, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. §§ 6022(2), (6).

In Title III of the Helms-Burton Act, Congress denounces the Cuban Government's history of confiscating property of Cuban citizens and United States nationals, explaining that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). In the Helms-Burton Act, Congress admonished that foreign investors who traffic in confiscated properties through the purchase of equity interests in, management of, or entry into joint ventures with the Cuban Government to use such properties "complicate any attempt to return [these expropriated properties] to their original

owners." *Id*. at §§ 6081(5), (7). The Act also advises that this "trafficking" in confiscated property undermines the foreign policy of the United States "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id*. at § 6081(6)(B).

Congress therefore sought to deter the trafficking in wrongfully confiscated property and to deny traffickers any profits from economically exploiting Castro's wrongful seizures. *See id*. at § 6081(11); *see also* 22 U.S.C. § 6082(a)(1)(A). And, as a result, in passing Title III of the Helms-Burton Act, "Congress created a private right of action against any person who 'traffics' in confiscated Cuban property." *De Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2021 WL 3173213, at *2 (S.D. Fla. July 27, 2021) (Bloom, J.) (quoting *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284 (S.D. Fla. 2019) (King, J.) (citing 22 U.S.C. §§ 6082(a)(1)(A), 6023(13)(A)).

Shortly after passage of the Helms-Burton Act, however, the President invoked Title III's suspension provision, and "Title III ha[d] since been waived every six months, . . . and ha[d] never effectively been applied." *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1312 (S.D. Fla. 2012) (Moore, J.); *see also* 22 U.S.C. § 6085(c) (presidential power to suspend the right to bring a cause of action under Title III). That changed on April 17, 2019, when the United States Department of State announced that the federal government "will no longer suspend Title III." *See* U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), *https://cl.usembassy.gov/secretary-of-state-michael-r-pompeos-remarks*. On May 2, 2019, the suspension of claimants' rights to bring actions under Title III was lifted, enabling claimants to file claims against alleged traffickers.

Plaintiffs, and other Cuban exile families now citizens of the United States, then initiated actions, including the instant case, against various defendants to recover damages under Title III of the Helms-Burton Act for the alleged trafficking in property that was confiscated by the Cuban Government and as to which these claimants allegedly own claims.

### B. *The European Blocking Statutes*

#### 1. The European Union Blocking Statute

The international community did not react positively to the United States' passage of the Helms-Burton Act, and, in November 1996, the European Union enacted a Blocking Statute to counteract its extraterritorial effects. Council Regulation (EC) No 2271/96 of 22 November 1996 ("protecting against the effects of the extra-territorial application of legislation adopted by a third country, and actions based thereon or resulting therefrom") (the "EU Blocking Statute"). A copy of the EU Blocking Statue is attached as Exhibit 2 to Defendants' Motion to Stay. [ECF No. 32-2.] The EU Blocking Statute provides:

> No person . . . shall comply, whether directly or through a subsidiary or other intermediary person, actively or by deliberate omission, with any requirement or prohibition, including requests of foreign courts, based on or resulting, directly or indirectly, from the laws specified in the Annex [which expressly includes the Helms-Burton Act] or from actions based thereon or resulting therefrom. Persons may be authorized, in accordance with the procedures provided in Articles 7 and 8, to comply fully or partially to the extent that non-compliance would seriously damage their interests or those of the Community.

*Id*. at Art. 5. The EU Blocking Statute expressly prohibits nationals of Member States of the European Union from complying with any requirements, including those derived from United States Courts, stemming from or arising out of the Helms-Burton Act. CMA CGM, as a French national, is subject to the EU Blocking Statute. Defendants argue that CMA America, as an agent of CMA CGM, may also be prohibited by the EU Blocking Statute from participating in these proceedings. *See* Motion to Stay [ECF No. 32] at ¶ 39.

However, the EU Blocking Statute provides no penalty for those who comply with requirements and proceedings arising out of Helms-Burton Act claims in contravention of the Blocking Statute's terms. Instead, the EU Blocking Statute requires Member States to "determine the sanctions to be imposed in the event of breach of any relevant provisions of [the Blocking Statute]." *Id.* at Art. 9. The EU Blocking Statute further requires that such sanctions by Member States "must be effective, proportional and dissuasive." *Id.*

### 2. The French Blocking Statute

France did not enact sanctions directed to breaches of the EU Blocking Statute as required by that Statute. However, Defendants claim that, as a French national, CMA CGM is subject to France's Blocking Statute, which has been in place since 1968, well before the EU Blocking Statute. *See* Mot. Stay at ¶ 19; French Blocking Statute, French Law No. 68-678 of July 26, 1968, as modified by French Law No. 80-538, dated July 16, 1980[1] (the "French Blocking Statute"). The French Blocking Statute provides:

> Subject to international treaties or agreements, it is forbidden for any natural person of French nationality or habitually resident on French territory and for any director, representative, agent or servant of a legal entity having its registered office or an establishment therein to communicate in writing, orally or in any other form, in any place whatsoever to foreign public authorities, documents or information of an economic, commercial, industrial, financial or technical nature, the communication of which is likely to affect the sovereignty, security, essential economic interests of France or public order, specified by the administrative authority as necessary.

*Id.* at Art. 1.

Originally enacted in 1968 in response to United States antitrust investigations into French shipping companies, the French Blocking Statute was tailored to protect French

---

[1] *Loi n° 68-678 du 26 juillet 1968 relative à la communication de documents et renseignements d'ordre économique, commercial, industriel, financier ou technique à des personnes physiques ou morales étrangères.*

citizens and corporations from the alleged excesses of United States discovery practices. *See Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19-CV-04238-MMC/RMI, 2020 WL 1911195, at*5 (N.D. Cal. Apr. 20, 2020). By its terms, the French Blocking Statute prohibits French nationals, like CMA CGM, from fully participating in proceedings in United States courts by prohibiting requests for or disclosure of commercial information, whether originating from France or elsewhere, in litigation outside of France absent authorization from French authorities. *See* French Blocking Statute, Art. 1.

It is less clear what the repercussions of such unauthorized participation would be for a French national. Initially, Defendants argued that violation of the French Blocking Statute would put both Defendants "at risk for significant liability in addition to reputational harm." Mot. Stay at ¶ 45. Defendants offered no authority for that argument. After Plaintiffs challenged whether Defendants face any actual risks for violation of the French Blocking Statute, Defendants asserted, in their Reply, that Article 459 of the French Customs Code provides the punishment for violation of the Blocking Statute. Reply Mot. Stay [ECF No. 39] at 5. Article 459 of the French Customs Code provides punishments for violations of "the laws and regulations governing financial relations with foreign countries," including five years imprisonment and confiscation of all assets associated with such violations. Defendants provide no authority for the application of Article 459, which appears on its face to apply to violations of French customs laws and international financial transaction regulations, to violations of the French Blocking Statute based on the unauthorized participation in United States litigation.

On the other hand, the French Blocking Statute, French Law 68-678, includes a penalty provision at Article III of the Statute which appears to apply to the circumstances

presented here. That provision indicates that violation of Article I of the French Blocking Statute could result in a term of imprisonment of 6 months and/or a fine of € 18,000 for individuals and up to € 90,000 for companies. Other courts that have considered the penalties for violations of the French Blocking Statute similarly found that Article III provides the applicable punishment. *See, e.g., Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 220 (E.D.N.Y. 2007). Defendants provide no reason to ignore this provision. In any event, it is clear from the text of these provisions that French law does provide some legal punishment that may be imposed for violations of its Blocking Statutes by participating in discovery in United States courts, whereas it does not expressly provide punishment for violation of the EU Blocking Statute, which is more directly targeted toward violations resulting from participating in Helms-Burton Act litigation.

However, as discussed below, United States courts have consistently determined that the French Blocking Statute was never expected nor intended to be enforced against French subjects but was instead "intended to provide them with tactical weapons and bargaining chips in foreign courts." *Compagnie Francaise D'Assurance v. Phillips Petroleum Co.*, 105 F.R.D. 16, 30 (S.D.N.Y. 1984); *Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat.*, 902 F.2d 1275, 1280 (7th Cir. 1990). United States courts have also consistently found that the chances of prosecution of a French national for violation of the French Blocking Statute are "minimal" and do not present a "real risk." *See, e.g., Bodner v. Paribas*, 202 F.R.D. 370, 375 (S.D.N.Y. 2000); *Compagnie Francaise*, 105 F.R.D. at 30.

## IV.   LEGAL STANDARD APPLICABLE TO MOTIONS TO STAY

Courts enjoy "broad authority to grant a stay." *In re Alves Brag*a, 789 F. Supp. 2d 1294, 1307 (S.D. Fla. 2011)(Goodman, J.). The power to stay is "incidental to the power inherent

in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). As the Eleventh Circuit has stated, "a variety of circumstances may justify a district court stay[.]" *Ortega Trujillo v. Conover & Co. Commc'ns* , 221 F.3d 1262, 1264 (11th Cir. 2000) (citations omitted) (herein referred to as "*Ortega Trujillo*"). In *Ortega Trujillo*, the Eleventh Circuit explained that such a stay may be authorized "as a means of controlling the district court's docket and of managing cases before the district court." *Id*. A stay may also be justified when principles of abstention, such as international comity, are implicated. *See generally id.* International comity is the recognition "which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Turner Entm't Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1519 (11th Cir. 1994) (herein referred to as "*Turner*") (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).

Ultimately, whether to grant a stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis*, 299 U.S. at 254. However, "the District Court must limit properly the scope of the stay. A stay must not be 'immoderate.'" *Ortega Trujillo*, 221 F.3d at 1264; *see also Jones v. Cent. Loan Admin. & Reporting*, No. 16-22428-CIV, 2016 WL 4530882, at *1 (S.D. Fla. Aug. 30, 2016) ("[S]o long as a stay is neither 'immoderate' nor indefinite, a stay is appropriate in the interest of judicial convenience.") (Scola, J.). "[I]f there is even a fair possibility that the stay . . . will work damage to someone else," the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis,* 299 U.S. at 255. The party seeking a stay

bears the burden of demonstrating its necessity. *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255).

Defendants argue that this Court should apply the considerations set out in *Turner* in determining whether to grant a stay in this case and also argue that those factors weigh in favor of granting the requested stay. Mot. Stay at 14-18. *Turner*, discussed below, involved a request for a stay pending resolution of a parallel proceeding in Germany. The considerations outlined in *Turner* include a proper level of respect for international law (international comity), fairness to the litigants, and efficient use of scarce judicial resources. *See* 25 F.3d at 1518. Plaintiffs respond that *Turner's* international comity analysis does not apply to the stay request in this case.

As discussed below, this Court is not convinced that the *Turner* decision, although informative on the issue of international comity in general, is on point or controls this Court's determination of the stay request in this particular case. However, the Court must weigh competing interests in determining whether a stay is justified, and the *Turner* considerations are relevant to this case, which, like *Turner* and *Ortega Trujillo*, does implicate principles of international abstention and comity.

## V.    DISCUSSION

The main issue presented is whether this Court should stay all proceedings in this case in their entirety based on the EU Blocking Statute and the French Blocking Statute pending determinations from both the EU Commission and the French Ministry regarding whether CMA CGM is authorized to participate in this litigation. Defendants argue they face the risk of serious repercussions, including criminal punishment, in France if they participate without authorization, whereas Plaintiffs argue the requested stay is immoderate and they would be

severely prejudiced if the litigation is delayed any longer. This Court considers the competing interests at stake here.

Initially, the Court notes that, putting aside the parties' positions with regard to the merits of Plaintiffs' claims or Defendants' anticipated defenses, the parties agree that Plaintiffs are proceeding pursuant to Title III of the Helms-Burton Act, which does provide for individual rights of action to individuals who fall within its parameters. As discussed at the hearing before this Court, the parties anticipate that, when they do participate in the litigation, Defendants will very likely raise issues in motions to dismiss regarding, among other things, personal jurisdiction and standing.

As discussed above, a district court has "broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton*, 520 U.S. at 695. This Court agrees that principles of abstention or international comity may justify a stay in some circumstances, and this Court must weigh competing interests in determining whether such principles justify a stay under the circumstances presented here. Before turning to the specifics of the instant case, the Court addresses several decisions from other courts that have considered stay requests against the backdrop of international comity issues.

### A. *Relevant Decisions Addressing International Comity In The Context Of Stay Requests*

1. The *Turner* And *Ortega Trujillo* Opinions

Defendants urge this Court to apply the factors laid out by the Eleventh Circuit in *Turner* and argue that, pursuant to *Turner*, this Court is bound to grant the requested stay. Although this Court does find the *Turner* comity and competing interests analyses to be relevant and helpful, this Court is not bound by the decision, which addressed a very different issue not presented in this case.

The issue presented in *Turner* was "whether a federal court, which properly has jurisdiction over an action, should exercise its jurisdiction where parallel proceedings are ongoing in a foreign nation and a judgment has been reached on the merits in the litigation abroad." 25 F.3d at 1518. The issue was before the Eleventh Circuit on appeal from an order denying a stay requested on the grounds a parallel proceeding was ongoing in another country. More specifically, the appellants filed a lawsuit in Germany seeking a declaratory judgment regarding the parties' rights under a contract, and one week later, the appellees filed a lawsuit in the United States for breach of contract and injunctive relief based on the same contract at issue in the German lawsuit. Appellants sought a stay in the district court case in the United States pending resolution of the German proceedings, which the district court denied. The Eleventh Circuit reversed, concluding that "the relevant concerns of international comity, fairness and efficiency point[ed]… to deference to the German forum which ha[d] already rendered a judgment on the merits." *Id*. at 1523.

The procedural posture and relevant circumstances presented in *Turner* are very different from those presented in the instant case.  Here, there are no parallel proceedings in another country, much less proceedings filed and decided prior to the initiation of the instant lawsuit. Thus, while the Eleventh Circuit's analysis of international comity principles in *Turner* is helpful, the decision is not binding on this Court's determination of the stay request here.

The Eleventh Circuit later revisited the issue of a stay based on international comity principles in *Ortega Trujillo*. There, the court, also faced with a requested stay based on parallel proceedings in another country, clarified that although principles of international comity may justify a stay of a case in our courts, "the district court must limit properly the

scope of the stay." 221 F.3d at 1264. The court went on to admonish that "[a] stay must not be 'immoderate.'" *Id.* (citing *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982). The court further explained, "In considering whether a stay is 'immoderate,' we examine both the scope of the stay (including its potential duration) and the reasons cited by the district court for the stay." *Id.*

In *Ortega Trujillo*, the defendant sought, and the district court granted, a stay of all proceedings pending the conclusion of a parallel case pending in the Bahamas. Unlike in *Turner*, in which there was already a judgment in the foreign court proceeding, the Eleventh Circuit in *Ortega Trujillo* found no indication that the Bahamian case would finally conclude at any quick or predictable time. *Id.* The Eleventh Circuit reversed the stay ordered by the district court as an abuse of discretion, finding the stay was indefinite in scope and, therefore, immoderate, and that the district court did not give sufficient reason to justify the indefinite stay. *Id.* at 1265.

2. The *Marti v Iberostar* and *Rodriguez v. Imperial Brands* Orders

Defendants next urge this Court to follow the decisions in *Marti v. Iberostar Hotels y Apartamentos S.L.*, 20-CV-20078-Scola (S.D. Fla. Apr. 24, 2020) (Scola, J.), and *Rodriguez v. Imperial Brands PLC*, No. 20-CV-23287-Gayles (S.D. Fla. Sept. 23, 2020) (Gayles, J.), in which courts in this District granted stays in Helms-Burton Act cases based on international blocking statutes. These decisions present similar scenarios to those in the instant case, but also present significant distinctions.

In the *Marti* case, the plaintiffs, like Plaintiffs in the instant case, asserted claims pursuant to Title III of the Helms-Burton Act based on the trafficking of wrongfully confiscated property in Cuba. Judge Robert Scola granted the defendants' motion for a stay

based on the EU Blocking Statute and Spain's Blocking Statute. Although the facts in *Marti* are very similar to those presented here, there are some important distinctions that are relevant to the weighing of competing interests.

In *Marti*, the Court addressed the concerns presented by Spain's Blocking Statute, which was enacted specifically to address the EU Blocking Statute and Helms-Burton Act claims and which set out specific penalties which were designed to be imposed in cases precisely like the one presented here. As discussed herein, that is not the case with the French Blocking Statute. Also, importantly, the court's decision granting the defendants' requested stay was entered over two years ago, in April 2020. While the court may not have anticipated how long the stay would remain in effect when granting it, the length of the stay in *Marti* is relevant to the Court's analysis in the instant case. As the docket in the *Marti* case reflects, there is no indication when the EU Commission will act on the defendants' requests for authorization to proceed, and, if they do, what the scope of that authorization will be.[2] Looking at it now, almost two and a half years later, the *Marti* stay may have reached the point of "immoderate." This Court also notes that the Stay Order in *Marti* is presently pending on appeal in the Eleventh Circuit. Thus, while the *Marti* court's decision is relevant and persuasive, there are important distinctions from the circumstances presented in the instant case such that it cannot be said to be on all fours, and, instead, may weigh in the balance against granting a stay in this case.

---

[2] To date, defendants in the *Marti* case have filed twenty-seven status reports indicating the status of the EU Commision's consideration of those defendants' requests for authorization. As of the most recently filed status report, filed on July 11, 2022, there is no indication that the EU is close to resolving the authorization requests or to what extent the defendants will be authorized to participate in the litigation. In fact, defendants have not received any communications from the EU authorities since July 16, 2021.  *See* ECF No. 59 in Case No. 20-CV20078-Scola (S.D. Fla 2022).

The plaintiffs in the *Rodriguez* case also asserted claims pursuant to Title III of the Helms-Burton Act based on the trafficking of wrongfully confiscated property in Cuba. The defendants in that case, British nationals, moved to stay based on the EU Blocking Statute and, later, the United Kingdom's Blocking Statute. The court granted a limited stay of five months, which has since expired. In *Rodriguez*, Judge Darrin Gayles did apply the *Turner* factors in granting the limited stay, but, again, the court was not faced with the unique circumstances of the French Blocking Statute nor with the concern that the stay would be immoderate because it was limited in duration by the court.

### B. *Defendants' Motion to Stay*

The Court now turns to Defendants' Motion to Stay in this case. [ECF No. 32]. Defendants argue that the interests of international comity dictate that this Court should stay this case pending a determination from the EU Commission and the French Ministry regarding whether CMA CGM is authorized to participate in this litigation. This Court considers the competing interests weighing in favor of and against such a stay, applying the considerations laid out by the Eleventh Circuit in *Turner* (international comity, fairness, and judicial resources), among other authorities, as well as consideration of whether the requested stay is sufficiently limited in scope, mindful that Defendants, as the movants, bear the burden of demonstrating the necessity of the stay.

1. International Comity

The United States Supreme Court explained the principle of international comity in *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the So. Dist. of Iowa*, 482 U.S. 522 (1987):

> Comity refers to the spirit of cooperation in which a domestic tribunal approaches the resolution of cases touching the laws and interest of other sovereign states.

18

This Court referred to the doctrine of comity among nations in *Emory v. Grenough* […]:

"'By the courtesy of nations, whatever laws are carried into execution, within the limits of any government, are considered as having the same effect everywhere, so far as they do not occasion a prejudice to the rights of other governments, or their citizens. . . .

"'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is their recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws."

*Id.* at 522, 544 n.27 (quoting *Emory v. Grenough*, 3 U.S. 369, 370 n.2 (1797)). Thus, giving due regard to the laws of the EU and France at issue here, this Court compares the United States' interests affected by the blocking statutes with the interests the EU and France seek to protect.

      *a.   The United States' Interests*

In Title III of the Helms-Burton Act, Congress explained the interests the United States sought to protect: "The wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S. C. §§ 6081(2)-(3). Further emphasizing the importance of the protected interests, the Act also stresses that the "trafficking" in confiscated property that is targeted by the Act undermines the foreign policy of the United States "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id.* § 6081(6)(B).

Based on a reading of the Act itself, it is beyond peradventure that the United States has a significant interest in protecting the claims of United States nationals who had property wrongfully confiscated by the Cuban Government, as Plaintiffs allege in this case.

19

b. *The EU's Interests*

The EU Blocking Statute was enacted with the specific intention of "provid[ing] protection ***against and counteract[ing]*** the effects of the extra-territorial application of the [specified] laws [which include the Helms-Burton Act]." EU Blocking Statute, Art. 1 (emphasis added). In other words, the EU Blocking Statute was created to block the United States' Helms-Burton Act. It is the EU's interest in "providing protection against and counteract[ing]" the claims of United States citizens proceeding under United States law (the Helms-Burton Act) that must be weighed against the United States' interest in enforcing that same law and permitting its citizens to pursue their rights within it.

By its very terms, the EU Blocking Statute was not aimed at protecting the European Union Member States themselves but at protecting Member States' nationals from being subject to lawsuits by United States citizens pursuant to United States laws. It is, in effect, the opposite of international comity.

c. *France's Interest*

As discussed above, the French Blocking Statute was enacted to protect French nationals from the alleged excesses of United States discovery practices. Thus, the interests France sought to protect with its Blocking Statute was to have its corporations avoid the "intrusiveness" of American pretrial discovery rules. *See Reinsurance Co. of Am.,* 902 F.2d at 1280; *Proofpoint*, No. CV 16-22428-CIV, 2020 WL 1911195, at *5.

d. *The Balance Of Sovereign Interests Weighs Against A Stay*

In weighing the balance of national interests at play, this Court finds that several strong national interests of the United States, cited above, are implicated. Moreover, enforcement of United States laws designed to protect such strong national interests through private civil

actions, such as the instant case, is a critical tool for protecting those interests. The United States also has "a substantial interest in fully and fairly adjudicating matters before its courts." *Compagnie Francaise*, 105 F.R.D. at 30. That interest is only realized if the parties have access to the courts and to relevant information.

On the other hand, the interest of the EU is in controlling the ability of American citizens to enforce United States laws and pursue their claims to property wrongfully confiscated by the Castro regime and trafficked in by European nationals. And France's interest is that of a sovereign in controlling access to information within its borders and protecting its citizens from discovery in foreign litigation.

The United States Supreme Court's comity analysis in *Societe Nationale,* in which the Court analyzed the French Blocking Statute, is informative with regard to the weighing of competing interests here: "It is clear that American courts are not required to adhere blindly to the directives of such a statute. Indeed, the language of the statute, if taken literally, would appear to represent an extraordinary exercise of legislative jurisdiction by the Republic of France over a United States district judge[.]" 482 U.S. at 544 n.29.

When the United States' interests in protecting its citizens from the wrongful taking of property from its citizens are weighed against the EU's and France's interests in controlling and interfering with the rights of United States citizens to pursue their rights under United States laws, this Court finds that the balance of international interests at play weighs against granting the requested stay.

2. Fairness

In *Turner*, the Eleventh Circuit described the fairness inquiry as follows: "Before accepting or relinquishing jurisdiction a federal court must be satisfied that its decision will

21

not result in prejudice to the party opposing the stay. . .  Ensuring the ability of the parties to fully and fairly litigate their claims in some tribunal surely is a paramount goal of international abstention principles." 25 F.3d at 1522 (citing *Caspian Invest. Ltd. v. Vicom Hldgs., Ltd.*, 710 F. Supp. 880, 884 (S.D.N.Y. 1991); *Hilton v. Guyot*, 159 U.S. 113, 205 (1895). The moving party must "demonstrate a 'clear case of hardship or inequity' if there is even a 'fair possibility' that the stay would work damage on another party." *Gold v. Johns-Manville Sales Corp.*, 723 F.2d 1068, 1076 (3d Cir. 1983) (citing *Landis*, 299 U.S. at 255).

Defendants argue that it would be unfair to require them to choose between facing serious punishment for participating in this litigation without authorization from EU and French authorities or defaulting in this case. Mot. Stay at ¶¶ 41-46. They also argue it would be unfair to require CMA America to proceed without co-Defendant CMA CGM. *Id.* at ¶ 46. On the other hand, Defendants assert that Plaintiffs will not be prejudiced because they are only seeking monetary relief, and they will be compensated for the delay by prejudgment interest on any monetary award. Mot. Stay at ¶ 41. Defendants also point out that Plaintiffs already waited more than two years after the Act became effective before filing this lawsuit, so they are hard-pressed to argue that an additional delay is prejudicial. *Id.* at ¶¶ 43-44.

Plaintiffs respond that it would be unfair to prevent them from pursuing their legal claims indefinitely, especially in light of the advanced age of Plaintiff De Fernandez and the other witnesses. As Plaintiffs point out, defendants in other similar Helms-Burton Act cases have already challenged whether a plaintiff's claim survives and may be pursued by her heirs if she passes away during the pendency of the litigation, and, although that motion was once rejected, it is a challenge they anticipate facing nonetheless. Resp. Mot. Stay at 17. Plaintiffs also reject the suggestion that the delay in filing their Complaint has any bearing here and cite

the significant work that went into preparation of the Complaint and compliance with pre-filing obligations. On the other hand, Plaintiffs point out that there is no evidence that Defendants will actually face penalties or punishment if they proceed in this litigation without authorization. *Id.* at 16-17.

The prejudice faced by either party is unclear and, in some sense, hypothetical. The advanced age of Plaintiff De Fernandez, coupled with the aging of Plaintiffs' witnesses, are very real concerns that do implicate Plaintiffs' ability to fully and fairly litigate their claims. However, these concerns can be alleviated, at least to some extent, by the taking of depositions to preserve testimony as deemed necessary by the parties. Nonetheless, the Court is mindful of its duty to avoid unnecessary delays and resulting burdens and expense because "justice delayed is justice denied." *See Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020). Meanwhile, the authorization process is confidential, and Plaintiffs complain they have no way of knowing how the process is proceeding and no way of participating in that process, which is completely out of their control. In *Landis*, the Supreme Court considered the hardships presented with stay requests in the context of abstention pending litigation in a different court and cautioned, "[o]nly in rare circumstances will a litigant . . . be compelled to stand aside" while a separate matter is settled "to which he is a stranger." *Landis*, 299 U.S. at 255.

As for potential prejudice to Defendants, that too is unclear. Defendants' primary argument regarding prejudice is that they will face potential penalties, both financial and criminal, if they participate in the litigation without authorization. That argument is unpersuasive. As discussed above, the EU Blocking Statute does not provide for any punishment itself but delegates the role of designating appropriate penalties for violations of the Statute to the Member States. However, France did not establish penalties for violation of

23

the EU Blocking Statute. Instead, Defendants rely on other penalties provided in the French Blocking Statute for violations of the French Blocking Statute's provisions. "Courts have noted, however, that there is no significant risk of prosecution for violations of the French blocking statute." *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 221 (E.D.N.Y. 2007) (citing *Minpeco S.A. v.* Conticommodity Servs., Inc., 116 F.R.D. at 527-28); *see also Compagnie Francaise*, 105 F.R.D. at 3; *Bodner*, 202 F.R.D. at 375).

Defendants offer no evidence of any French national (or anyone for that matter) being prosecuted or penalized for violation of the French or EU Blocking Statute, and Plaintiffs point out that, to the contrary, French nationals who are defendants in other Helms-Burton Act cases have participated in litigation without authorization and without punishment. Likewise, this Court is not convinced that Defendants here face any real risk of prosecution for violation of the Blocking Statutes and, therefore, discounts the hardship posed by the prospect of sanctions. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010). That being said, because the text of the French Blocking Statute does provide for the *potential* prosecution of French nationals, Defendants are not without cause for some concern.

In short, the Court finds that the fairness inquiry does not weigh in favor of either granting or denying the requested stay but, instead, is in equipoise. However, because the burden is on Defendants to "demonstrate a 'clear case of hardship or inequity,'" this factor does not favor granting Defendants' Motion.

  3. Judicial Resources

Next, the Court considers the efficient use of scarce judicial resources and the general interest in avoiding piecemeal litigation.

On this point, Defendants argue that a stay of the entire case will preserve judicial resources because it will avoid piecemeal litigation, which would result if only the case against CMA America proceeds. Presumably, Defendants anticipate that either the stay will be granted as to CMA CGM, only, or, if the stay is denied, CMA CGM would default, in either case leaving only CMA America to litigate the matter. Plaintiffs respond that it is the Defendants who are seeking piecemeal litigation by seeking a stay. Although they do not explain how that would be the case, Plaintiffs, too, are presumably proceeding based on the assumption that CMA CGM will either benefit from a stay or elect to default, causing the need for separate litigation of the default proceedings.

Plaintiffs have also raised another concern regarding the process of requesting authorization from the EU and French authorities. Because the process is confidential, neither Plaintiffs nor the Court know what is happening behind the scenes, and, importantly, we cannot predict what authorization Defendants will ultimately receive, if any, much less when. Thus, it is possible Defendants may receive authority from the EU Commission but not the French Ministry, or vice versa. It is also possible that Defendants may receive authority only to file motions to dismiss but not to participate in discovery. In short, the resulting authorization may actually cause piecemeal litigation. In short, the Court finds that the interest in avoiding piecemeal litigation is an issue for both sides and favors neither.

As the proponent of the stay, Defendants bear the burden of establishing that judicial economy is best served by ordering a stay. *Clinton*, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."). The undersigned is not persuaded that judicial economy is best served by staying this action based on the very real possibility that piecemeal litigation will not be avoided by granting the stay. Given the foregoing, the undersigned finds

that Defendants have not carried their burden to demonstrate that judicial economy would be best served by entering a stay in this case.

    4.  <u>The Scope of The Requested Stay</u>

A district court "must limit properly the scope of a stay. A stay must not be 'immoderate.'" *Ortega Trujillo*, 221 F.3d at 1264 (finding that an indefinite stay pending resolution of another action, entered by the district court, constituted an abuse of discretion): *see also Landis*, 299 U.S. at 257 ("The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits.").

Defendants argue the requested stay is not immoderate because they have requested a specific end date – 30 days after they receive authorization from the EU and French authorities. Mot. Stay at ¶¶ 47-49. Defendants also assert that they "anticipate" that the authorities will act on their requested stay faster than in the other cases where requests have been pending for years because the authorities already have those nearly identical requests under consideration.

Plaintiffs argue, predictably, that the fact that the request for authorization in the *Marti* case has been pending for more than two years is an indication that the requested stay is immoderate. And, as discussed above, Plaintiffs also argue that it is unclear what authorization Defendants sought or, ultimately, what authorization, if any, will be granted. The promise of complete authorization from both the EU and French authorities for Defendants to fully participate in this litigation appears highly unlikely to happen any time in the near future, if at all. More realistically, the wait for that to happen appears indefinite.

This Court is mindful of the fact that Defendants' Motion to Stay has already been pending for over nine months, and this case has effectively been stayed during that time.

During that time, there is no indication that either the EU Commission or the French Ministry has made any progress with consideration of Defendants' requests. Further, as discussed above, the Court is aware that there has been no actionable progress in the *Marti* case, in which the authorization was sought from the EU more than two years ago. Finally, although Defendants have presented at least some evidence that the EU Commission has acknowledged receipt of various similar requests and, arguably, has been considering similar requests for the last two years or more, Defendants offer no evidence regarding the timing or progress of the French Ministry's consideration.

Based on the information presented and available, there is nothing to give the Court comfort that the requested stay is anything but indefinite. Therefore, even if Defendants had satisfied their burden of demonstrating the balance of interests weighs in favor of granting a stay, the requested stay is immoderate, and hence, unlawful and must be denied.

## VI.    CONCLUSION

Accordingly, for the reasons set forth above, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Stay Proceedings Pending International Request [ECF No. 32] is **DENIED**.  It is further

**ORDERED AND ADJUDGED** that Defendants shall file and serve responses to the Complaint within twenty (20) days of the date of this Order.

**DONE AND ORDERED** in Chambers in Miami-Dade County, Florida, this 12th day of July, 2022.

_____
MELISSA DAMIAN
UNITED STATES MAGISTRATE JUDGE