## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL, et al.,
      Plaintiffs,

       v.                                  CASE NO. 1:21-CV-22778-
                                                COOKE/DAMIAN

CMA CGM S.A. (a/k/a CMA CGM THE
FRENCH LINE; a/k/a CMA CGM GROUP)
and CMA CGM (AMERICA) LLC,
      Defendants.

_____

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' COMBINED
## MOTIONS TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

## TABLE OF CONTENTS

**INTRODUCTION**……………………………………………………………………………..1

**RELEVANT BACKGROUND**…………………………………………………………………1

**ARGUMENT**……………………………………………………………………………………3

I.   The Personal Representatives of the Deceased Blanco Rosell Siblings' Estates and the Inheritors are Proper Plaintiffs…………………………………………………....3

    A.  The Estates Did Not Acquire Ownership of the Deceased Siblings' Claims and Any Other Interpretation Violates Constitutional Equal Protection…3

    B.  In the Alternative, the Inheritors are Proper Plaintiffs…………………....5

II.   Cuba Need Not Have Confiscated the Property From a U.S. National………….6

    A.  The Plain Language Of The HBA Establishes That Claimants And Property Owners Need Not Be U.S. Nationals At The Time Of Confiscation........6

       1.  The Act Contains No Requirement That Claimants Be U.S. Nationals At The Time of Confiscation……………………………………………..6

       2.  The Statutory Construction Advanced By Defendants Conflicts With Express Provisions of The Act……………………………………………7

          i.     Section 6083(b) Contradicts Defendants' Interpretation………………………………………………………..7

          ii.    Section 6083(c)(1) Contradicts Defendants' Interpretation……………………………………………………9

          iii.   Section 6082(a)(5)(C) Contradicts Defendants' Interpretation……………………………………………………9

          iv.   Section 6081(3)(B)(iii) Undermines Defendants' Interpretation…………………………………………………10

    B.  The Legislative History Of The HBA Provides Confirmation………….10

    C.  *Regueiro* Does Not Compel This Court to Adopt Defendants' Construction of The HBA……………………………………………………………10

III.   The HBA Requires a "Claim to" Confiscated Property, Not Direct Ownership of Confiscated Property………………………………………………………………...11

IV.   The Domestic Takings Rule Has No Application Here…………………………13

V.   Collateral Estoppel is Inapplicable…………………………………………………14

    A. Collateral Estoppel Does Not Preclude Plaintiffs' Claims and Therefore Cannot Be Raised in a Rule 12(b)(6) Motion……………………………14

    B. Collateral Estoppel Should Not Be Decided Until After Resolution of the *Seaboard Marine* Appeal………………………………………………………15

    C. Collateral Estoppel Should Not Be Applied Where Resolution of an Appeal Has Little to No Impact on Pretrial Proceedings in This Case…………16

    D. Collateral Estoppel Does Not Apply to Conclusions of Law…………..17

VI.    This Court Has Specific Personal Jurisdiction over CMA France……………..18

# TABLE OF AUTHORITIES

## Cases

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022)................................ 22, 23

*Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71(1988)........................... ...................... 4

*Bravo-Fernandez v. United States*, 580 U.S. 5 (2016) ............................................ 15

*SEC v. Carillo*, 115 F.3d 1540, 1545-1546 (11th Cir. 1997)................................ 21, 22, 23

*Concordia v. Bendekovic*, 693 F.2d 1073 (11th Cir. 1982) ...................................... 14

*D'Addario v. D'Addario*, 901 F.3d 80 (2d Cir. 2018) ............................................... 3

*De Fernandez v. CMA CGM S.A.*, 2022 U.S. Dist. LEXIS 123083 (S.D. Fla. July 12, 2022)................................................................................................. 25

*De Fernandez v. Crowley Holdings, Inc.*, No. 21-CV-20443, 2022 WL 860373 (S.D. Fla. Mar. 23, 2022)............................................................................................... 3

*De Fernandez v. Seaboard Marine, Ltd.*, 2022 WL 3577078 (S.D. Fla. Aug. 19, 2022)...... 3, 18

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003)................................................. 12

*Est. of Tallman ex rel. Tallman v. City of Gastonia*, 682 S.E.2d 428 (N.C. App. 2009)............4

*FCStone Merchant Services, LLC v. SGR Energy, Inc.*, 2021 U.S. Dist. LEXIS 131392 (S.D. Tex. July 14,2021)............................................................................................23

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017 (2021)............19, 22, 23

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) .. 12

*Garcia-Bengochea v. Carnival Corp.*, 2021 WL 1085544 (11th Cir. Feb. 23, 2021) .................. 5

*Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281 (S.D. Fla. 2020).............. 11, 12, 13

*Garcia-Bengochea v. Norwegian Cruise Line Holdings Ltd.*, No. 1:19-CV-23593-JLK, 2020 WL 5028209 (S.D. Fla. Aug. 25, 2020)............................................................... 11

*Gonzalez v. Amazon, Inc.*, 835 Fed. Appx. 1011 (11th Cir. 2021) ......................................... 5

*Jaffree v. Wallace,* 837 F.2d 1461, 1466 (11th Cir. 1988)...................................................... 16

*Johnson v. United States*, 2015 WL 10963702 (S.D. Fla. Feb. 9, 2015) ................................. 8

*Karimas Imp. Exp., LLC v. Guaranteed Int'l Shipping LLC*, 2021 U.S. Dist. LEXIS 261041 (D. Conn. July 27, 2021)...................................................................................... 20

*Marubeni Am. Corp. v. Stevens Shipping & Terminal Co.*, 1999 U.S. Dist. LEXIS 24315 (S.D. Ga. Apr. 23, 1999)……………………………………………………………………………..23

*Matter of Tr. Est. of Renjes*, 42 Haw. 151 (1957…………………………………………………………… 4

*Mondelez Glob. LLC v. Int'l Union of Operating Engineers Loc. 399*, 2019 WL 216738 (N.D. Ill. Jan. 16, 2019) ……………………………………………………………………………………… 16

*Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14 (2004)…………………………… 23

*North American Sugar Inds v. Xinjiang*, 2022 U.S. Dist. LEXIS 156237 (S.D. Fla. Aug. 30, 2022)………………………………………………………………………………………………24

*Patel v. Garland*, 142 S. Ct. 1614 (2022) …………………………………………………………… 7

*Phillipp*, 141 S. Ct. at 711 …………………………………………………………………………… 13

Pub. L. 104–114, Title III, § 303, March 12, 1996, 110 Stat.785 …………………………… 8

*Regueiro v. American Airlines, Inc.*, 2022 U.S. Dist. LEXIS 116153 (S.D. Fla. June 30, 2022)11

*Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194 (1993)……… 4

*Smith v. Cimmet*, 199 Cal. App. 4th 1381, 1390 (2011) ……………………………………………… 4

*Soto v. Booking.com B.V.*, No. 20-cv-24044-MGC, Doc. No. 48 (S.D. Fla. Sep. 29, 2021) ….. 4

*State Farm Mut. Auto. Ins. Co. v. B & A Diagnostic, Inc.*, 104 F. Supp. 3d 1366, 1374 (S.D. Fla. 2015) ………………………………………………………………………………………… 15

*Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. V. Societe Generale, S.A.*, 2021 WL 6065758 (S.D.N.Y. Dec. 22, 2021)……………………………………………………………13

*Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067 (11th Cir. 2003) ………………… 16

*Zaboth v. Beall*, 26 Va. Cir. 269, 1992 WL 884464 (Va. 1992)……………………………………… 4

*Ziegler v. Subalipack (M) SDN BHD*, 2017 U.S. Dist. LEXIS 128584 (S.D. Tex. Aug. 14, 2017)……………………………………………………………………………………………… 20

## Statutes

22 U.S.C. § 1643c…………………………………………………………………………8, 9, 13

22 U.S.C. § 1643c(a)……………………………………………………………………… 13

22 U.S.C. § 1643*l*…………………………………………………………………………… 8

22 U.S.C. 6021 …………………………………………………………………………… 2

22 U.S.C. § 6023(15)……………………………………………………………………… 4

22 U.S.C. § 6023(4) ……………………………………………………………………… 2

22 U.S.C. § 6081(11) .................................................................................... 13

22 U.S.C. § 6081(3)(B)(iii) ........................................................................... 10

22 U.S.C. § 6082(a)(1)(A) .......................................................................7, 14

22 U.S.C. § 6082(a)(4)(B) .............................................................................. 3

22 U.S.C. § 6082(a)(5)(C) .............................................................................. 9

22 U.S.C. § 6083(c)(1) .................................................................................... 9

28 U.S.C. § 6081(11) .................................................................................... 12

22 U.S.C. §§ 6081-6085 .................................................................................. 4

22 U.S.C. §§ 6082(a)(1)(a), (a)(4)(B), (a)(5)(C) ........................................... 7

Fla. Stat. § 731.201(14) .................................................................................. 3

Fla. Stat. § 733.612(20) .................................................................................. 5

## Other Authorities

141 Cong. Rec. H9342 (1995) ...................................................................... 10

142 Cong. Rec. S1487 (1996) ....................................................................... 10

*Fading legend of Castro the idealist*; Alistair Cooke, January 14, 1959)..............................2

18A Fed. Prac. & Proc. Juris. § 4433 (3d ed.) ...................................... 16, 17

Fed.R.Civ.P. 12(b)(6) .................................................................................... 15

H.R. Rep. 104-202 at 31 (July 24, 1995) ..................................................... 10

https://history.state.gov/historicaldocuments/frus1958-60v06/d257 ............................... 2

https://www.theguardian.com/news/2016/dec/16/looking-back-castro-cuba-revolution.. 2

*The IRS Collection Process, Publication 594*, INTERNAL REVENUE SERVICE (July 2018) and *Asset Forfeiture Policy Manual 2021*, U.S. DEP'T OF JUST., 2021 ................................................. 2

Plaintiffs hereby oppose the Combined Motions to Dismiss Plaintiffs' Amended Complaint the motion to stay filed by Defendant CMA CGM (AMERICA) LLC ("CMA CGM America") and Defendant CMA CGM S.A. ("CMA France").

## INTRODUCTION

Defendants' motion to dismiss should be denied. First, the estates and inheritors are proper plaintiffs and should not be dismissed. Second, there is nothing in the Helms-Burton Act ("HBA") that requires the claimant to be a U.S. national at the time of confiscation and any such limitation contradicts the Act's express provisions and related statutes. Third, as every court encountering the argument has held, the HBA does not require direct ownership and shareholders of companies whose assets were confiscated may bring claims. Fourth, the HBA does not require a violation of international law; hence the domestic takings rule is wholly inapplicable. Fifth, Defendants improperly raised collateral estoppel in a Rule 12(b)(6) motion even though they are not seeking dismissal based on it. Regardless, granting preclusive effect to a different court's decision on a limited contract interpretation issue currently on appeal would not impact pretrial proceedings in this case. Therefore, the Court should deny or defer consideration of collateral estoppel rather than enter an order that the Court may be required to vacate. Sixth, the Court has personal jurisdiction over CMA France.

## RELEVANT BACKGROUND

Throughout their motion, Defendants take the unusual approach of legitimizing a despotic, tyrannical government that oppresses its citizens. Belying history, Defendants' motion treats the Cuban revolution as a friendly affair and depicts Plaintiffs as criminal actors. Defendants characterize mass theft through confiscation during the Cuban revolution as lawful conduct, highlighting the Cuban government's pretextual reasons for that theft as legitimate and overlooking mass torture and extrajudicial killings committed in the name of those same pretexts. In a particularly regrettable passage, Defendants liken the repressive, murderous Cuban regime to the United States government, arguing that Cuba, whose mercenaries confiscated by force without any due process, simply engaged in the same types of forfeiture as the IRS and the Department of Justice. MTD at 16 (citing *The IRS Collection*

*Process, Publication 594*, Internal Revenue Service (July 2018) and *Asset Forfeiture Policy Manual 2021*, U.S. Dep't of Just., 2021).[1]

Plaintiffs are the victims of the Cuban government, not its outlaws. Plaintiffs' property was not "forfeited as a sanction." MTD at 1. These were, of course, pretextual justifications that the violent, revolutionary Cuban government used to murder, oppress, and steal all private businesses in Cuba. Defendants now exploit those pretexts to claim that the confiscations from the Plaintiffs were justified and not "wrongful."[2] Announcing patently contrived and false justifications for torture, murder, and theft does not make torture, murder, and theft any less wrongful. Plaintiffs submit that any discourse about the Cuban revolution in legal filings should be accurate and respectful of its victims.[3] Defendants' adoption of Castro's pretexts is unseemly and wrong.

---

[1] Defendants' revisionist history is contradicted by Congressional findings in the HBA (22 U.S.C. 6021), including: "(15) The Castro government has utilized from its inception and continues to utilize torture . . . as well as execution, exile, confiscation, political imprisonment, and other forms of terror and repression, as means of retaining power."

[2] Defendants argue the confiscations were justified because they mistakenly contend that the HBA requires a "wrongful" confiscation. As shown below, Defendants confused the non-operative, congressional findings for the operative, Title III provisions. No operative provision of the HBA uses the term "wrongful." Rather, a confiscation is a taking or seizure without compensation (22 U.S.C. § 6023(4)), exactly what Plaintiffs alleged. Of course, it was also wrongful, but that is not the legal standard under the HBA.

[3] *See, for example,* Dispatch From the Embassy in Cuba to the Department of State, Havana, February 25, 1959 ("The civilian courts are being purged . . .. Revolutionary Courts, operating under the 'Rebel Code of Justice,' are conducting summary courts-martial of persons both civilian and military accused of a wide variety of crimes committed under the previous regime. Trials, particularly in the provinces, are often mere formalities.") (available at https://history.state.gov/historicaldocuments/frus1958-60v06/d257); *Fading legend of Castro the idealist*; Alistair Cooke, January 14, 1959 ("The Associated Press last night calculated that since the New Year, at least 145 persons have been shot . . .. In Santiago, the rebels have arrested 320 others, of whom ***70 were given a mass trial and all found guilty***. Fourteen were taken out and ***shot at once*** and the rest will be ***executed in batches***.") (emphasis added) (available at https://www.theguardian.com/news/2016/dec/16/looking-back-castro-cuba-revolution).

## ARGUMENT

I.     **The Personal Representatives of the Deceased Blanco Rosell Siblings' Estates and the Inheritors are Proper Plaintiffs**

Based on the requirement that a Title III claimant must have been an American citizen who acquired ownership of the claim to Confiscated Property before March 12, 1996 (22 U.S.C. § 6082(a)(4)(B)), Defendants mistakenly argue that the estates and inheritors cannot bring a Title III claim. For the reasons explained below, the Court should reject this argument.

A.     **The Estates Did Not Acquire Ownership of the Deceased Siblings' Claims and Any Other Interpretation Violates Constitutional Equal Protection**

Defendants incorrectly assume that, when the Blanco Rosell siblings died, a change in legal ownership of deceased siblings' claims automatically occurred, causing their estates to "acquire" ownership of their claims. MTD at 8. An estate, however, is not a legal entity and cannot acquire ownership of anything. An estate is simply the term used to describe the property of a person who has died. Under Florida law, where the deceased siblings' estates are pending, an estate cannot acquire the deceased's property because the estate **is** the deceased's property. Fla. Stat. § 731.201(14) ("'Estate' means the property of a decedent that is the subject of administration."); *see* 33 C.J.S. Executors and Administrators § 5 ("The 'estate' of a deceased person is **not a legal entity** but is merely a name indicating the sum total of the decedent's assets and liabilities") (emphasis added).

Plaintiffs submit that that the *Seaboard Marine* decision – which is now on appeal – in holding that the estates "acquired" ownership of the deceased siblings' claims*, 2021 WL 3173213, at *9, relied on inapplicable cases, including case law that pre-dates the operative Florida Probate Code, Fla. Stat. § 731.201(14), which defines an "estate" as the decedent's property.[4] The *Seaboard Marine* court's conclusion is (as will be demonstrated on appeal) contrary to Florida law as well as cases from around the country, which acknowledge that an estate is not a legal entity but simply a term used to describe a decedent's property. *See, e.g., D'Addario v. D'Addario*, 901 F.3d 80, 102 (2d Cir. 2018) (an estate is "merely a name to indicate the sum total of the assets and liabilities of the decedent") (citations omitted); *Smith v. Cimmet*,

---

[4] For this reason, Plaintiffs also respectfully disagree with the *Crowley* decision adopting the reasoning of the *Seaboard Marine* court. *de Fernandez v. Crowley Holdings, Inc.*, No. 21-CV-20443, 2022 WL 860373, at *6 (S.D. Fla. Mar. 23, 2022).

199 Cal. App. 4th 1381, 1390 (2011) (an estate "is simply a collection of assets and liabilities") (citations omitted).[5]

Moreover, the *Seaboard Marine* court's interpretation of Section 6082(a)(4)(B) violates constitutional equal protection. Importantly, the cutoff date in Section 6082(a)(4)(B) applies equally whether the claimant is an individual or a corporation. *See* 22 U.S.C. § 6023(15) (defining "United States national" to include both citizens and legal entities). As claimants, they are identical in all respects. Thus, an interpretation of the HBA that strips one class of U.S. nationals—natural persons—of their claims upon dying natural death, while allowing another class of U.S. nationals— legal entities such as corporations—to retain their claims in perpetuity, creates two arbitrary and irrational classes of unequal claimholders. Such an outcome would eviscerate the equal protection conferred by the Due Process Clause of the Fifth Amendment. *See Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review.").

Title III's purpose is reflected in its title: the "Protection of Property Rights of United States Nationals." 22 U.S.C. §§ 6081-6085. There is no rational basis for treating U.S. nationals who are natural persons differently than U.S. nationals who are legal entities; such an interpretation of Section 6082(a)(4)(B) would undermine Congress's stated purpose for the Act and would be contrary to "the common mandate of statutory construction to avoid absurd results." *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 200 (1993). The only reasonable interpretation is that Section 6082(a)(4)(B) is simply a statutory cutoff date for when an individual or legal entity had to have been or become a U.S. citizen to be able to acquire ownership of a claim. It is unrelated to whether a claim survives a claimant's death. Indeed, in a ruling made after the *Seaboard Marine* ruling, this Court held that HBA claims do survive a claimant's death. *See Soto v. Booking.com B.V.*, No. 20-civ-24044-MGC, Doc. No. 48 (S.D. Fla. Sep. 29, 2021).

---

[5] *See also, e.g., Est. of Tallman ex rel. Tallman v. City of Gastonia*, 682 S.E.2d 428, 434 (N.C. App. 2009); *Zaboth v. Beall*, 26 Va. Cir. 269, 1992 WL 884464, *1 (Va. 1992); *Republic Bankers Life Ins. Co. v. Bunnell*, 478 S.W.2d 800, 801 (Tex. Civ. App. 1972); *Matter of Tr. Est. of Renjes*, 42 Haw. 151, 163 (1957).

As alleged in the Amended Complaint, the decedents acquired their claims to the Confiscated Property long before March 12, 1996. The deceased siblings' Personal Representatives are the proper Plaintiffs to represent the deceased's interests in this case. *See* Fla. Stat. § 733.612(20) (the personal representative may "[p]rosecute or defend claims or proceedings *in any jurisdiction* for the protection of … the decedent's property") (emphasis added). Under both Florida law and constitutional equal protection, Section 6082(a)(4)(B) should be interpreted to preserve the deceased siblings' claims.

The personal representative of the estates did not acquire ownership of the claims against Defendants. Likewise, the decedents' estates did not acquire ownership of the claims. The claims against Defendants are part of each decedent's estate and the personal representatives bring those claims in a representative capacity because the estates are not legal entities capable of owning anything. The MTD must be denied with respect to the estates' claims being prosecuted by their personal representatives.

**B.    In the Alternative, the Inheritors are Proper Plaintiffs**

Although Defendants cite non-binding decisions that have interpreted "acquire" to include passive inheritance, Defendants have presented no binding authority that an heir may not "acquire" ownership of a claim through inheritance after March 12, 1996. Plaintiffs urge the court to adopt the interpretation of former Congressman Dan Burton, co-sponsor of the HBA, and others who have explained:

> There is nothing in the actual language of section 6082(a)(4)(B) that precludes an heir to a claim that existed before March 12, 1996, from pursuing that same claim under Title III after that date. The requirement in section 6082(a)(4)(B) that the U.S. national acquire ownership of the claim before March 12, 1996 *does not apply to inheritances of a claim*. That provision was specifically enacted to disallow the acquisition of claims by purchase or trade in a secondary market for claims….Stated simply, Congress did not want to create a marketplace for the buying and selling of Title III claims. A claim inherited from a family member was never at issue.

Brief of Former Congressmen Dan Burton and Robert Torricelli and Directorio Democratico Cubano, Inc., *Amici Curiae* in Support of Appellant and Reversal, in *Garcia-Bengochea v. Carnival Corp.*, 2021 WL 1085544 (11th Cir. Feb. 23, 2021) (emphasis added).[6]

---

[6] Defendants cite *Gonzalez v. Amazon, Inc.*, 835 Fed. Appx. 1011, 1012 (11th Cir. 2021), but that case is inapposite. In *Gonzalez*, the Eleventh Circuit found an HBA claim inherited after March 12, 1996, to be an "ownership" claim, namely Gonzalez's mother's HBA claim, which

## II.     Cuba Need Not Have Confiscated the Property From a U.S. National

Without citing any operative provision of the HBA, Defendants incorrectly claim that the HBA imposes an explicit condition that Cuba must have confiscated the property from a U.S. national. There is no such requirement in the HBA. The HBA's provisions are clear and unambiguous and the Court's inquiry begins and ends there. Should the Court nevertheless pursue a further inquiry, a requirement of U.S. nationality at the time of confiscation cannot be read into the Act because such a requirement would contradict express language in other provisions of the Act, a related statute, and the Act's legislative history.

### A.     The Plain Language Of The HBA Establishes That Claimants And Property Owners Need Not Be U.S. Nationals At The Time Of Confiscation

The key case cited by Defendants acknowledged that the HBA's provisions do not include an "explicit condition that the confiscation have deprived a United States national of the property at issue." *Regueiro v. Am. Airlines*, 2022 WL 2399748, at *6 (S.D. Fla. May 20, 2022). ***The judicial inquiry is therefore complete***. Courts must "begin [their] construction of a statutory provision where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (citations omitted). "[W]hen the words of a statute are unambiguous, then, this first canon of statutory construction is also the last: ***judicial inquiry is complete***." *Id.* (emphasis added)

---

she inherited from her husband in 2016: "after Gonzalez's father passed away in November of 2016, Gonzalez's mother inherited the property. She chose to give her ownership claim to Gonzalez, her eldest son, because of her advanced age and fragile health." *Id.* at 1011. The difficulty presented by the *Gonzalez* case is that there were two post-March 12, 1996 events: (1) the 2016 inheritance by Gonzalez's mother from Gonzalez's father when he died and (2) Gonzalez's mother's 2016 *inter vivos* transfer of "her ownership claim to Gonzalez, her eldest son, because of her advanced age and fragile health." *Id.* The *inter vivos* transfer from mother to son arguably runs afoul of §6082(a)(4)(B). The Eleventh Circuit upheld the dismissal of Gonzalez's claims because "Nothing within Gonzalez's amended complaint suggest he acquired a claim to his grandfather's property before [March 12, 1996]." *Id.* But in doing so, the Eleventh Circuit referred to Gonzalez's mother's claim as an "ownership" claim, even though she inherited her claim after March 12, 1996.

### 1. The Act Contains No Requirement That Claimants Be U.S. Nationals At The Time of Confiscation

The principal operative provision of Title III of the HBA states, in relevant part,

> any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to *any* United States national who owns the claim to such property for money damages….

22 U.S.C. § 6082(a)(1)(A) (emphasis added). There is no requirement that the claimant or property owner must have been a U.S. national when their property was confiscated.

The use of the phrase "*any* United States national" in Section 6082(a)(1)(A) confirms that Congress intended to include *all* U.S. nationals as potential claimants under Title III— not just the subset of U.S. nationals who were U.S nationals before the confiscation of their property. (citations omitted). "Any" means "one or some indiscriminately of whatever kind." *Patel v. Garland*, 142 S. Ct. 1614, 1622 (2022) (citing Webster's Third New International Dictionary, at 97).

Moreover, where Congress intended to include limitations in the requirements for bringing a claim under Title III, it did so expressly. *See* 22 U.S.C. §§ 6082(a)(1)(a), (a)(4)(B), (a)(5)(C). In fact, Section 6082(a)(1)(A) is silent as to whether a claimant must have been a U.S. national at the time of confiscation. Courts must construe Congress's silence on an issue "as exactly that: silence." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).

Absent any statutory language imposing a condition as to when a claimant or owner of confiscated property must have become a U.S. national, Defendants' argument fails.

### 2. The Statutory Construction Advanced By Defendants Conflicts With Express Provisions of The Act

The HBA not only lacks any operative provision supporting Defendants' construction but also includes several provisions expressly recognizing claims by persons who became U.S. nationals *after* their property was confiscated by the Cuban Government. Defendants' interpretation of the Act must be rejected because it would, in violation of the rules of statutory construction, deprive these provisions of meaning and effect, rendering them inoperative, superfluous, void, and insignificant.

### i.    Section 6083(b) Contradicts Defendants' Interpretation

Section 6083(b) of the HBA directly contradicts the contention that claimants must have been U.S. nationals at the time their property was confiscated. That provision expressly permits courts to refer cases to the Foreign Claims Settlement Commission ("FCSC") "whether or not" the claimants were U.S. citizens at the time of confiscation and amended the International Claims Settlement Act of 1949 ("ICSA") "by adding at the end the following new section":

> "SEC. 514. Notwithstanding any other provision of this Act and only for purposes of section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, a United States district court, for fact-finding purposes, may refer to the [Foreign Claims Settlement] Commission, and the Commission may determine, questions of the amount and ownership of ***a claim by a United States national*** (as defined in section 4 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996), resulting from the confiscation of property by the Government of Cuba described in section 503(a), ***whether or not the United States national qualified as a national of the United States (as defined in section 502(1)) at the time of the action by the Government of Cuba***."

Pub. L. 104–114, Title III, § 303, March 12, 1996, 110 Stat.785 (emphasis added). Although it is omitted from the published version of Section 6083,[7] this language is codified at 22 U.S.C. § 1643*l*, in proximity to other provisions of the ICSA. This provision confirms that "a claim by a United States national" can be asserted under the HBA "whether or not the United States national qualified as a national of the United States…at the time of the action [*i.e.*, confiscation] by the Government of Cuba."

The addition of this new language in Section 1643*l* of the ICSA reflects Congress' recognition that, for claims other than those brought under the HBA, the FCSC may consider only claims brought by someone who was "a national of the United States ***on the date of the loss***." 22 U.S.C. § 1643c (emphasis added). The new language, applicable only to HBA plaintiffs, accommodated claims by persons who became U.S. nationals ***after*** the date of confiscation, demonstrating that Congress intended to authorize such claims in Title III.

---

[7] Omitted" means "deleted for a reason other than it was repealed," here because "it amend[s] another provision." *See* Glossary, Office of Law Revision Counsel (available at https://uscode.house.gov/faq.xhtml).

Construing Title III to require a claimant to have been a U.S. national at the time of confiscation would violate the rules of statutory construction. *Johnson v. United States*, 2015 WL 10963702, at *8 (S.D. Fla. Feb. 9, 2015) ("[A] statute must be construed to give effect to all its provisions, ***so that no part will be inoperative or superfluous, void or insignificant***.") (emphasis added).

### ii.    Section 6083(c)(1) Contradicts Defendants' Interpretation

Section 6083(c)(1) provides:

Nothing in this chapter or in section 514 of the [ICSA], as added by subsection (b), shall be construed–

> (1) to require or otherwise authorize ***the claims of Cuban nationals who became United States citizens after their property was confiscated*** to be included in the claims certified to the Secretary of State by the Foreign Claims Settlement Commission for purposes of future negotiation and espousal of claims with a friendly government in Cuba when diplomatic relations are restored….

22 U.S.C. § 6083(c)(1) (emphasis added). In this provision of the HBA, Congress again acknowledged "the claims of Cuban nationals who became United States citizens *after* their property was confiscated" (although such claims will not be part of any potential settlement with a friendly government in Cuba). The construction advanced by Defendants would deprive this provision of any meaning or effect and render it superfluous.

### iii.    Section 6082(a)(5)(C) Contradicts Defendants' Interpretation

Section 6082(a)(5)(C) provides:

(C) A United States national, other than a United States national bringing an action under this section on a claim certified under title V of the [ICSA], may not bring an action on a claim under this section before the end of the 2-year period beginning on the date of the enactment of this Act.

22 U.S.C. § 6082(a)(5)(C). Anyone who was a U.S. national at the time of confiscation was eligible to file a claim under the ICSA (*see* 22 U.S.C. § 1643c(a)) and the HBA requires anyone who was eligible to file a claim under the ICSA to have done so. *See* 22 U.S.C. § 6082(a)(5)(A). Thus, anyone who was a U.S. national at the time of confiscation would be "a United States national bringing an action under this section on a claim certified under title V of the [ICSA]." 22 U.S.C. § 6082(a)(5)(C).

If only those who were U.S. nationals at the time of confiscation could bring an action under Title III, then no one could bring such an action who was "other than a United States

national bringing an action under this section on a claim certified under title V of the [ICSA]." *Id.* In that event, the two-year waiting period imposed by Section 6082(a)(5)(C) ***could not apply to anyone***, rendering that provision meaningless, inoperative, and superfluous. Under the rules of statutory construction, the Court should reject the construction urged by Defendants in favor of the interpretation compelled by the HBA's express language: Title III permits claims by persons who became U.S. nationals *after* the confiscation of their property.

### iv.   Section 6081(3)(B)(iii) Undermines Defendants' Interpretation

In support of Title III of the HBA, Congress made the express finding that:

(3)  Since Fidel Castro seized power in Cuba in 1959 …

    (B)  through his personal despotism, he has ***confiscated the property of*** …

        (iii) thousands [of] ***Cubans who*** claimed asylum in the United States as refugees because of persecution and ***later became naturalized citizens of the United States***.

22 U.S.C. § 6081(3)(B)(iii) (emphasis added). Having identified a group of victims who became U.S. nationals *after* the Cuban Government confiscated their property, it is unreasonable to conclude that Congress intended to exclude those victims from the remedy provided by Title III.

### B.   The Legislative History Of The HBA Provides Confirmation

Because the HBA's plain language is clear and unambiguous (and Defendants do not argue otherwise), the Court need not even consider the Act's legislative history. But even if there were some ambiguities, the legislative history unequivocally demonstrates that Title III does not require the claimant or owner of confiscated property to have been a U.S. national when the property was confiscated by the Cuban government.

Members of Congress and Congressional reports acknowledged that the provisions enacted as Title III granted a private right of action to ***all*** who were U.S. nationals before the law was enacted—even if they were not U.S. nationals when their property was confiscated. *See, for example*, 141 Cong. Rec. H9342 (1995) (the HBA provides a remedy for "Cubans who left Cuba and became Americans, who are American citizens now"); H.R. Rep. 104-202 at 31 (July 24, 1995) (those who became U.S. citizens after confiscation "are included within the definition of a United States national"); 142 Cong. Rec. S1487 (1996) ("this legislation

will broaden the universe of those eligible to be compensated to include individuals who were not U.S. citizens at the time their property was taken."); *id.* at S1498.

### C.   *Regueiro* Does Not Compel This Court To Adopt Defendants' Construction Of The HBA

Defendants' construction relies not on the statute itself but on a district court decision in *Regueiro v. American Airlines, Inc.*, 2022 U.S. Dist. LEXIS 116153, at *8 (S.D. Fla. June 30, 2022). It is well-established that a "district court is not bound by another district court's decision, or even an opinion by another judge of the same district court[.]" *Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991). Among other things, the *Regueiro* court overlooked relevant provisions of the Act, including Sections 6083(b), 6082(a)(5)(C), and 6081(3)(B)(iii); indeed, no party raised these provisions in the briefing prior to the magistrate judge's report and recommendation or at the hearing before the magistrate judge. *See Regueiro*, No. 19-cv-23965-JEM, ECF Nos. 123, 126, 127 (S.D. Fla.). This Court should conduct its own statutory construction analysis, taking into consideration the arguments and authorities set forth herein that were not raised in *Regueiro*.[8]

### III.   The HBA Requires a "Claim to" Confiscated Property, Not Direct Ownership of Confiscated Property

Defendants next advance an argument rejected by every court that has encountered it – that owning a "claim to" confiscated property should mean ownership of confiscated property. *See, e.g., Iglesias v. Pernod Ricard*, No. 20-CV-20157-KMW, 2020 WL 13367465, at *11 (S.D. Fla. Aug. 17, 2020) (rejecting identical argument); *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1289-90 (S.D. Fla. 2020) (same).[9]

As the *Garcia-Bengochea* court explained, the argument that corporate shareholders have no "claim to" confiscated property where the corporation owned that property belies "the text, context, and purpose of Helms-Burton." *Garcia-Bengochea*, 407 F. Supp. 3d at 1289.

---

[8] In their section on the *Regueiro* decision (MTD at 9-10), Defendants also raise arguments on the domestic takings rule and indirect ownership through corporations, both of which are raised in separate sections of the motion (MTD at 10-14, 14-16) and addressed by Plaintiffs in the corresponding sections of this opposition.

[9] *See also Garcia-Bengochea v. Norwegian Cruise Line Holdings Ltd.*, No. 1:19-CV-23593-JLK, 2020 WL 5028209, at *2 (S.D. Fla. Aug. 25, 2020) ("Norwegian's Motion to Dismiss on this ground is denied for the same reasons discussed in the Court's August 26, 2019 order in the Carnival case.").

The *Garcia-Bengochea* court analyzed dictionary definitions, Congressional intent, multiple canons of statutory construction, and the goal of the HBA to conclude as a matter of law that shareholders of confiscated companies have claims to the confiscated assets of those companies and the HBA does not require direct ownership of those assets. *Id*. at 1289-91.

First, the HBA provides a cause of action to anyone who owns a "claim" to confiscated property. The ordinary meaning of "claim" implies something "substantially broader than a ***direct interest***" in confiscated property and courts should not use "corporate formalities...to confine Helms-Burton." *Id*. (emphasis in original). Similarly, courts may not "add or subtract words from a statute." *Id*. at 1290 (citing *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009)). Defendants' interpretation requires the Court to subtract the words "the claim to" from the phrase "owns *the claim to* such property" so that only plaintiffs who directly owned confiscated property may bring an HBA case.

Defendants argue without support that Congress added the words "claim to" for purposes of allowing a person who acquired the original property owner's "claim to" the property to bring an HBA cause of action. *See* MTD at 13 ("The additional words 'the claim to such' make it clear that the 'national' who can pursue 'the claim to such' property does not necessarily need to be the *original* owner of the property.") (emphasis in original). But the "original owner" in Defendants' hypothetical still only transferred their "claim to" the same property. Moreover, the HBA does not support the contention that Congress was concerned about those who acquired a "claim to" confiscated property from the original owner. To the contrary, Congress expressly stated in the statute that it was concerned about the "victims of these confiscations." 28 U.S.C. § 6081(11). Indeed, the *Garcia-Bengochea* court found that Congress's use of this "colloquial language" compelled the conclusion that Congress did not have "corporate formalities in mind." *Garcia-Bengochea*, 407 F. Supp. 3d at 1289.

Defendants contend this was "clear legal error," citing a new "legal presumption" that "courts are to presume the strict application of corporate formalities unless expressly varied by Congress." MTD at 11-12 (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003)). There is no such presumption. The *Dole* case Defendants cite as establishing this "presumption" did no such thing. *Dole* simply held that Congress likely "had corporate formalities in mind" when enacting the Foreign Sovereign Immunities Act ("FSIA") because Congress used language such as "shares" and "separate legal person." *Dole*, 538 U.S. at 475.

12

In fact, *Garcia-Bengochea* distinguished *Dole* on that ground. *Garcia-Bengochea*, 407 F. Supp. 3d at 1289 (distinguishing *Dole*). Just as *Dole* found Congress likely considered corporate formalities because it used corporate terms, *Garcia-Bengochea* found that Congress likely ***did not*** consider corporate formalities when it enacted Title III of the HBA because it used terms like the "rightful owner" and "victims." *Id*. There is no clear legal error.

Next, as Defendants acknowledge, courts interpret the HBA in context with the "closely related" International Claims Settlement Act of 1949. *Id*. "Claims" against Cuba in that statute may be based on property "owned wholly or partially, directly ***or indirectly*** by a national of the United States." 22 U.S.C. § 1643c(a) (emphasis added). This "added context" indicates that a claim under Helms-Burton does not require direct ownership and includes indirect ownership based on a claim to corporate ownership. *Garcia-Bengochea*, 407 F. Supp. 3d at 1290.

Finally, Defendants' corporate formality argument would "substantially undermine Congress' goal of deterring trafficking." *Id*. (citing 22 U.S.C. § 6081(11)). If the corporate entity no longer exists (or if the Cuban government simply confiscates it), Defendants could continue to traffic in Plaintiffs' property with impunity, leaving the shareholders without any rights to pursue recompense. According to *Garcia-Bengochea*, it is simply "implausible" to suggest Congress intended this result.  *Id*.

## IV.    The Domestic Takings Rule Has No Application Here

Defendants argue that any confiscation under the HBA is required to violate international law and the confiscation at issue here did not violate international law because of the domestic takings rule. MTD at 14-15. Although the domestic takings rule does "demarcate[] a class of acts that are outside of the purview of international law," any argument that the rule applies to the HBA "has no basis in law." *Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, 2021 WL 6065758, at *6 (S.D.N.Y. Dec. 22, 2021). The domestic takings rule is irrelevant because there is nothing in the HBA that requires a violation of international law. Defendants rely heavily on *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 711 (2021), and misquote it as acknowledging some "longstanding U.S. law" that takings by a foreign state must violate international law to be recognized by U.S. courts. MTD at 14 (citing *Phillipp*, 141 S. Ct. at 711).  There is no such rule.  *Philipp* interpreted a provision in the FSIA that expressly required that a confiscation of property was

"taken in violation of international law." 28 U.S.C. § 1605(a)(3). The HBA has no such requirement.  *Philipp* court that Congress's use of that phrase requiring a violation of international law compels courts to consider the domestic takings rule. *Philipp*, 141 S. Ct. at 715. The HBA does not contain any such requirement of a violation of international law and therefore the domestic takings rule has no application here.

Defendants next argue that the HBA requires a "wrongful" confiscation and Plaintiffs failed to plead same. Notwithstanding Defendants' repeated, emphasized use of the term "wrongful" (MTD at 1, 14-15), the term "wrongful" appears nowhere in the HBA's operative provisions. Defendants mistake congressional findings in Section 6081, which does use the term "wrongful," with the HBA's operative provisions, which do not. Congressional findings appearing in the prologue of a statute "cannot override a statute's operative language." *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019). The Supreme Court has made clear that "operative provisions should be given effect as operative provisions, and prologues as prologues." *Dist. Of Columbia v. Heller*, 554 U.S. 570, 578 n.3 (2008). The operative provision requires trafficking in property "which was confiscated by the Cuban Government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1)(A). The term "confiscated" is defined as the Cuban Government's seizure of property without providing compensation. 22 U.S.C. § 6023(4). Plaintiffs pled the Cuban Government seized their property "without compensation" no less than ten times. Doc. No. 65 at ¶¶ 2, 94, 95, 102, 172(a), (c), (d), (e), (h), (i).

## V.    Collateral Estoppel is Inapplicable

Defendants argue that a decision currently on appeal should be given preclusive effect to compel this Court to adopt that decision's ruling on (1) a contract interpretation issue, and (2) a statutory interpretation issue. First, neither argument actually seeks dismissal of the cause of action and it is therefore inappropriate for a Rule 12(b)(6) motion. Second, the Court should follow Supreme Court precedent suggesting the appropriate path is to defer ruling on collateral estoppel until after the appeal. Third, collateral estoppel should not be applied regardless because it has no impact on pretrial proceedings in this case. Fourth, collateral estoppel does not apply to these questions of law.

## A. Collateral Estoppel Does Not Preclude Plaintiffs' Claims and Therefore Cannot Be Raised in a Rule 12(b)(6) Motion

Although collateral estoppel is an affirmative defense, it can be raised in a motion to dismiss where it precludes the action and the defense is apparent on the face of the complaint. *Concordia v. Bendekovic*, 693 F.2d 1073, 1076 (11th Cir. 1982). Neither is true here.

First, collateral estoppel can only be raised in a Rule 12(b)(6) motion where application of the defense would "summarily dismiss[]" the action. *Id.* at 1075 (citations omitted). But Defendants' collateral estoppel argument – at least with respect to the Concession – does not seek dismissal of the action. Rather, Defendants argue that Plaintiffs should be estopped from relitigating a particular contract interpretation issue – namely, the geographic scope of the Concession – which is unrelated to whether Plaintiffs properly pled an HBA claim. MTD at 16. This is not a proper Rule 12(b)(6) argument because it does not seek dismissal for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Regardless of the Concession's geographic scope, Plaintiffs adequately alleged a one-count complaint for trafficking in violation of the HBA and Defendants' collateral estoppel argument does not dispute this. Moreover, even if the Concession did not exist at all, Defendants concede their collateral estoppel argument would not result in dismissal because Plaintiffs still adequately pled trafficking by Defendants' use of Plaintiffs' confiscated land. *See* MTD at 16 n.6 (conceding their argument would not result in "dismissal of the alleged trafficking upon 11,000 Acres of sugar land").

Second, the defense of collateral estoppel is not apparent on the face of the Amended Complaint. Although a court can take judicial notice of another court's records to determine whether collateral estoppel applies, the moving party must introduce into evidence all relevant records from the prior proceeding. *Concordia*, 693 F.2d at 1076 (reversing a district court's application of res judicata at the motion to dismiss stage where the moving party only introduced the complaint and judgment). Simply referring to various filings in another case is insufficient. *State Farm Mut. Auto. Ins. Co. v. B & A Diagnostic, Inc.*, 104 F. Supp. 3d 1366, 1374 (S.D. Fla. 2015). Here, Defendants only refer to various filings in the *Seaboard Marine* case but have not introduced any records into evidence other than a version of the Concession Plaintiffs filed in the prior case.  MTD at 17-19 and Exh. B.

**B.    Collateral Estoppel Should Not Be Decided Until After Resolution of the *Seaboard Marine* Appeal**

As the Supreme Court said: "[i]n significant part, preclusion doctrine is premised on an underlying confidence that the result achieved in the initial litigation was substantially correct. 'In the absence of appellate review,' we have observed, 'such confidence is often unwarranted.'" *Bravo-Fernandez v. United States*, 580 U.S. 5 (2016) (citations omitted). Applying *Bravo-Fernandez*, a district court recently held that, although there were "forceful reasons to apply collateral estoppel," denying its application pending appeal of the initial judgment was necessary "to bolster 'confidence that the result achieved in the initial litigation was substantially correct.'" *Mondelez Glob. LLC v. Int'l Union of Operating Engineers Loc. 399*, 2019 WL 216738, at *4 (N.D. Ill. Jan. 16, 2019) (citing *Bravo-Fernandez*, 137 S. Ct. at 358).

Here, far from bolstering confidence in its correctness, Plaintiffs have strong arguments showing legal error by the district court in *Seaboard Marine* by, among other things, interpreting "whereas" clauses as binding and sufficient to override the unambiguous operative provisions of the Concession. *See Whetstone Candy Co., Inc. v. Kraft Foods, Inc.*, 351 F.3d 1067 (11th Cir. 2003) ("Whereas" clauses "are not binding when the contract is otherwise unambiguous.…They are merely prefatory recitations of the facts that lead the parties to enter the agreement") (citations omitted). Moreover, the district court interpreted the Concession in a manner that contradicts the plain language of one operative provision, renders superfluous other operative provisions, and adds limitations to the Concession that do not exist in its unambiguous operative terms.

**C.    Collateral Estoppel Should Not Be Applied Where Resolution of an Appeal Has Little to No Impact on Pretrial Proceedings in This Case**

Although an appeal does not strip a judgment of its collateral estoppel effect, courts must nevertheless confront the "substantial difficulties" that arise where a second court must decide the preclusive effect of a judgment "while an appeal [of that judgment] is pending." 18A Fed. Prac. & Proc. Juris. § 4433 (3d ed.). This is because a "judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel." *Jaffree v. Wallace,* 837 F.2d 1461, 1466 (11th Cir. 1988) (quoting 1B *Moore's Federal Practice* Para. 0.416[2], at 517 (1984)). Given these practicalities, where an appeal is pending, application of collateral estoppel to dismiss or stay a case is "least attractive when the second action presents claims or issues that must be tried regardless of the

16

outcome of the first action and there are cogent reasons to fear the effects of delay." 18A Fed. Prac. & Proc. Juris. § 4433 (3d ed.).

Here, Plaintiffs have appealed the *Seaboard Marine* decision and the outcome of that appeal ***will not*** impact the pretrial proceedings in this case. Accordingly, there is no reason to make a collateral estoppel determination at this stage. In the *Seaboard Marine* appeal, the Eleventh Circuit must determine whether the scope of the Concession is the Bay of Mariel (as expressed in the plain language of its operative provisions) or confined to one small dock on the east side of the Bay of Mariel (in contravention of its express terms). The Eleventh Circuit must also determine whether the estates and inheritors are proper plaintiffs. In either outcome, merits discovery in this case will be the same. Plaintiffs require discovery concerning the extent of Defendants' trafficking in the Bay of Mariel. Regardless of the scope of the Concession, Plaintiffs alleged that Defendants traffic in their 11,000 acres of land, on which sit major facilities that Plaintiffs alleged Defendants use as part of their trafficking, such as the headquarters for the Container Terminal, the logistics facility alleged in Plaintiffs' Amended Complaint, and container storage areas. *See, e.g.*, Am. Compl. at ¶¶ 35-36, 126-33. Even if a portion of the Container Terminal does not sit on those 11,000 acres and that portion is not otherwise included in the scope of the Concession, discovery in this case encompasses Defendants use of the Container Terminal and the surrounding land. It cannot be separated, and Defendants do not argue otherwise. Moreover, discovery may reveal that Defendants traffic throughout the Bay of Mariel; hence any limitations on the geographic scope within the Bay are irrelevant. Similarly, whether this case involves one Plaintiff or all Plaintiffs, the elements required to prove trafficking are the same.

Finally, there are "cogent reasons to fear the effects of delay." 18A Fed. Prac. & Proc. Juris. § 4433 (3d ed.). Plaintiff Odette Blanco de Fernandez is 92 years old and Defendants have not sought to dismiss her from the case. Imposing any delay pending resolution by the Eleventh Circuit or issuing a ruling that could later be vacated after an Eleventh Circuit reversal is inherently prejudicial to Ms. Fernandez. It is prejudicial to all Plaintiffs, as many of the facts Plaintiffs must prove relate to events that occurred sixty years ago and testimony may come from witnesses of advanced age. Defendants have already successfully delayed this case for over a year due to lengthy motion practice resulting in the denial of all of Defendants' arguments for a stay. See Doc. Nos. 54, 56.

### D.     Collateral Estoppel Does Not Apply to Conclusions of Law

"[I]ssue preclusion does not attach to abstract rulings of law." 18 Fed. Prac. & Proc. Juris. § 4425 (3d ed.); see also *Matter of Westmoreland Coal Co.*, 968 F.3d 526, 532 (5th Cir. 2020) ("Preclusion does not apply if 'the issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based.'") (citing Restatement (Second) of Judgments § 29(7) (1982)). Here, Defendants seek to apply collateral estoppel to two conclusions of law by a different court: (1) the interpretation of the scope of the Concession as a question of law (see *De Fernandez v. Seaboard Marine, Ltd.*, 2022 WL 3577078, at *8 (S.D. Fla. Aug. 19, 2022) ("[I]nterpreting the 1955 Concession is a question of law for the Court."); and (2) the interpretation of Florida probate law and the HBA as applied to heirs and estates (see *de Fernandez v. Seaboard Marine, Ltd.*, 2021 WL 3173213, at *8 (S.D. Fla. July 27, 2021)). Both these issues are questions of law to which collateral estoppel does not apply.

Even if collateral estoppel could apply to questions of law, the Court should nevertheless consider these two issues of law *de novo* at the appropriate time in these proceedings and afterwards consider the impact of collateral estoppel. See *Int'l Railways of Cent. Am. v. United Brands Co.*, 358 F. Supp. 1363, 1374 (S.D.N.Y. 1973) ("It seems easier to approach contract interpretation *de novo* and then to see whether the findings or the doctrines of res judicata or collateral estoppel support or defeat the result.").

## VI.    This Court Has Specific Personal Jurisdiction over CMA France

CMA France[10] contends that this Court lacks personal jurisdiction over it under both the Florida Long-Arm Statute and Federal Rule of Civil Procedure 4(k)(2) "because of the limits of constitutional due process." (Dkt. 72 at 19).[11] CMA France is wrong.

---

[10] CMA America does not join in the personal jurisdiction argument (*see* MTD at 19-25); hence, CMA America concedes that this Court has jurisdiction over it (*see also id.* at 25, noting CMA America is "before the Court").

[11] CMA France contests personal jurisdiction under both Florida Statute §48.193 and Federal Rule of Civil Procedure 4(k)(2) on the ground that "this Court cannot assert jurisdiction over S.A. because of the limits of constitutional due process." (MTD at 19). Because CMA France does not take issue with the application of any particular part of §48.193 or Rule 4(k)(2) other than the due process limitation, Plaintiffs likewise confine their argument here to constitutional due process. As CMA France concedes (MTD at 19), the minimum contacts analysis is the same under Rule 4(k)(2) and the Florida Long-Arm Statute, except that, under

The parties agree that, to establish a non-resident defendant's minimum contacts with a forum "for specific-jurisdiction purposes, (1) the claim must 'arise out of or relate to' one of the defendant's contacts in the forum, (2) the defendant must have 'purposefully availed' itself of the privilege of conducting activities within the forum, and (3) jurisdiction must comport with 'traditional notions of fair play and substantial justice.'" *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1310 (11th Cir. 2022).

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017 (2021), held:

> The contacts needed for [specific] jurisdiction often go by the name purposeful availment. … The defendant…must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State. …The contacts must be the defendant's own choice and not random, isolated, or fortuitous. …. They must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there. … The plaintiff's claims…must arise out of or relate to the defendant's contacts with the forum.

*Id.* at 1024-1025 (internal citations, quotations, and other marks omitted). In that case, Ford conceded that it did substantial business in the two states at issue and therefore purposefully availed itself of the privilege of conducting business there (*id.* at 1026). Ford argued, however, that the lower courts lacked jurisdiction because the lawsuits did not arise out of its in-forum conduct. *Id.* The Supreme Court rejected that position and held that:

> Ford's causation-only approach finds no support in this Court's requirement of a connection between a plaintiff's suit and a defendant's activities . . .. our most common formulation of the rule demands that the suit "arise out of or relate to the defendant's contacts with the forum." The first half of that standard asks about causation; but the back half, after the "or," contemplates that some relationships will support jurisdiction without a causal showing.

*Id.* at 1026, 1028 (citations omitted).

Here, as in *Ford*, CMA France purposefully availed itself of the privilege of doing lucrative business in the United States and Florida, and Plaintiffs' suit arises out or relates to those abundant U.S. contacts. *First*, as to purposeful availment of the forum, contrary to CMA France's protestation that it has "purposefully avoided connection to this forum" (Dkt. 72 at

---

Rule 4(k)(2), the relevant forum is the United States as a whole rather than the particular state in which the district court sits. *Teck Res. Ltd.*, 43 F.4th at 1310.

23), Plaintiffs alleged in their Amended Complaint that CMA France *itself* – not through its subsidiaries (*contra* Dkt. 72 at 21)[12] – repeatedly reached into Florida and the United States. It did so by *itself* entering into contracts (the Bills of Lading)[13] as "Carrier"[14] (and therefore the disclosed principal) of nearly 700 cargo shipments from various U.S. Ports – including PortMiami in Miami-Dade County, Florida – to the Port of Mariel, Cuba as the port of discharge. The Port of Mariel is alleged to sit on and use Plaintiffs' Confiscated Property. (Am. Compl. ¶¶ 26-30, 37-41, including the allegation that CMA America signed as "agent" for CMA France as "Carrier" on the U.S.-Cuba Bills of Lading).

CMA France does *not* dispute the allegations that it entered into the nearly 700 Bills of Lading listing U.S. ports of loading and Port of Mariel as the port of discharge, and it expressly admits to having entered into at least one a contractual "Bill of Lading for Combined Transport and Port to Port Shipment" that specifically identifies the "Port of

---

[12]Notably subsidiary CMA America *also* took relevant action in Florida. The Amended Complaint alleges: "The business that CMA America transacts in Florida includes trafficking in the Confiscated Property by acting as CMA France's agent for CMA France's carrying of containers from PortMiami to the Port of Mariel." (Am. Compl. ¶39) (*see also id.* ¶40 "CMA America is the agent on behalf of CMA France for the entire shipment of containers from PortMiami in Florida to the Port of Mariel in Cuba regardless of whether the containers make any stops or change vessels on the way."); *id.* ¶156 and ¶157, "As CMA France's agent, CMA America handles aspects of the U.S. side of the trafficking voyages, including booking the travel to Cuba, coordinating the travel to Cuba, loading the containers onto CMA France's vessels, and communicating with CMA France's customers.").

[13] *See Crowley Am. Transport, Inc. v. Richard Sewing Machine Co.*, 172 F.3d 781, 783 n.2 (11th Cir. 1999) ("A 'bill of lading' is the contractual agreement between a shipper and a carrier.").

[14] According to CMA France's publicly available terms and conditions "'Carrier' means the Party on whose behalf this Bill of Lading is issued." https://www.cma-cgm.com/static/eCommerce/Attachments/BILL%20OF%20LADING%20CMA%20CG M%20Terms%20and%20Conditions%20-%2006_2020.pdf (last visited October 18, 2022). *See also Karimas Imp. Exp., LLC v. Guaranteed Int'l Shipping LLC*, 2021 U.S. Dist. LEXIS 261041 (D. Conn. July 27, 2021) (in case where bill of lading said "[s]igned for the Carrier CMA CGM S.A. by CMA CGM (America) LLC as agent for the Carrier," finding as fact: "The defendant, CMA CGM America, is the United States agent for the disclosed principal, non-party CMA CGM S.A."); *Ziegler v. Subalipack (M) SDN BHD*, 2017 U.S. Dist. LEXIS 128584 (S.D. Tex. Aug. 14, 2017) (finding that, where the U.S. subsidiary, MSC USA, signed the bill of lading "as agent on behalf of the carrier MSC Mediterranean Shipping S.A.," MSC Mediterranean Shipping S.A. was the disclosed principal).

Loading" (Box 12) as "Miami" and the "Port of Discharge from Vessel" (Box 13) as "El Mariel" (*see* Dkt. No. 72-1, Robbins Decl. Ex. D at pages 378-81 of the pdf; *see also* MTD at 22). That Bill of Lading for Combined Transport and Port to Port Shipment was on June 28, 2020 "Signed for the Carrier CMA CGM SA by CMA CGM (America) LLC as agent for the Carrier." The following combined images are excerpted from that Bill of Lading for Combined Transport attached to Defendants' Motion to Dismiss at Dkt. No. 72 (the "Uncontested Bill of Lading").



Rather, CMA France ignores the importance of the key uncontested jurisdictional fact that it is the disclosed principal to these nearly 700 contracts, all of which resulted from CMA France's solicitation of U.S. (including Florida) customers and its own business dealings (Am. Compl. ¶¶ 29, 31). The import of its status as "Carrier" and disclosed principal on the Bills of Lading is that CMA France itself purposefully reached into and availed itself of the privilege of doing business in Florida and the United States. *See SEC v. Carillo*, 115 F.3d 1540, 1545-1546 (11th Cir. 1997) (purposeful availment where repeat solicitation advertisements contemplating a continuing relationship with U.S. customers were reasonably calculated to reach the forum); *S & Davis Int'l, Inc. v. Yemen*, 218 F.3d 1292, 1305 (11th Cir. 2000) (in personal jurisdiction analysis, noting "Performance logically required contact and interaction with the United States"). The shipment of the container that is the subject of the Uncontested Bill of Lading was expressly contracted **by CMA France** to be carried **by CMA France** as "Carrier" from the South Florida Container Terminal at the Port of Miami within this judicial district to the "Port of Discharge from Vessel" at "El Mariel."

Moreover, while it is not dispositive, *see Teck*, 43 F.4th at 1311, the Amended Complaint also alleges throughout that CMA France did not obtain authorization of U.S. Plaintiffs, who are in Florida, to do all that it was repeatedly doing in Mariel, Cuba. Although

the failure to obtain U.S. plaintiffs' authorization *by itself* might be insufficient under Eleventh Circuit precedent, it is certainly a relevant contact, and when considered together with the other voluminous contacts, demonstrates purposeful availment.

*Second*, Plaintiffs' claims indisputably arose out of or related to CMA France's contacts with Florida and the United States. Plaintiffs alleged that CMA France is using its forum contacts (entering into contracts to serve as Carrier for U.S.-origin cargo shipments from the United States, including Florida ports, to the Port of Mariel, Cuba) as an instrument for achieving the trafficking alleged, namely the use, profiting, and benefiting from Plaintiffs' confiscated property in Mariel, Cuba. *See Carillo*, 115 F.3d at 1544-1545 (finding relatedness satisfied where defendants used U.S.-based bank accounts to carry out the sale of unregistered securities to U.S. investors). Under *Ford Motor*, it matters not that Plaintiffs' Confiscated Property is in Cuba or that the cargo shipments departed *from* Florida as opposed to traveled *to* Florida and hence that the effects were felt mainly in Cuba. (*Contra* Dkt. 72 at 24). The question for specific personal jurisdiction is whether there is a "strong relationship among the defendant, the forum, and the litigation." *Ford Motor*, 141 S. Ct. at 1028. Here, there is no question that, because of the nearly 700 cargo shipments for which CMA France served as Carrier (and CMA America as agent), there is a strong relationship among the defendant (CMA France), the forum (the United States as a whole or Florida for the Florida-originating shipments), and this litigation (which involves *inter alia* those very cargo shipments).

Similarly, in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), although the foreign defendants gave bribes and gifts to alleged terrorists ***in Iraq***, the D.C. Circuit held personal jurisdiction existed ***in the U.S.*** because those foreign defendants had contracts with U.S. companies that supplied the products used in those bribes and gifts. Importantly, the Court explained that "***the forum contacts need not themselves be unlawful***." *Id.* at 234 (emphasis added). As to purposeful availment, the foreign suppliers "reached into the United States to contract with an affiliated U.S. manufacturer to be the manufacturer's exclusive agent in Iraq." *Id.* at 233. Pursuant to those contracts, the foreign suppliers "worked in Iraq to secure contracts to sell the U.S. manufacturer's goods there." *Id.* at 233. As for whether plaintiffs' claims arose out of or related to the defendants' in-forum contacts with the forum, the Court found that they did because plaintiffs' claims focused on defendants' provision of bribes to the alleged terrorists. In other words, defendants were using "forum contacts as an instrument for

achieving the wrong alleged." *Id.* at 234 (citing *Licci*, 732 F.3d 161). Notably, "the forum contacts need not themselves be unlawful. And the defendants' forum contacts need not have caused or given rise to the plaintiffs' claims." *Id.* (citing *Ford Motor*).

Here as in *Atchley*, CMA France used its many forum contacts as an instrument for achieving the wrong alleged. For purposes of the personal jurisdiction inquiry, it does not matter whether the U.S.-originating cargo shipments might constitute "legal U.S. trade" (Dkt. 72 at 21, 24). Again, "the forum contacts need not themselves be unlawful." *Atchley*, 22 F.4th at 234; *see also Carillo*, 115 F.3d at 1545 (finding that, although the U.S. bank accounts by themselves were not fraudulent, the use of those bank accounts to carry out sales of unregistered securities was related to plaintiffs' cause of action of securities fraud). CMA France cites no law suggesting that a forum-based contact must be illegal to be relevant.

Moreover, it is irrelevant that the U.S.-originating cargo shipments may have stopped in Jamaica and/or were loaded onto different ships with different operators before finally arriving in the Port of Mariel. (Dkt. 72 at 21). As noted above, the salient fact is that CMA France entered into contractual Bills of Lading for cargo shipments loaded in U.S. ports, including PortMiami, with Mariel as the expressly listed port of discharge. Indeed, those Bills of Lading *do not even mention Jamaica* or any intermediary port.  They identify the U.S. port and the Port of Mariel.  *See* Uncontested Bill of Lading, Defendants' Motion to Dismiss at Dkt. No. 72.  The Carrier's obligations continue from port of loading to port of discharge. *See Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 14, 18–19 (2004) ("A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage"); *Marubeni Am. Corp. v. Stevens Shipping & Terminal Co.*, 1999 U.S. Dist. LEXIS 24315 (S.D. Ga. Apr. 23, 1999) ("A 'bill of lading' after all, 'is a contract between the shipper and the carrier and continues to govern the rights and obligations of the parties until delivery'") (internal quotation omitted). (*See also* Am. Compl. ¶¶ 40 and 156, alleging that CMA America's and CMA France's roles last "for the entire shipment of containers from PortMiami in Florida to the Port of Mariel in Cuba regardless of whether the containers make any stops or change vessels on the way").

In fact, a district court recently found that similar forum contacts not only "related to" the torts alleged but had a direct causal relationship with the claims. In *FCStone Merchant Services, LLC v. SGR Energy, Inc.*, 2021 U.S. Dist. LEXIS 131392 (S.D. Tex. July 14, 2021),

plaintiff FMS sued *inter alia* defendant shipping company, STS, for breach of contract and various torts related to two voyages of domestic crude oil from Texas to Colombia. The shipping company moved to dismiss for lack of personal jurisdiction, arguing it lacked minimum contacts with Texas and that the alleged wrongdoing occurred in Colombia so the wrongdoing did not arise out of or relate to any Texas contacts. The district court rejected that argument, holding that, if   STS had not loaded "its ship with the cargo from a Texas-based client and transporting it through Texas waters and into the ocean until reaching Colombia—then the alleged disputes giving rise to FMS's causes of action against STS would not have occurred." *Id.* at *10 (internal quotations, citations, and other marks omitted). Here too the trafficking alleged arises out of or relates to CMA France's shipping activities.

The cases relied upon by CMA France are inapposite. In *Teck*, the plaintiff "alleged only that the effects of [defendant] Teck's actions were felt in the United States—not that Teck engaged in any 'activity or occurrence' in the United States." 43 F.4th at 1311. By contrast, here, Plaintiffs have alleged the CMA France engaged in nearly 700 cargo shipments originating in the United States with Mariel, Cuba – including Plaintiffs' Confiscated Property – as the final destination.

The magistrate recommendation in *North American Sugar Inds v. Xinjiang*, 2022 U.S. Dist. LEXIS 156237 (S.D. Fla. Aug. 30, 2022), is also distinguishable. There, a defendant noted it was *not* the "carrier for or a party to either of the two shipments at issue" and the other defendants noted they had no involvement in the shipments or simply monitored them. *Id.* at *14-15. The defendants thus argued – and the court agreed – that they "did not take any actions in this forum" with respect to two shipments that went from China to Cuba, with stops in Miami. *Id.* This case is distinguishable because (a) CMA France *is* the carrier for the almost 700 cargo shipments and in that way *is* directly involved with the shipments, (b) unlike the shipments in *North American Sugar*, which stopped in Florida, the shipments here *originated* in the United States, including Florida, and listed on the contracts Mariel, Cuba as the destination, and (c) CMA France, personally as the disclosed principal and carrier on its bills of lading, and by and through its agents in the United States, engaged in numerous activities, as alleged in the Amended Complaint in Florida and the United States related to the loading of those shipments onto vessels to be carried by CMA France to Mariel, Cuba (ECF No. 65, ¶¶ 26, 29, 37, 55.b, 153).

For all these reasons, due process is more than satisfied, and CMA France is subject to the specific personal jurisdiction of this Court.  CMA France also argues, however, that it will suffer "great" "difficulties" if it is found subject to the Court's personal jurisdiction because of the EU and French Blocking Statutes. (Dkt. 72 at 22-23). This argument should be rejected. CMA France raised these Blocking Statutes in an effort to stay this litigation, and this Court rejected CMA France's arguments in a thorough opinion, finding that the U.S. interest outweighed any foreign interests and CMA France had not met its burden of proving hardship. *De Fernandez v. CMA CGM S.A.*, 2022 U.S. Dist. LEXIS 123083 (S.D. Fla. July 12, 2022). CMA France has identified no supposed procedural burden either. (*Contra* Dkt. 72 at 22). That experts were involved in the question of ownership in the Seaboard Marine case is not remarkable. U.S. litigation often involves the use of expert witnesses to opine on certain questions, including ownership. There is nothing unique or particularly burdensome, and whether CMA France would want to use experts in support of its defenses is entirely within CMA France's control.   Finally, Plaintiffs never argued that the HBA private right of action trumps due process concerns. (*Contra* Dkt. 72 at 25). And, the fact that CMA America is before the Court matters not because Plaintiffs alleged that *both* CMA France and CMA America are liable for their own trafficking. Both parties must now defend those claims here.

Dated:  October 18, 2022

David A. Baron, Esq. (admitted *pro hac vice*)
dbaron@bcr-dc.com
Melvin White, Esq. (admitted *pro hac vice*)
mwhite@bcr-dc.com
Laina C. Lopez, Esq. (admitted *pro hac vice*)
lcl@bcr-dc.com
Berliner Corcoran & Rowe LLP
1101 17th Street, N.W., Suite 1100
Washington, D.C. 20036-4798
Telephone: (202) 293-5555
Facsimile:  (202) 293-9035

Richard W. Fields, Esq. (admitted *pro hac vice*)
fields@fieldslawpllc.com
Martin Cunniff, Esq. (admitted *pro hac vice*)
MartinCunniff@fieldslawpllc.com
Fields PLLC
1701 Pennsylvania Ave, N.W., Suite 200
Washington, D.C. 20006

Respectfully submitted,

*/s/ John S. Gaebe*
John S. Gaebe, Esq.
Florida Bar No. 304824
johngaebe@gaebelaw.com
Law Offices of John S. Gaebe P.A.
5870 SW 96 St.
Miami, Florida  33156
Telephone: (305) 607-4755

David J. Horr, Esq.
Florida Bar No. 310761
dhorr@admiral-law.com
William R. Boeringer, Esq.
Florida Bar No. 347191
wboeringer@admiral-law.com
William B. Milliken, Esq.
Florida Bar No. 143193
wmilliken@admiral-law.com
Horr, Novak & Skipp, P.A.
Two Datran Center, Suite 1700

Telephone:  (833) 382-9816

*Counsel for Plaintiffs*

9130 S. Dadeland Boulevard
Miami, Florida 33156
Telephone: (305) 670-2525
Facsimile: (305) 670-2526

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of October 2022, the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ John S. Gaebe*
_____
John S. Gaebe, Esq.
