UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 21-CV-22778-RUIZ/DAMIAN

ODETTE BLANCO DE FERNANDEZ
*née* BLANCO ROSELL, *et al.*,

      Plaintiffs,

v.

CMA CGM S.A. (a/k/a CMA CGM
THE FRENCH LINE, a/k/a CMA CGM
GROUP) and CMA CGM (AMERICA) LLC,

      Defendants.

_____/

**REPORT AND RECOMMENDATION ON
DEFENDANTS' COMBINED MOTIONS TO DISMISS [ECF NO. 72]
AND PLAINTIFFS' MOTION TO STAY [ECF NO. 119]**

      THIS CAUSE is before the Court on Defendants, CMA CGM S.A. ("CMA France")
and CMA CGM (AMERICA) LLC ("CMA America") (collectively "Defendants"),
Combined Motions to Dismiss Plaintiffs' Amended Complaint, filed September 27, 2022
[ECF No. 72] (the "Motion to Dismiss"), and Plaintiffs' Motion to Stay Ruling on Collateral
Estoppel, filed March 24, 2023 [ECF No. 119] (the "Motion to Stay"). These Motions were
referred to the undersigned pursuant to an order of referral by the Honorable Kathleen M.
Williams, United States District Judge, on behalf of the Honorable Marcia G. Cooke, United
States District Judge, for appropriate resolution [ECF No. 78].[1] *See* 28 U.S.C. § 636(b)(1)(B).

---

[1] This case was later reassigned to the Honorable Rodolfo A. Ruiz, United States District
Judge. [ECF No. 97].

The undersigned has reviewed the Motion to Dismiss, the Response [ECF No. 77] and Reply [ECF No. 79] thereto, as well as Plaintiffs' Motion to Stay and related memoranda [ECF Nos. 125 and 130], all pertinent portions of the record, and the relevant legal authorities. The undersigned also heard from the parties who appeared, through counsel, before the undersigned on December 1, 2022, and on April 4, 2023, and is otherwise fully advised in the premises.

As discussed below, Plaintiffs, Cuban exiles and their estates and heirs, sued Defendants, related French and American entities engaged in international shipping, for claims arising under Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, known as the Helms-Burton Act (22 U.S.C. § 6021, *et seq.*). Defendants seek dismissal of Plaintiffs' claims with prejudice on grounds Plaintiffs fail to state a claim for relief under the Helms-Burton Act, and Defendants seek dismissal as to Defendant CMA France based on a lack of personal jurisdiction. Plaintiffs seek a stay of this Court's consideration of one of the asserted grounds for dismissal, collateral estoppel.

For the reasons set forth below, the undersigned recommends Defendants' Motion to Dismiss be granted in part and denied in part and that the claims of all Plaintiffs, except those of Plaintiff Odette Blanco De Fernandez *née* Blanco Rosell ("Ms. De Fernandez"), be dismissed. With respect to Ms. De Fernandez's claims, the undersigned recommends that her claims based on rights under a 70-Year Concession, discussed below, be dismissed on collateral estoppel grounds and that Plaintiffs' Motion to Stay consideration of the collateral estoppel issue be denied. The undersigned also recommends the Motion to Dismiss be denied as to personal jurisdiction over CMA France.

# I.    RELEVANT BACKGROUND AND FACTS

Because Defendants seek dismissal on personal jurisdiction grounds in addition to attacking the sufficiency of Plaintiffs' claims, the Court undertakes a more thorough analysis of Defendants' operations and contacts with the Southern District of Florida. The facts and background relevant to the determination of the Motion to Dismiss are taken from the Amended Complaint and viewed as true. *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1296 (11th Cir. 2021). Additional evidence submitted in support of the parties' personal jurisdiction arguments is considered in connection with the personal jurisdiction discussion below.

## A.  *The Plaintiffs*

Plaintiffs are fourteen individuals asserting claims on their own behalf, in their individual capacities, and in representative capacities as personal representatives, heirs, and administrators of estates of decedents (collectively referred to as "Plaintiffs"). *See* Complaint [ECF No. 1]. One Plaintiff, Ms. De Fernandez, is asserting claims individually on her own behalf. [ECF No. 65 (the "Amended Complaint") at ¶ 8]. The other thirteen Plaintiffs assert claims based on their representative capacities on behalf of Ms. De Fernandez's four siblings, all of whom are deceased. (Ms. De Fernandez and her siblings are collectively referred to herein as the "Blanco Rosell Siblings").

As alleged in the Amended Complaint, in 1960, the Cuban Government seized, without compensation, "property and rights, whatever their nature," related to property, as detailed below, that Plaintiffs claim belonged to the Blanco Rosell Siblings. *See* Am. Compl. at ¶¶ 2–4. After the seizure of their property in 1960, the Blanco Rosell Siblings all fled Cuba to the United States and became United States citizens. *Id.* at ¶ 5. All became United States citizens prior to March 12, 1996, the effective date of the Helms-Burton Act, but *after the*

Cuban Government seized their property. *Id.* Except for Ms. De Fernandez, who is 92 years of age, all of the Blanco Rosell Siblings passed away after becoming United States citizens and prior to the filing of this lawsuit. *Id.*

### B. The Defendants

#### 1. CMA France

Defendant CMA CGM S.A. ("CMA France") is a French entity, a Société Anonyme, organized under French Law. Am. Compl. at ¶ 26. CMA France is an international marine transportation company and, according to the Amended Complaint, one of the world's leading container carriers. *Id.* Plaintiffs allege Defendant CMA France operates in Florida and Cuba, both directly, as the disclosed principal on its bills of lading, and indirectly, through subsidiaries. *Id.* According to Plaintiffs, CMA France was the carrier on nearly 700 bills of lading for trafficking voyages from the United States to the Port of Mariel, Cuba. *Id.* at ¶ 28. Plaintiffs also allege CMA France solicits customers in Florida and throughout the United States with offers of "door-to-door service" using "Through Bills of Lading," which cover transportation on both land and sea. *Id.* at ¶¶ 29, 31.

The Amended Complaint alleges that vessels operated by CMA France call at the *Terminal de Contenedores del Mariel*[2] ("TCM"), which is part of the Port of Mariel within the *Zona Especial de Desarrollo Mariel*[3] ("ZEDM") in the Bay of Mariel, Cuba. Plaintiffs allege that, by "calling" (offloading or loading containers at a port of call) at the TCM, CMA France engages in commercially beneficial transactions and other commercial activities at the Port of

---

[2] In English, the Container Terminal of Mariel, herein referred to as the TCM.

[3] In English, the Special Development Zone of Mariel, herein referred to as the ZEDM.

Mariel and surrounding areas, including the ZEDM, from which it has profited. *See id.* at ¶¶ 33–37. In the Amended Complaint, Plaintiffs explain that when CMA France's ships call at the TCM in the Port of Mariel, "CMA France uses, benefits and profits from the logistics facilities built directly on Plaintiffs' Confiscated Property," and that "CMA France's services to its customers would not be possible or profitable without the use of the logistics facility located on Plaintiffs' Confiscated Property." *Id.* at ¶ 34.

The Amended Complaint also alleges that, after calling at the TCM and using the logistics facility, "CMA France delivers its cargo to its intended destination in Cuba, exploiting road and rail directly on Plaintiffs' Confiscated Property for its own commercial benefit." *Id.* at ¶ 35. And, as alleged in the Amended Complaint, CMA France developed a logistics facility and warehouses at the Port of Mariel which "occupies, utilizes and exploits land that is part of the ZEDM that Cuba confiscated from the Blanco Rosell Siblings." *Id.* at ¶ 36.

Plaintiffs include a photograph of a bill of lading in the Amended Complaint that shows CMA France as the carrier for a cargo shipment directly from the Port of Miami to the Port of Mariel. *Id.* at ¶ 38. That bill of lading indicates CMA America as the Agent for the Carrier. *Id.*

2. <u>CMA America</u>

Defendant CMA CGM (AMERICA) LLC ("CMA America") is a United States limited liability company organized in New Jersey with its principal place of business in Virginia. *Id.* at ¶ 39. According to the Amended Complaint, CMA America has transacted business in Florida since 2008 and acts as CMA France's agent for the carrying of containers from the Port of Miami to the Port of Mariel. *See id.* Plaintiffs allege that, along with CMA

France, CMA America is part of the CMA CGM Group and traffics in Plaintiffs' Confiscated Property by acting as the agent on behalf of CMA France for the shipment of containers from the United States, including from the Port of Miami, to the Port of Mariel. *Id.* at ¶¶ 39–40.

According to the Amended Complaint, CMA America and CMA France offer and contract with their customers to provide all services in the United States, including Florida, and Cuba involved in the collection, storage, loading, shipment, and inland delivery of shipments from the United States to the Port of Mariel. *Id.* at ¶ 41.

### B. *The Confiscated Property*

In the Amended Complaint, Plaintiffs allege the Blanco Rosell Siblings owned Maritima Mariel SA ("Maritima Mariel"), a Cuban corporation established in 1954. *Id.* at ¶ 84. In August 1955, the Cuban Government granted Maritima Mariel a 70-year Concession to "plan, study, execute, maintain, and exploit public docks and warehouses in the Bay of Mariel Bay, province of Pinar del Rio Province, and the construction of new buildings and works" (the "70-Year Concession"). *Id.* at ¶ 86. The Amended Complaint details a series of exceptional rights which Maritima Mariel was authorized to exercise in the Bay of Mariel pursuant to the 70-Year Concession. *See id.* at ¶ 87. Plaintiffs allege that Maritima Mariel and the 70-Year Concession are part of the property confiscated by the Cuban Government from the Blanco Rosell Siblings. *Id.* at ¶ 89.

In addition to the 70-Year Concession and Maritima Mariel, the Blanco Rosell Siblings allege they owned other companies, including Compañía Azucarera Mariel S.A., which owned and operated a sugar mill then known as Central San Ramón and held extensive land holdings surrounding Mariel Bay that were also confiscated by the Cuban Government. *Id.* at ¶¶ 90–93.

Plaintiffs allege that when the Cuban Government seized their property in 1960, it seized Maritima Mariel and the 70-Year Concession rights, as well as Central San Ramón and Compañía Azucarera Mariel and all of their land holdings, all of which were previously owned by the Blanco Rosell Siblings. *Id.* at ¶¶ 89 and 92. The Blanco Rosell Siblings' property confiscated by the Cuban Government is described in Resolution No. 436 published in the Cuban Official Gazette, dated September 29, 1960, at 23405-23406, as follows:

> (a) their wholly owned company, Maritima Mariel SA, and the 70-Year Concession held by Maritima Mariel SA, to develop docks, warehouses and port facilities on Mariel Bay, a deep water harbor located on the north coast of Cuba; and
> (b) their wholly owned companies, including [Compañía] Azucarera Mariel S.A., and their extensive land holdings (approximately 11,000 acres) on the southeast, south and west sides of Mariel Bay, which included a number of improvements such as roads, railways, buildings, and utilities.

*Id.* at ¶¶ 2, 4, 94–96.

Plaintiffs also allege that the Cuban Government incorporated the Confiscated Property into the ZEDM and that the Blanco Rosell Siblings' land holdings around Mariel Bay, which are part of the Confiscated Property, cover the entirety of the ZEDM where the facilities that CMA France uses for its shipping business are located. *Id.* at ¶¶ 104–109. And, according to the Amended Complaint, Plaintiffs' rights under the 70-Year Concession extend to all of Mariel Bay, including the area in the ZEDM where the Container Terminal, TCM, used by CMA France is located. *Id.* at ¶ 110.

Plaintiffs claim CMA CGM Group and, in particular, CMA France is involved with the Cuban Government in the development and operation of a commercial logistics facility within the ZEDM (and on the Confiscated Property) from which CMA France benefits and profits. *Id.* at ¶¶ 111–113. As detailed in the Amended Complaint, Plaintiffs claim that CMA France, along with Cuban entities, are trafficking in Plaintiffs' Confiscated Property without

their authorization by virtue of their use of and profitable operations on the Confiscated Property. *See id.* The Amended Complaint includes a map indicating where the facilities used by CMA France are located in relation to Plaintiffs' property rights. *Id.* at ¶ 114.

According to Plaintiffs, the Cuban Government seized the Confiscated Property and Defendants are trafficking in the Confiscated Property without the Blanco Rosell Siblings' permission and without providing adequate compensation. *See, e.g., id.* at ¶ 116. The Amended Complaint extensively details Defendants' conduct and uses of the Confiscated Property for their own benefit. *See id.* at ¶¶ 36–51.

## II.   THE LIBERTAD ACT, ALSO KNOWN AS THE HELMS-BURTON ACT

As set forth in the Helms-Burton Act, since Fidel Castro seized power in Cuba in 1959, the communist Cuban Government has engaged in the systematic repression of the Cuban people through, among other things, "violations of human rights and fundamental freedoms." *See* 22 U.S.C. §§ 6021(4), (22). In response, the United States has undertaken various measures to impose sanctions against the Castro regime and to deter foreign investors from investing in Cuba while protecting the claims of United States nationals who had property confiscated by the Cuban Government. In 1996, Congress passed Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq.* (the "LIBERTAD Act," "Title III," the "Helms-Burton Act," or the "Act"), "to strengthen international sanctions against the Castro government" and, relevant to the instant case, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." *Id.* §§ 6022(2), (6).

In Title III of the Helms-Burton Act, Congress denounced the Cuban Government's history of confiscating property of Cuban citizens and United States nationals, explaining that

"[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). Additionally, Congress admonished that foreign investors who traffic in confiscated properties through the purchase of equity interests in, management of, or entry into joint ventures with the Cuban Government to use such properties "complicate any attempt to return [these expropriated properties] to their original owners." *Id.* §§ 6081(5), (7). The Act also advises that this "trafficking" in confiscated property undermines the foreign policy of the United States "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government." *Id.* at § 6081(6)(B).

Congress therefore sought to "deter the trafficking in wrongfully confiscated property" and to "deny traffickers any profits from economically exploiting Castro's wrongful seizures." *See id.* § 6081(11); *see also* 22 U.S.C. § 6082(a)(1)(A). As a result, in passing Title III of the Helms-Burton Act, "Congress created a private right of action against any person who 'traffics' in confiscated Cuban property." *De Fernandez v. Seaboard Marine, Ltd.*, No. 20-cv-25176, 2021 WL 3173213, at *2 (S.D. Fla. July 27, 2021) (Bloom, J.) (quoting *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284 (S.D. Fla. 2019) (King, J.) (citing 22 U.S.C. §§ 6082(a)(1)(A), 6023(13)(A)).

Under Title III of the Act, "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property . . . ." 22 U.S.C. § 6082(a)(1)(A). The Act defines "traffics" as follows:

a person "traffics" in confiscated property if that person knowingly and intentionally--

(i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity[4] using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A) (footnote supplied).

Thus, the definition of "traffics" relates to offending conduct in the broad concept of "confiscated property"— *i.e.*, any property that was nationalized, expropriated, or otherwise seized by the Cuban Government to obtain ownership or control, without the property having been returned or adequate and effective compensation provided "without the authorization of any United States national who holds a claim to the property." *Id.* § 6023(13); *see also id.* § 6023(4).

Shortly after passage of the Helms-Burton Act, however, President Clinton invoked Title III's suspension or waiver provision, and "Title III ha[d] since been waived every six months, . . . and ha[d] never effectively been applied." *Odebrecht Constr., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1312 (S.D. Fla. 2012) (Moore, J.); *see also* 22 U.S.C. § 6085(c) (presidential power to suspend the right to bring a cause of action under Title III). That changed on April 17, 2019, when the Department of State announced that the federal government "will no

---

[4] Under Title III, the term "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d); 22 U.S.C. § 6023(3).

longer suspend Title III."[5] On May 2, 2019, the suspension of claimants' rights to bring actions under Title III was lifted, enabling claimants to file claims against alleged traffickers.

Plaintiffs, and other Cuban exile families now citizens of the United States, then initiated actions, including the instant case, against various defendants to recover damages under Title III of the Helms-Burton Act for the alleged trafficking in property that was confiscated by the Cuban Government and as to which these claimants allegedly own claims.

### III.    RELEVANT PROCEDURAL HISTORY

Plaintiffs filed the original Complaint in this case on July 30, 2021. [ECF No. 1]. Shortly thereafter, on September 20, 2021, CMA America filed a Motion to Stay, seeking to stay all proceedings in the case based on European and French Blocking Statutes. [ECF No. 32]. This Court denied the Motion to Stay on July 12, 2022 [ECF No. 54], following which Defendants filed a motion to dismiss on August 15, 2022 [ECF No. 58]. On September 6, 2022, Plaintiffs filed the Amended Complaint, which is the operative pleading. [ECF No. 65].

Defendants filed the Motion to Dismiss now before the Court on September 27, 2022. [ECF No. 72]. The Motion is fully briefed and ripe for adjudication.

On February 25, 2023, Plaintiffs filed a Notice Regarding Potential Vacatur of Summary Judgment and Final Judgment in *De Fernandez v. Seaboard Marine, Ltd.*, No. 20-cv-25176 (S.D. Fla.), No. 22-12966 (11th Cir.) (the "*Seaboard Marine* Case") [ECF No. 103]. In the Notice, Plaintiffs indicate that during a recent mediation, the parties in the *Seaboard Marine* Case reached an agreement in principle that was expressly conditioned upon a final vacatur of the summary judgment order and final judgment entered by the District Court in the

---

[5] U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), https://cl.usembassy.gov/secretary-of-state-michael-r-pompeos-remarks.

*Seaboard Marine* Case. Plaintiffs also indicate that because the *Seaboard Marine* Judgment may be vacated, they intended to request a stay of this Court's consideration of Defendants' collateral estoppel argument asserted in the Motion to Dismiss because that argument is based on the *Seaboard Marine* Judgment.

After no motion to stay was filed in the instant case, on March 23, 2023, the undersigned entered an Order Requiring Joint Status Report Regarding Notice Regarding Potential Vacatur and directed the parties to update the Court regarding whether they will be filing a motion to stay. [ECF No. 116]. The following day, Plaintiffs filed the Motion to Stay Ruling on Collateral Estoppel, indicating the parties in the *Seaboard Marine* Case had in fact filed an Agreed Motion to Vacate the *Seaboard Marine* Order and Judgment. [ECF No. 119]. Defendants filed an Opposition to Plaintiffs' Motion to Stay on March 31, 2023 [ECF No. 125], and on April 7, 2023, Plaintiffs filed a Reply in support of their Motion to Stay [ECF No. 130].

## IV.   DEFENDANTS' MOTION TO DISMISS

In the Motion to Dismiss, Defendants seek dismissal of Plaintiffs' Helms-Burton Act claims, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on five grounds: (1) the claims of all Plaintiffs other than Ms. De Fernandez must be dismissed because the estates and heirs of the other Blanco Rosell Siblings did not acquire their claims before March 12, 1996; (2) the claims of all Plaintiffs must be dismissed because none were United States nationals at the time of the alleged confiscation of their property; (3) the claims of all Plaintiffs must be dismissed because the Act does not permit claims based on the indirect interests of shareholders; (4) the claims of all Plaintiffs must be dismissed because Plaintiffs fail to allege facts establishing that the confiscations were wrongful; and (5) Plaintiffs are

collaterally estopped from asserting claims based on the 70-Year Concession because another court in this District already determined that the shipping facilities at issue are not within the land covered by the 70-Year Concession. *See* Mot. to Dismiss at 9–10.

Defendants also argue Plaintiffs' claims against CMA France must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) based on a lack of personal jurisdiction.

## V.   APPLICABLE LEGAL STANDARDS

### A.  *Legal Standard On A Rule 12(b)(6) Motion To Dismiss*

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This pleading requirement serves to "give the defendant fair notice of what a plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rule 12(b)(6) provides that a defendant may move to dismiss a complaint that does not satisfy Rule 8's requirements for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court must accept the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *See Ziyadat*, 3 F.4that 1296. Although Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," a mere "formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Instead, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a Rule 12(b)(6) motion, a court generally may not look beyond the pleadings. *See Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1266 n.11 (11th Cir. 1997). The pleadings include any information attached to a complaint. Fed. R. Civ. P. 10(c); *Crenshaw v. Lister*, 556 F.3d 1283, 1291 (11th Cir. 2009). However, a district court may consider a document attached to a motion to dismiss if it is (1) central to the party's claim, and (2) its authenticity is not challenged. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010).

### B. *Personal Jurisdiction*

Motions to dismiss for lack of personal jurisdiction are governed by Federal Rule of Civil Procedure 12(b)(2). "A court must dismiss an action against a defendant over which it has no personal jurisdiction." *S.O.S. Res. Servs., Inc. v. Bowers*, No. 14-22789-Civ, 2015 WL 2415332, at *2 (S.D. Fla. May 21, 2015) (Cooke, J.) (quoting *Verizon Trademark Servs., LLC v. Producers, Inc.*, 810 F. Supp. 2d 1321, 1323–24 (M.D. Fla. 2011)).

To survive a motion to dismiss, a plaintiff must plead sufficient facts to establish a *prima facie* case of jurisdiction over a nonresident defendant. *Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 625 (11th Cir. 2010). In other words, "[t]he plaintiff bears the initial burden of alleging sufficient jurisdictional facts to make a *prima facie* case; if the defendant rebuts with contrary affidavit evidence, the plaintiff reassumes the burden." *Id.* (citing *United Techs. Corp v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). The plaintiff establishes a *prima facie* case if it "presents enough evidence to withstand a motion for directed verdict." *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000) (citation omitted).

"A federal district court in Florida may exercise personal jurisdiction over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). In that vein, the dispute over personal jurisdiction begins with a two-part inquiry: "(1) whether personal jurisdiction exists over the nonresident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013); *see also* Fed. R. Civ. P. 4(k)(1)(A); *United Technology Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). The reach of the Florida long-arm statute is a question of Florida law; therefore, federal courts construe the long-arm statute as they believe the Florida Supreme Court would. *Mazer*, 556 F.3d at 1274. (citation omitted). In the absence of authority from the Florida Supreme Court, federal courts look to the Florida district courts of appeal. *Id.* at 1274–75 (citation omitted).

At this stage, the Court accepts the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. *See Consolidated*, 216 F.3d at 1291. If the defendant refutes personal jurisdiction by sustaining its burden of challenging the plaintiff's allegations through affidavits or other competent evidence, the plaintiff must substantiate its jurisdictional allegations through affidavits, testimony, or other evidence of its own. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). The Court construes all reasonable inferences in the light most favorable to the plaintiff when dealing with conflicting evidence. *See PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 802, 810 (11th Cir. 2010) ("If such inferences are sufficient to defeat a motion for judgment

as a matter of law, the court must rule for the plaintiff, finding that jurisdiction exists."); *see also Consolidated*, 216 F.3d at 1291.

## VI.    DISCUSSION

### A.  *Claims Under Title III Of The Helms-Burton Act.*

In *Havana Docks Corp. v. Carnival Corp.*, Judge Bloom broke down the elements of a claim under Title III of the Helms-Burton Act (Sections 6082(a)(1)(A) and 6085(a)) as follows:

> Divided into the elements of the claim, the LIBERTAD Act states that (1) "any person"; (2) that "traffics"; (3) "in property which was confiscated by the Cuban Government on or after January 1, 1959"; (4) "shall be liable to any United States national"; (5) "who owns the claim to such property"; and (6) trafficking must occur after November 1, 1996. *See* 22 U.S.C. §§ 6082(a)(1)(A), 6085(a).

592 F. Supp. 3d 1088, 1150 (S.D. Fla. 2022) (Bloom, J.), *motion to certify appeal denied*, 2022 WL 1522007 (S.D. Fla. May 13, 2022). In *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 930 (11th Cir. 2023), the Eleventh Circuit cites the *Havana Docks* Court's recitation of the elements of a claim and points out, "Two other provisions of Title III, however, contain limitations on which U.S. nationals can bring a claim[.]" The Court then cites Sections 6082(a)(4)(B) and (C) of the Act:

> (B) In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.
> (C) In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

*Id.* (citing §§ 6082(a)(4)(B) & (C)).

### B.  *Claims Of Heirs And Estates Of The Blanco Rosell Siblings.*

The first issue raised by Defendants in the Motion to Dismiss is whether those Plaintiffs who inherited their claims from, or are proceeding as representatives of estates of,

the Blanco Rosell Siblings (that is, everyone other than Ms. De Fernandez) can assert claims under Title III of the Act. *See* Mot. to Dismiss at 15–17. Plaintiffs allege, and Defendants do not dispute, that all Plaintiffs other than Ms. De Fernandez inherited or otherwise acquired their interests in the claims to the Confiscated Property after March 12, 1996. Defendants argue that by inheriting their claims or otherwise obtaining rights to estates that own claims to the Confiscated Property after March 12, 1996, those Plaintiffs "acquired" ownership of their claims after March 12, 1996, and, therefore, their claims are barred by Section 6082(a)(4). In *Garcia-Bengochea*, which was decided after the parties' memoranda were filed in this case, the Eleventh Circuit agreed with Defendants' argument on this issue. 57 F.4th at 930 ("Because La Marítima was confiscated prior to 1996, and Dr. Garcia-Bengochea inherited his interest (*i.e.*, acquired ownership of his claim) after Desiderio's death in 2000, he cannot assert a claim under Title III.").

The issue before the Eleventh Circuit in *Garcia-Bengochea* was the same as the issue presented here, and the decision is binding on this Court in this case. As such, Defendants' Motion must be granted as to all Plaintiffs other than Ms. De Fernandez on grounds they cannot assert a claim under Title III because they acquired their claims after March 12, 1996, in contravention of Section 6082(a)(4).

The undersigned now turns to the other issues raised by Defendants which, as the result of the foregoing, apply only as to Ms. De Fernandez's claims.

### C. *Whether A Claimant Must Be A United States National At The Time Of The Confiscation Of Their Property*.

Plaintiffs allege that all the Blanco Rosell Siblings were Cuban nationals at the time their property was confiscated by the Cuban Government and that they all became United States nationals prior to the effective date of the Act (March 12, 1996). Am. Compl. at ¶ 5.

Defendants argue that Plaintiffs'[6] claims are barred because they were not United States nationals at the time the property at issue was confiscated by the Cuban Government. *See* Mot. at 9. In support, Defendants rely on the decision in *Regueiro v. American Airlines, Inc.*, No. 19-CV-23965, 2022 WL 2399748, at *8 (S.D. Fla. May 20, 2022) (Louis, J.), *report and recommendation adopted in relevant part*, 2022 WL 2352414 (S.D. Fla. June 30, 2022) (Martinez, J.), *appeal dismissed*, No. 22-12538-DD, 2022 WL 18494920 (11th Cir. Dec. 2, 2022) (citing *Gonzalez v. Amazon.com, Inc.*, No. 19-23988-CIV, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020) (Scola, J.)).

Plaintiffs respond that Title III of the Act is unambiguous and that the operative provisions under which they proceed include no language requiring claimants to have been United States nationals at the time their property was confiscated. Resp. at 6. The undersigned agrees.

The issue is one of statutory interpretation. It is, of course, axiomatic that the process of interpreting the provision of the Act at issue begins with the text of the provision itself, that is, the civil remedy provision of the Helms-Burton Act under which Plaintiffs proceed here. *See CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) ("This Court has repeatedly stated that '[w]e begin our construction of [a statutory provision] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision.'") (quoting *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc)).

---

[6] As noted above, because Ms. De Fernandez is the only Plaintiff whose claims may proceed under the Act, Defendants' remaining arguments only apply to Ms. De Fernandez. However, all the named Plaintiffs are similarly situated in regard to this issue in that none of the Blanco Rosell Siblings were United States nationals at the time the property at issue was confiscated.

The civil remedy provision of the Helms-Burton Act is found at Section 6082(a) of the Act, which provides:

**(a) Civil remedy**

    **(1) Liability for trafficking**

        (A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this subchapter, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, ***shall be liable to any United States national who owns the claim to such property*** for money damages[.]

22 U.S.C. § 6082(a)(1) (emphasis added). This provision includes no limitation on the "any United States national[s]" to whom liability is owed that indicates it is intended to apply to only those who were United States nationals at the time their property was confiscated. The plain text states that the provision applies to "any United States national who owns the claim[,]" indicating that the determinative factor is whether a United States national presently ***owns*** the claim. If Congress intended to limit liability to only those who were United States nationals at the time the property was confiscated, it could have and would have said so. As the Supreme Court has admonished, "We do not start from the premise that [the statutory] language is imprecise. Instead, we assume that in drafting this legislation, Congress said what it meant." *United States v. LaBonte*, 520 U.S. 751, 757 (1997).

Here, the Act does not require the Court to look to other sources to discern the definition of the term at issue, "United States national," because the Act itself includes a definition:

**§ 6023. Definitions**

    As used in this chapter, the following terms have the following meanings:
    …
**(15) United States national**
        The term "United States national" means---

19

(A) *any United States citizen*; or
(B) any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States.

22 U.S.C. § 6023(15) (emphasis added). Again, the definition does not restrict United States nationals to only those who were United States nationals at the time the Government of Cuba confiscated their property.[7] As defined, the term "United States national" clearly and unambiguously includes "any United States citizen." According to the allegations in the Amended Complaint, Ms. De Fernandez is a United States citizen (and was at the time this lawsuit was filed), and, therefore, for purposes of the Act, Ms. De Fernandez is a United States national. As also alleged in the Amended Complaint, Ms. De Fernandez presently owns the claim to the property at issue, and, therefore, she is a United States national to whom traffickers (as defined in the Act) are liable.

---

[7] Notably, the Act's definition of trafficking also does not restrict the term "United States national" to those who were nationals at the time their property was confiscated:

**(13) Traffics**
(A) As used in subchapter III, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally--
(i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization *of any United States national who holds a claim to the property.*

22 U.S.C. § 6023(13) (emphasis added).

Defendants offer no sound reason why the Court should look beyond the unambiguous text of the provision at issue to find that Congress intended to limit the definition of United States national to only those who were United States nationals when their property was confiscated nor why the Court should add language into the otherwise clear terms of the Act. As indicated above, Defendants rely on the decision in *Regueiro*, 2022 WL 2399748, *report and recommendation adopted in relevant part*, 2022 WL 2352414. There*,* the court acknowledged: "Absent from this subsection defining liability for trafficking is any explicit condition that the confiscation have deprived a United States national of the property at issue." *Id.* at *6 (citing 22 U.S.C. § 6082(a)(1)(A)). Nevertheless, the court looked beyond the civil remedy provision and the definition of "United States national" in the Act and, instead, considered Congress's findings, which are set forth in the prefatory language of the Act, to create an otherwise non-existent limitation in the operative provision. The *Regueiro* Court was persuaded by the congressional findings on grounds they are "relevant to the enactment of Title III" and concluded that, when the series of findings are considered collectively, they "support the creation of a private cause of action, to discourage exploitation of 'this property,'" which, according to the *Regueiro* Court, is property confiscated from then-United States nationals. *Id.*

The court's decision in *Regueiro* is well reasoned, but the undersigned, respectfully, does not agree with the court's interpretation of the provision nor its use of Congressional findings in a prefatory section of the Act to determine Congress's intent when the plain language of the operative provision—the cause of action and applicable definition—is clear.

As a general matter, "a prefatory clause does not limit or expand the scope of the operative clause." *District of Columbia v. Heller*, 554 U.S. 570, 578 (2008). Instead, "operative

provisions should be given effect as operative provisions, and prologues as prologues." *Id.* at 578 n.3. In *Heller,* the Supreme Court was interpreting a prefatory clause in the same sentence of Constitutional text (interpreting the Second Amendment), but the Court later clarified that this principle applies to all "federal legislation." *Hawaii v. Office of Haw. Affs.*, 556 U.S. 163, 175 (2009) ("As we recently explained in a different context, 'where the text of a clause itself indicates that it does not have operative effect, such as 'whereas' clauses in federal legislation . . . , a court has no license to make it do what it was not designed to do.'" (quoting *Heller*, 554 U.S. at 578 n.3)); *see also Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019) ("[S]tatements of purpose, . . . by their nature 'cannot override [a statute's] operative language.'" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 220 (2012))).

Thus, in all federal legislation, the Court must look to the operative clause. Prefatory clauses, like whereas clauses, statements of purpose, and findings, do not limit or expand the scope of operative clauses and should only be considered when the provision at issue is ambiguous. *See Heller*, 554 U.S. at 578. "Rather than focusing on the operative words" of the provision at issue, Defendants and the *Regueiro* Court "directed [their] attention to the . . . clauses that preface" them. *Hawaii*, 556 U.S. at 175. Where, as here, the operative provision is not ambiguous, the undersigned respectfully finds that relying on the Congressional findings in the prefatory provision of the Act is unwarranted.

The *Regueiro* Court was also persuaded by dicta in the Eleventh Circuit's decision in *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251 (11th Cir. 2006), a case that was not brought under the Helms-Burton Act, in which the court commented, in a footnote, that the plaintiff's claim may not have been actionable if it had been brought under the Act because the property at issue was owned by Cuban nationals at the time it was expropriated. *Id.* at 1255 n.3. The

court's comment, in the footnote of the 17-year-old decision that was not addressing a Helms-Burton Act claim, is dicta.[8] *See, e.g.*, *United States v. Eggersdorf*, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997) ("[L]anguage in . . . [an opinion] . . . not necessary to deciding the case then before us" is dicta); *Moon v. Head*, 285 F.3d 1301, 1318 (11th Cir. 2002) (Carnes, J., concurring) ("Those statements are dicta. They are dicta because they go beyond the facts of the . . . case itself . . . ."). And dicta is not binding on any court for any purpose. *See, e.g.*, *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996) ("[W]e are not required to follow dicta contained in our own precedents . . . ."); *Great Lakes Dredge & Dock Co. v. Tanker Robert Watt Miller*, 957 F.2d 1575, 1578 (11th Cir. 1992) (because what is said in a prior opinion about a question not presented there is dicta, and dicta is not binding precedent, a later panel is "free to give that question fresh consideration"). For the foregoing reasons, the undersigned finds the court's comment in *Glen* unpersuasive.

The undersigned finds the Eleventh Circuit's more recent decision in *Garcia-Bengochea*, decided after *Regueiro*, more persuasive, although also not binding on this issue. In *Garcia-Bengochea*, the court analyzed a claim under the Helms Burton Act and laid out the requirements of the operative provisions of the Act (Sections 6082(a)(1)(A) and 6085(a)) that must be satisfied to result in liability. 57 F.4th at 929–30. The court found that the claimant satisfied the requirements of the provisions where he alleged "(a) the Cuban government confiscated [the claimant's property] after January 1, 1959; (b) the [defendants] trafficked in [his property] after the effective date of the Act; (c) he *is* a United States national;[9] and (d) he

---

[8] Further, *Glen* was decided 13 years before the suspension of Title III of the Helms-Burton Act was lifted. As such, at the time of the *Glen* decision, Title III jurisprudence on this issue was virtually nonexistent.
[9] The fact that Garcia-Bengochea was not a United States national when the property at issue was confiscated was not before the court.

owns an interest (*i.e.*, has a claim) in [the property]." *Id.* at 930[10] (citing *Havana Docks Corp.*, 592 F. Supp. 3d at 1150–51) (emphasis added). Based on these elements, Ms. De Fernandez also satisfies the requirements of Sections 6082(a)(1)(A) and 6085(a).

The Eleventh Circuit also pointed out that the Act does contain express limitations on which United States nationals can bring a claim:

> (B) In the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996.
> (C) In the case of property confiscated on or after March 12, 1996, a United States national who, after the property is confiscated, acquires ownership of a claim to the property by assignment for value, may not bring an action on the claim under this section.

*Id.* (citing §§ 6082(a)(4)(B) & (C)). The court identified no other limitations on which United States nationals may bring a claim under the Act, and the Court did not look to the Act's prefatory findings to read other limitations into the statutory language.

The undersigned finds, based on the express terms of the Act's operative provisions, that the Act does not require a claimant to have been a United States national at the time the property at issue was confiscated by the Cuban Government. Instead, any United States national may bring a claim under the Act, regardless of whether they were a United States national at the time their property was confiscated, as long as the property was confiscated prior to March 12, 1996, and they acquired ownership of the claim to such property prior to March 12, 1996. The undersigned notes that another court in this District recently reached the same conclusion on this issue after the memoranda were filed in this case. *See De Fernandez*

---

[10] As indicated above, the claims in *Garcia-Bengochea* were ultimately barred because the claimant inherited ownership of his claim after the effective date of the Act. 57 F.4th at 931.

*v. Crowley Holdings, Inc.*, No. 21-cv-20443, 2023 WL 2646346, at *2–3 (S.D. Fla. Mar. 27, 2023) (Gayles, J.) (rejecting the argument that claimants must have been United States nationals at the time their property was confiscated).

Here, because Ms. De Fernandez has alleged that she is a United States citizen and that prior to March 12, 1996, she owned a claim to property that was confiscated by the Cuban Government after January 1, 1959, she may bring a claim under the Act against anyone who traffics in that property in contravention of the Act.

Accordingly, the undersigned recommends that Defendants' Motion to Dismiss be denied to the extent it is based on the argument that Ms. De Fernandez's claims are barred because she was not a United States national at the time her property was confiscated. The undersigned next considers Defendants' remaining arguments for dismissal.

### D.  Whether The Act Permits Claims Based On The Interests Of Shareholders.

Defendants next argue that Plaintiffs' claims must be dismissed because the Act does not permit claims based on the indirect interests of shareholders. Mot. at 10–11. According to Defendants, because Plaintiffs were not the named owners of the Confiscated Property but, instead, allege shareholder interests in Cuban corporations that owned the Confiscated Property, they are not United States nationals "who own[] the claims to such property[.]" *Id.* In support, Defendants contend that if Congress had intended to grant corporate shareholders the right to recover for indirect ownership of assets, it could have done so expressly, as it did in the International Claims Settlement Act ("ICSA"). *Id.* at 11. And, according to Defendants, "[t]he absence of language granting rights to corporate shareholders in [the Act] 'instructs us that Congress did not intend to disregard structural ownership rules.'" *Id.* (quoting *Dole Food*

*Co. v. Patrickson*, 538 U.S. 468, 476 (2003)). Defendants concede that every court in this District to have considered this issue has reached a contrary conclusion. *Id*.

Relying on the district court's decision in *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281 (S.D. Fla. 2019) (King, J.), Plaintiffs respond that Defendants' argument that corporate shareholders have no claim to confiscated property where the property is owned by the corporation "belies 'the text, context, and purpose of Helms-Burton.'" Resp. at 11 (citing *Garcia-Bengochea*, 407 F. Supp. 3d at 1289).

In the Amended Complaint, Plaintiffs allege the Blanco Rosell Siblings, including Ms. De Fernandez, owned, in equal parts, the Cuban corporations Maritima Mariel SA, Compañía Azucarera Mariel S.A., and several other companies. Am. Comp. at ¶¶ 83–93. Plaintiffs further allege that those companies owned the 70-Year Concession, described above, that gave Maritima Mariel priority rights in the Bay of Mariel, as well as the extensive land holdings to the southeast, south, and west of the Bay of Mariel comprising the Confiscated Property at issue. *Id*. The question, then, is whether, for purposes of the Act, Plaintiffs' ownership of shares in these corporate entities that owned or have claims to the Confiscated Property rather than their direct ownership of such property satisfies the requirements of the Act.

The answer is again found in the text of the operative provision of the Act. As explained above, the civil remedy provision of the Act expressly provides that any person that traffics in property that was confiscated by the Cuban Government on or after January 1, 1959, shall be liable "to any United States national ***who owns the claim to such property*** . . . ." 22 U.S.C. § 6082(a)(1)(A) (emphasis added). The text of the operative provision does not require that the United States national to whom traffickers are liable own the confiscated

property but, instead, requires that they own the claim to such property. This is a distinction with a difference.

Defendants contend that the provision requires direct ownership of the property at issue and that if Congress had intended to permit shareholders to pursue indirect claims based on property owned by corporations, it would have done so expressly. Mot. at 11. In support, Defendants cite the ICSA, which expressly authorizes recoveries for property "owned wholly or partially, directly or indirectly by a national of the United States." *Id*. (citing 22 U.S.C. § 1643c(a)). According to Defendants, "[t]he Supreme Court requires courts interpreting statutes to presume Congress's knowledge and strict application of the corporate form unless there is an 'indication that Congress intended us to depart from the general rules regarding corporate formalities.'" *Id*. (citing *Dole*, 538 U.S. at 476). And, therefore, Defendants contend that the absence of language granting rights to corporate shareholders in the Act indicates that Congress did not intend to disregard structural ownership rules. *Id*.

The undersigned finds that Defendants' interpretation of the Act is flawed.

Initially, Defendants' argument is directed at whether ownership of the property at issue must be direct or may be indirect. However, as noted above, the Act does not require claimants own the property at issue (directly or indirectly) but, instead, requires claimants own ***the claim*** to such property. 22 U.S.C. § 6082(a)(1)(A). Defendants' statutory construction argument, focusing on ownership of the property, ignores the phrase "claim to." Thus, as Judge Bloom observed, Defendants' reading of the Act would require the Court to delete the words "the claim to" from the phrase "owns the claim to such property," and to effectively rewrite the Act to cover only those plaintiffs who "own such property." *See De Fernandez v. Seaboard Marine, Ltd.*, No. 20-cv-25176, 2022 WL 3577078, at *6 (S.D. Fla. Aug. 19, 2022)

(Bloom, J.) (appeal pending) (citing *Garcia-Bengochea*, 407 F. Supp. 3d at 1290; *De Fernandez v. Crowley Holdings, Inc.*, 2022 WL 860373, at *5). Defendants' interpretation thus ignores the canon of construction that courts may not add or subtract words from a statute. *See Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009).

The plain language of the Act makes clear that plaintiffs who own *a claim* to confiscated property—not just plaintiffs who own or own a direct interest in the confiscated property—are entitled to relief under the Act. 22 U.S.C. § 6082(a)(1)(A). Here, the Act does not define the term "claim," so the Court looks to the term's ordinary meaning at the time the Act was passed. Judge King conducted this inquiry and found, "[b]ased on contemporary dictionary definitions, Congress would have understood that a *claim* to confiscated property is substantially broader than a *direct interest* in such property." *Garcia-Bengochea*, 407 F. Supp. 3d at 1289 (citing Webster's New World College Dictionary 257 (3d ed. 1996) (defining "claim" as "a demand for something rightfully or allegedly due" or "a right or title to something"); Merriam-Webster's Collegiate Dictionary 210 (10th ed. 1993) (defining "claim" as "a demand for something due or believed to be due," "a right to something," or "an assertion open to challenge")). The undersigned agrees.

Likewise, the undersigned agrees with Judge King's determination that Defendants' reliance on the decision in *Dole* is misplaced. In *Dole*, the Supreme Court analyzed the Foreign Sovereign Immunities Act ("FSIA"), which uses terms like "shares" and "separate legal entity" when referring to ownership interests. *Dole*, 538 U.S. at 475. As Judge King found,

> [T]here is no indication in the [Helms-Burton Act's] text that Congress was legislating with corporate formalities in mind. Instead, Congress used the broadly understood term 'claim,' combined with colloquial language such as the 'rightful owners' and 'victims of these confiscations' in the congressional findings, §§ 6081(8), (11). This counsels against using corporate law to confine Helms-Burton.

*Garcia-Bengochea*, 407 F. Supp. 3d at 1289–90; *Cf. Dole*, 538 U.S. at 474 (Congress's use of language such as "shares" and "separate legal person" indicated that "Congress had corporate formalities in mind" and "was aware of settled principles of corporate law and legislated within that context").

Consistent with the other courts in this District to have addressed this issue,[11] the undersigned finds that Plaintiffs' allegation of ownership of claims to the Confiscated Property by virtue of their ownership of shares of entities that owned the properties is sufficient to state a claim under Title III of the Act. Importantly, at this, the motion to dismiss stage, the Court is concerned with whether Plaintiffs have sufficiently alleged that they own a claim to the Confiscated Property and not with whether they will ultimately prove that they own such claims, which presents a factual question not appropriate for resolution on a motion to dismiss.

Accordingly, the undersigned recommends that Defendants' Motion to Dismiss be denied to the extent it is based on the argument that the Helms-Burton Act does not permit claims based on the interests of shareholders.

### E. Whether Plaintiffs Must Allege That Confiscations Were Wrongful

Defendants next argue that Plaintiffs' claims must be dismissed because Plaintiffs fail to allege facts establishing that the confiscations by the Cuban Government were wrongful.

---

[11] *See, e.g.*, *Garcia-Bengochea v. Norwegian Cruise Line Holdings Ltd.*, No. 19-cv-23593, 2020 WL 5028209, at *2 (S.D. Fla. Aug. 25, 2020) (King, J.) (same); *Iglesias v. Pernod Ricard*, No. 20-CV-20157, 2020 WL 13367465, at *11 (S.D. Fla. Aug. 17, 2020) (Williams, J.) ("Plaintiffs' allegation that they have—albeit through an alleged inheritance—a claim to property once owned by a corporation confiscated by the Cuban Government is sufficient to survive a motion to dismiss."); *Regueiro*, 2022 WL 2399748, at *9 (Louis, J.), *report and recommendation adopted in relevant part*, 2022 WL 2352414 (Martinez, J.) (same).

According to Defendants, the alleged seizures of property by the Cuban Government are not actionable under the Helms-Burton Act because the seizures were of Cuban property from Cuban citizens by the Cuban Government for alleged violations of Cuban law, and, therefore, they are domestic takings not subject to relief under the Act. Mot. at 14. Defendants contend that Congress enacted the Helms-Burton Act "against the backdrop of the 'domestic takings rule[]'" and that the Act includes no language abrogating the domestic takings rule such that the Court cannot determine the validity of the confiscations at issue on the merits. *Id.* at 15. And, even if the domestic takings rule does not apply, Defendants argue Plaintiffs fail to plead sufficient facts establishing that the confiscation of their property was otherwise "wrongful." *Id.* at 15–16.

Plaintiffs respond that Defendants' argument that the domestic takings rule applies to the Helms-Burton Act "has no basis in law." Resp. at 13 (quoting *Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, 577 F. Supp. 3d 295, 308 (S.D.N.Y. 2021)). Plaintiffs also point out that the Act contains no language requiring that the property at issue be taken in violation of international law and that the operative provision of the Act does not require that confiscations be "wrongful." *Id.* at 13–14.

Turning once again to the text of the Act, the undersigned agrees with Plaintiffs that nothing in the operative provision of Title III or the Act's definition of confiscation requires that the confiscations of claimants' properties be "wrongful" or that they violate international law.

The operative provision, Section 6082(a)(1)(A), provides: "[A]ny person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for

money damages . . . ." 22 U.S.C. § 6082(a)(1)(A). Absent from this provision is any requirement or condition that the property at issue had to be wrongfully confiscated or confiscated in violation of international law. Defendants are effectively asking the Court to add in the word "wrongfully" before "confiscated" or the term "in violation of international law" after "confiscated." As explained above, courts may not add or subtract words from a statute to alter the meaning of an operative provision. *See Friends of Everglades*, 570 F.3d at 1224.

Defendants' statutory construction argument also finds no support in the Act's definition of confiscated:

> **(4) Confiscated**
> As used in subchapters I and III, the term "confiscated" refers to--
> (A) the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959--
>     (i) without the property having been returned or adequate and effective compensation provided; or
>     (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and
> (B) the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay, on or after January 1, 1959--
>     (i) a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;
>     (ii) a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or
>     (iii) a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

22 U.S.C. § 6023(4). Like the operative provision, the definition does not include the word "wrongful" or the term "in violation of international law." This sort of definition within legislative text is "virtually conclusive." *Sturgeon*, 139 S. Ct. at 1086 (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 228 (2012)); *see ibid.* ("'It is very rare that a defined meaning can be replaced' or altered").

31

Thus, neither the terms of the operative provision nor the definition of the word "confiscated" in the Act includes limiting language requiring that confiscations by the Cuban Government have been wrongful or a violation of international law. And the undersigned finds no ambiguity in the statutory text warranting reference to Congress's intent. Therefore, the well-established canons of statutory construction require the Court to start and end with the text of the Act and to proceed with the understanding that Congress meant what it said or what it did not say. *LaBonte*, 520 U.S. at 757. As such, where, as here, the terms are unambiguous and the Act includes a definition of the term at issue, the undersigned will not attempt to rewrite the operative provision or applicable definitions in the Helms-Burton Act by adding or subtracting text or attempting to discern Congress's intent from its prefatory findings set out in the Act. *See Heller*, 554 U.S. at 578; *Hawaii*, 556 U.S. at 175; *Sturgeon*, 139 S. Ct. at 1086.

The Act does not require that confiscations be wrongful, and, in the absence of a requirement in the Act that confiscations violate international law, the undersigned finds that the domestic takings rule does not apply to Title III of the Helms-Burton Act. *See Sucesores de Don Carlos Nunez y Dona Pura Galvez*, 577 F. Supp. 3d at 308 (same).

A review of the Amended Complaint reflects that Plaintiffs have alleged that the Cuban Government seized the Confiscated Property without the Property having been returned or adequate and effective compensation provided and without the claim to the Property having been settled pursuant to an international claims settlement agreement, and, therefore, Plaintiffs have satisfied the pleading requirements of Title III of the Act insofar as confiscation is concerned.[12] *See* Am. Comp. at ¶ 102.

---

[12] Notably, the Eleventh Circuit's recitation of the elements of a claim under Title III in *Garcia-*

### F. Whether Plaintiffs' Claims Based On The 70-Year Concession Are Barred By Collateral Estoppel.

Defendants argue that Plaintiffs are estopped from asserting claims based on their interests in the 70-Year Concession granted by the Cuban Government to Maritima Mariel in 1955 as the result of the Final Judgment entered in the *Seaboard Marine* Case. Mot. at 16–19. In *Seaboard Marine*, Judge Bloom held that shipping to the TCM and ZEDM at the Port of Mariel does not constitute trafficking in Plaintiffs' Confiscated Property because, generally, those geographic areas do not fall within the scope of Plaintiffs' rights under the 70-Year Concession. 2022 WL 3577078, at *8–11. Defendants contend that all the requirements for collateral estoppel apply here as to the 70-Year Concession rights because the issue is identical to the issue presented and actually litigated in the *Seaboard Marine* Case, the determination of the specific issue was a critical and necessary part of the judgment in that case, and Plaintiffs had a full and fair opportunity to litigate the issue in that case. Mot. at 16–18 (citing *CSX Transp., Inc. v. Bhd. Of Maint. Of Way Emples.*, 327 F.3d 1309, 1317 (11th Cir. 2003)).

In their Response to the Motion, Plaintiffs do not deny that the requirements for application of collateral estoppel set forth in *CSX Transport* are met with regard to the issue of the 70-Year Concession rights if the Court takes judicial notice of the judgment in the *Seaboard Marine* Case. Instead, Plaintiffs assert several arguments for why collateral estoppel should not be applied under the circumstances presented here. Plaintiffs argue the doctrine may not be raised in a Rule 12(b)(6) motion to dismiss where Defendants are not using the defense to

---

*Bengochea* also did not contain a requirement that confiscations be wrongful. The court found that the claimant satisfied the requirements of the provisions where he alleged "(a) the Cuban government confiscated [the claimant's property] after January 1, 1959; (b) the [defendants] trafficked in [his property] after the effective date of the Act; (c) he is a United States national; and (d) he owns an interest (*i.e.*, has a claim) in [the property]." 57 F.4th at 930 (citing *Havana Docks Corp.*, 592 F. Supp. 3d at 1150)(alterations added).

argue failure to state a claim and where the defense would not bar Plaintiffs' entire lawsuit. Resp. at 15. Plaintiffs also argue that the defense is not apparent on the face of the Amended Complaint and, therefore, cannot be applied at the motion to dismiss stage because it would require the Court to consider evidence outside the four corners of the complaint. *Id*. Plaintiffs further contend that collateral estoppel should not be decided while the appeal of the *Seaboard Marine* Judgment is pending, especially because regardless of the outcome, the appeal will have no impact on pretrial proceedings in the instant case. *Id*. at 16–17. And Plaintiffs argue collateral estoppel should not apply because Defendants seek to apply the doctrine to conclusions of law. *Id*. at 18. Plaintiffs alternatively argue that even if the doctrine applies to the issues raised, the Court should nevertheless consider the issues involving the 70-Year Concession *de novo* in these proceedings and later consider the impact of collateral estoppel, relying on *International Railways of Central America v. United Brands Company*, 358 F. Supp. 1363, 1374 (S.D.N.Y. 1973). *Id*.

While Defendants' Motion to Dismiss was pending, Plaintiffs alerted the Court that the parties in the *Seaboard Marine* Case had reached a settlement in principle which was contingent on the *Seaboard Marine* Court's vacatur of the summary judgment order on which Defendants' collateral estoppel defense is based. [ECF No. 103]. Since then, Plaintiffs sought and were granted a partial stay of the appeal of the *Seaboard Marine* Final Judgment in the Eleventh Circuit, filed the request to vacate the summary judgment order in the *Seaboard Marine* district court case, and filed a motion to stay ruling on the collateral estoppel issue in the instant case pending determination of the motion to vacate the *Seaboard Marine* Judgment. *See* ECF No. 119. Defendants oppose the requested stay in the instant case (and have

indicated that they and others have requested permission to intervene in the *Seaboard Marine* Case to oppose the vacatur). [ECF No. 125].

All that being said, the issue before this Court is whether the Court should apply collateral estoppel to bar Plaintiffs' claims based on the 70-Year Concession or wait and see what happens with the *Seaboard Marine* vacatur and appeal. Cognizant of the potential waste of resources that may ensue if the *Seaboard Marine* Judgment is reversed on appeal, the undersigned finds there is no basis to avoid application of collateral estoppel under the circumstances presented.

1. <u>Whether The Requirements For Collateral Estoppel Are Met.</u>

As set forth above, Plaintiffs do not deny in their Response that the requirements for application of collateral estoppel set forth in *CSX Transport* are met with regard to the issue of whether their trafficking claims based on their 70-Year Concession rights are estopped by the summary judgment order in the *Seaboard Marine* Case. And, having reviewed the *Seaboard Marine* Order and Plaintiffs' allegations in this case, the undersigned agrees that the elements of collateral estoppel are met. The issue is identical to the issue presented and actually litigated in the *Seaboard Marine* Case, the determination of the specific issue was a critical and necessary part of the judgment in that case, and Plaintiffs had a full and fair opportunity to litigate the issue in the *Seaboard Marine* action. Therefore, the undersigned considers the alternative reasons presented by Plaintiffs for avoidance of estoppel.

2. <u>Whether Collateral Estoppel Applies In A Rule 12(b)(6) Motion That Does Not Seek To Dispose Of The Entire Complaint</u>.

Plaintiffs argue the doctrine may not be raised in a Rule 12(b)(6) motion to dismiss where Defendants are not using the defense to argue failure to state a claim and where the defense would not bar Plaintiffs' entire lawsuit. Resp. at 15.

Initially, Plaintiffs offer no authority for their contention that seeking dismissal based on collateral estoppel "is not a proper Rule 12(b)(6) argument because it does not seek dismissal 'for failure to state a claim upon which relief may be granted.'" Resp. at 15 (citing Fed. R. Civ. P. 12(b)(6)). Notably, that argument directly contradicts Plaintiffs' own statement in the preceding paragraph in which they acknowledge that collateral estoppel can be raised in a motion to dismiss. *Id.* In any event, the law is clear in the Eleventh Circuit that although collateral estoppel is normally raised as an affirmative defense under Rule 8(c), it can be asserted in a Rule 12(b)(6) motion if its existence can be judged on the face of the complaint or based upon public documents. *See Burstein v. Rumball*, 297 F. App'x 918, 920 (11th Cir. 2008); *Concordia v. Bendekovic*, 693 F.2d 1073, 1075 (11th Cir. 1982).

Plaintiffs argue, however, that the doctrine may only be applied on a motion to dismiss if its application precludes the entire action and not just one issue, as in the instant case. Resp. at 15. Relying on *Concordia*, 693 F.2d at 1075, Plaintiffs argue that "collateral estoppel can only be raised in a Rule 12(b)(6) motion where application of the defense would 'summarily dismiss[]' the action." Resp. at 15. A careful reading of the *Concordia* decision reveals that is not the court's holding, and the undersigned finds Plaintiffs' argument is contrary to the authority in this Circuit and, in fact, appears to confuse the doctrine of res judicata, or claim preclusion, with collateral estoppel, known as issue preclusion. As the Eleventh Circuit explained, "When claim preclusion does not apply to bar an entire claim or set of claims, the doctrine of collateral estoppel, or issue preclusion, may still prevent the relitigation of particular issues which were actually litigated and decided in a prior suit." *Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501 (11th Cir. 1990) (citations omitted); *see also Burstein v. Rumball*, 297 F. App'x 918, 920 (11th Cir. 2008). Thus, collateral estoppel may be applied

36

to bar relitigation of specific issues, and, so too, may a motion to dismiss based on collateral estoppel be used to dismiss only part of a lawsuit or claim.

### 3. Whether The Collateral Estoppel Defense Is Sufficiently Apparent On The Face Of The Complaint.

Next, Plaintiffs argue that the defense is not apparent on the face of the Amended Complaint and, therefore, cannot be applied at the motion to dismiss stage because it would require the Court to consider evidence outside the four corners of the Amended Complaint. Resp. at 15. According to Plaintiffs, Defendants must introduce into evidence all relevant records from the prior proceeding for the doctrine to apply. *Id.* (citing *Concordia*, 693 F. 2d at 1076).

Consideration of a Rule 12(b)(6) motion is generally limited to the face of the complaint, and, with some exceptions, consideration of matters outside the pleadings requires conversion of the motion to dismiss to one for summary judgment. Fed. R. Civ. P. 12(d); *Day v. Taylor*, 400 F. 3d 1272, 1275–76 (11th Cir. 2005). However, the Eleventh Circuit permits a district court to take judicial notice of certain documents attached to a motion to dismiss or response without converting the motion to dismiss into a motion for summary judgment. *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010). A court may do so when such documents are public records that are "'not subject to reasonable dispute' because they [are] 'capable of accurate and ready determination by resort to sources whose accuracy [can] not reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)). Moreover, a court may take notice of another court's order "for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citations omitted). Thus, the undersigned finds the Court may take

judicial notice of the Summary Judgment Order and Final Judgment in the *Seaboard Marine* Case for the limited purpose of confirming that those judicial acts occurred.

Moreover, Defendants attached the relevant orders to their Motion to Dismiss, and the Court may also take judicial notice of the orders attached to Defendants' Motion to Dismiss [ECF No. 72-2] as matters of public record not subject to reasonable dispute. The undersigned also notes that Plaintiffs directly reference the *Seaboard Marine* Case in the Amended Complaint [ECF No. 65 at 31 n.11], as well as in their Response to Defendants' Motion to Dismiss. Accordingly, the Court may consider Defendants' collateral estoppel argument raised in their Motion to Dismiss based on the *Seaboard Marine* orders attached to the Motion without converting the Motion to one for summary judgment or requiring Defendants to introduce all of the records from the *Seaboard Marine* Case into evidence.

4.  Whether Collateral Estoppel Should Be Applied In Light Of The Pending Appeal Of The *Seaboard Marine* Judgment.

Plaintiffs contend that the collateral estoppel issue should not be decided while the appeal of the *Seaboard Marine* Judgment is pending, especially because, according to Plaintiffs, regardless of the outcome, the appeal will have no impact on pretrial proceedings in the instant case. Resp. at 16–17.

Plaintiffs' request to stay consideration of the collateral estoppel issue due to the pending appeal is contrary to the authority in the Eleventh Circuit, which has explained: "The established rule in the federal courts is that a final judgment retains all of its *res judicata* consequences pending decision of the appeal." *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988) (citations omitted); *see also Fid. Standard Life Ins. Co. v. First Nat'l Bank & Tr. Co. of Vidalia, Ga.,* 510 F.2d 272, 273 (5th Cir. 1975), *cert. denied*, 423 U.S. 864 (1975) ("A case pending appeal is *res judicata* and entitled to full faith and credit unless and until reversed on

appeal."); *Yacht Club on the Intracoastal Condo. Ass'n v. Lexington Ins. Co.*, No. 12–81275–CV, 2013 WL 6189181, at *2 (S.D. Fla. Nov. 26, 2013) ("That the judgment is on appeal does not vitiate its finality."). Therefore, the undersigned finds collateral estoppel applies regardless of the pending appeal.

Likewise, Plaintiffs' claim that the *Seaboard Marine* Court's determination regarding the 70-Year Concession will have little to no impact on pretrial proceedings in this case is unavailing. At this time, the *Seaboard Marine* Order is a final judgment on the merits with preclusive effect on issues surrounding the 70-Year Concession. As the record in the *Seaboard Marine* Case reflects, the issue of the geographic boundaries of Plaintiffs' rights under the 70-Year Concession was heavily litigated and required significant briefing, testimony, and expert opinions. Removal of the complexities involved in determining that issue from the instant case will very likely impact the pretrial proceedings before this Court, which is precisely the reason for the doctrine. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980) ("As this Court and other courts have often recognized, res judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.") (citing *Montana v. United States*, 440 U.S. 147, 153–54 (1979) ("To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions.")).

Accordingly, the undersigned finds that the *Seaboard Marine* Order is a final judgment on the merits with collateral estoppel consequences despite the pending appeal.

5.  Whether Collateral Estoppel Applies Based On The Issues Decided In The
    *Seaboard Marine* Order.

Plaintiffs also argue that collateral estoppel should not apply based on the *Seaboard Marine* Order because the preclusive issues are conclusions of law. Resp. at 18. However, the authority relied on by Plaintiffs in support of this argument do not apply here. In *Matter of Westmoreland Coal Co.*, 968 F.3d 526 (5th Cir. 2020), the Fifth Circuit held that there is an exception to the application of issue preclusion when a party attempts to use a legal issue decided in a federal circuit to preclude determination of the same legal issue in a different circuit as that "would inhibit a court from performing its function of developing the law." *Id.* at 532. That is not the case here, in which Defendants seek to apply the doctrine based on a decision from another district court in the same District.

And, as Defendants point out, the general principle is that if the requirements of collateral estoppel apply, the doctrine "can apply to preclude relitigation of both issues of law and issues of fact if those issues were conclusively determined in a prior action." *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 170–171 (1984) (quoting *United States v. Mendoza*, 464 U.S. 154, 155–162 (1984); *Allen*, 449 U.S. at 94). Plaintiffs have offered no applicable authority to the contrary.

Plaintiffs alternatively argue that even if the doctrine applies to the issues raised, the Court should nevertheless consider the issues involving the 70-Year Concession *de novo* in these proceedings and later consider the impact of collateral estoppel, relying on *International Railways of Central America v. United Brands Co.*, 358 F. Supp. 1363, 1374 (S.D.N.Y. 1973). Resp. at 18. The undersigned does not find the court's comment in the *International Railways* case persuasive. 358 F. Supp. at 1374 ("It seems easier to approach contract interpretation *de novo* and then to see whether the findings or the doctrines of res judicata or collateral estoppel

support or defeat the result."). Instead, the undersigned finds the principles underlying the doctrine of collateral estoppel, including avoidance of waste of judicial resources, preventing the undue burden and expense of relitigating issues, and preventing inconsistent decisions, to be more persuasive. *See Allen*, 449 U.S. at 94; *Montana*, 440 U.S. at 153–54.

Therefore, the undersigned finds that collateral estoppel may be applied to bar relitigation of the legal and factual issues determined by Judge Bloom in *Seaboard Marine*.

6. Whether The Court Should Decide The Collateral Estoppel Issue While The Motion To Vacate The *Seaboard Marine* Order Is Pending.

Most recently, in their Motion to Stay Ruling On Collateral Estoppel, Plaintiffs ask this Court to use its inherent authority to stay ruling on the collateral estoppel issue to "conserve judicial resources and ensure that [this] matter is handled efficiently." ECF No. 119 (quoting *In re Application of Alves Braga*, 789 F. Supp. 2d 1294, 1307 (S.D. Fla. 2011), and *Harte Hanks, Inc. v. Castaneda*, No. 19-62134-CIV, 2021 WL 972722, at *1 (S.D. Fla. Mar. 16, 2021)). As set forth above, Plaintiffs have informed the Court that the parties in the *Seaboard Marine* Case reached a settlement in principle which is contingent on the *Seaboard Marine* Court's vacatur of the summary judgment order on which Defendants' collateral estoppel defense is based. [ECF No. 103]. Since then, Plaintiffs sought and were granted a partial stay of the appeal of the *Seaboard Marine* Final Judgment in the Eleventh Circuit, filed the request to vacate the summary judgment order in the *Seaboard Marine* district court case, and filed the motion to stay ruling on the collateral estoppel issue in the instant case pending determination of the motion to vacate the *Seaboard Marine* Judgment. [ECF No. 119].

Before turning to whether a stay is warranted, the undersigned considers the effect of vacatur on the preclusive effect of a judgment and, specifically, the effect of vacatur resulting from a settlement by the parties against whom the estoppel is asserted. Notably, the requested

stay is before the Court while the motion to vacate is pending. Thus, like the pending appeal, the undersigned finds that the pending motion to vacate does not vitiate the preclusive effect of the judgment. The question, then, is whether the judgment maintains its preclusive effect if vacatur is granted.

    *a. The Preclusive Effect Of A Vacated Judgment Resulting From A Settlement.*

The general rule is that a judgment that is vacated or set aside is without preclusive effect in later litigation. *See Jaffree*, 837 F.2d at 1466; *see also Watermark Senior Living Ret. Cmtys., Inc. v. Morrison Mgmt. Specialists, Inc.*, 905 F.3d 421, 427 (6th Cir. 2018); *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 970 F.2d 1138, 1146 (2d Cir. 1992), *aff'd sub nom. John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86 (1993); *Pontarelli Limousine, Inc. v. City of Chicago*, 929 F.2d 339, 340–41 (7th Cir. 1991). Under that rule, judgments that are reversed and vacated either by an appellate or trial court typically will lose their preclusive effect. *See Jaffree*, 837 F.2d at 1466; Restatement (Second) of Judgments § 13, cmt. f (1982) (stating that a judgment ceases to be final if a trial court sets it aside after granting a motion for a new trial). Similarly, a party who obtains vacatur of a judgment when a case becomes moot on appeal through no fault of that party may be able to avoid the application of issue preclusion against it in future litigation. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–40 (1950).

However, the general rule that vacatur deprives a judgment of its preclusive force is not without exceptions. In fact, several courts around the country have recognized that judgments may retain their finality and preclusive effect when they are set aside or vacated, and particularly, when they are vacated at the request of parties based upon a settlement. *See, e.g.*, *Sentinel Tr. Co. v. Universal Bonding Ins. Co.*, 316 F.3d 213, 218–23 (3d Cir. 2003); *Birgel v.*

42

*Bd. of Comm'rs of Butler Cnty., Ohio*, 125 F.3d 948, 952 (6th Cir. 1997) ("[W]e will not permit a plaintiff to abandon his failing state court suit and file a virtually identical suit in federal court in hopes of achieving a more favorable result."); *Bates v. Union Oil Co. of Cal.*, 944 F.2d 647, 649–52 (9th Cir. 1991); *John Morrell & Co. v. Local Union 304A of United Food & Com. Workers*, 913 F.2d 544, 561–62 (8th Cir. 1990); *O'Reilly v. Malon*, 747 F.2d 820, 822–824 (1st Cir. 1984); *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1187–92 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983). *But see Harris Tr.*, 970 F.2d at 1146 (denying preclusive effect to a judgment vacated upon settlement).

In the absence of authority from the Eleventh Circuit, the undersigned finds the above-discussed authority from the majority of circuits to address the issue persuasive and well-reasoned.

Turning to the circumstances presented here, Plaintiffs chose to fully litigate their claims against Seaboard Marine, risking an adverse decision. They lost on that risk, and only when they lost did they apparently decide to settle, seeking to avoid collateral estoppel in this and other cases they have filed based on the same rights. Like the First, Third, Fifth, Sixth, and Ninth Circuits in the above-cited cases, the undersigned finds that a final judgment should maintain its finality even after vacatur when the vacatur is the result of a request following a settlement for the purpose of avoiding collateral estoppel. Thus, the undersigned finds Plaintiffs should be precluded from relitigating the issue decided in *Seaboard Marine* unless the judgment is reversed or set aside based on the appeal or a legal determination.

### b.   The Propriety Of A Stay Pending Determination Of The Motion To Vacate

As set forth above, the undersigned finds that the *Seaboard Marine* Judgment should maintain its preclusive effect pending the appeal and the determination of the motion to

vacate by the district court. Likewise, the undersigned finds that even if the district court ultimately grants the motion to vacate based on the *Seaboard Marine* parties' settlement agreement, the judgment should not lose its preclusive effect. With this in mind, the undersigned turns to Plaintiffs' Motion to Stay [ECF No. 119] and the interests at stake.

Although courts do enjoy broad authority to grant a stay, ultimately, whether to grant a stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *See De Fernandez v. CMA CGM S.A.*, No. 21-CV-22778, 2022 WL 2713737, at *6 (S.D. Fla. July 12, 2022) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *In re Alves Brag*a, 789 F. Supp. 2d 1294, 1307 (S.D. Fla. 2011) (Goodman, J.)). "A variety of circumstances may justify a district court stay[.]" *Ortega Trujillo v. Conover & Co. Commc'ns, Inc.*, 221 F.3d 1262, 1264 (11th Cir. 2000) (citations omitted). However, a stay must not be "immoderate." *Id.* (quoting *CTI-Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982)); *see also Jones v. Cent. Loan Admin. & Reporting*, No. 16-22428-CIV, 2016 WL 4530882, at *1 (S.D. Fla. Aug. 30, 2016) (Scola, J.) ("[S]o long as a stay is neither 'immoderate' nor indefinite, a stay is appropriate in the interest of judicial convenience."). In *Landis*, the Supreme Court instructed, "[I[f there is even a fair possibility that the stay . . . will work damage to someone else," the party seeking the stay "must make out a clear case of hardship or inequity in being required to go forward." 299 U.S. at 255. Therefore, the party seeking a stay bears the burden of demonstrating its necessity. *Clinton v. Jones*, 520 U.S. 681, 708 (1997) (citing *Landis*, 299 U.S. at 255).

Under the circumstances presented, the undersigned finds that Plaintiffs have not satisfied their burden of demonstrating the necessity of a stay. It will be particularly challenging for Plaintiffs to demonstrate a clear case of hardship or inequity in being required

to go forward. As discussed above, the greater weight of authority dictates that the *Seaboard Marine* Judgment should retain its preclusive effect even if the district court grants the parties' vacatur request. And, even if the judgment is vacated and the court determines that it should thereafter lose its preclusive effect, by Plaintiffs' own account, they do not believe they will be particularly set back by the need to relitigate the issue in this case. Plaintiffs argued in their Response to the Motion to Dismiss that the outcome of the Seaboard Marine appeal "***will not*** impact the pretrial proceedings in this case." Resp. at 17 (emphasis supplied). According to Plaintiffs, regardless of what happens with the appeal, "merits discovery in this case will be the same." *Id*. As the undersigned observed above, a significant amount of discovery and litigation already took place regarding Plaintiffs' rights under the 70-Year Concession, so, presumably, they are already a few steps ahead as far as information-gathering relevant to the issue is concerned. Thus, in light of the fact that vacatur will likely not affect the preclusive effect of the *Seaboard Marine* Judgment, combined with the fact that Plaintiffs have espoused the view that pretrial proceedings will not be affected one way or the other, Plaintiffs have failed to satisfy their burden of demonstrating the necessity of a stay of determination of the collateral estoppel issue here.

As such, the undersigned recommends the Motion to Stay [ECF No. 119] be denied and that the Court proceed with determination of the collateral estoppel issue. Further, for all the reasons set forth above, the undersigned recommends Defendants' Motion to Dismiss be granted as to Plaintiffs' claims based on their rights under the 70-Year Concession based on collateral estoppel.

### G.  Whether This Court May Exercise Personal Jurisdiction Over Defendant CMA France

Defendants argue Plaintiffs' claims must be dismissed as to CMA France because this Court lacks personal jurisdiction over it. Specifically, Defendants argue this Court lacks general jurisdiction over CMA France because the connections Plaintiffs allege between CMA France and Florida only occur through subsidiaries, and "[t]his is too constitutionally tenuous a connection for general jurisdiction" over a French entity headquartered in France. Mot. at 20. Defendants also argue there is no specific jurisdiction over CMA France because (1) there is a lack of a connection between the forum and the underlying controversy because the conduct occurred in Jamaica and Cuba; (2) jurisdiction over CMA France does not comport with constitutional due process because CMA France is confronted with "extreme procedural burden[s]" if it continues in the litigation here; (3) CMA France has purposefully avoided connection to this forum by operating in Florida only through its agent, CMA America; (4) the Amended Complaint does not allege intentional conduct by CMA France in Florida; (5) the relevant conduct occurred in Jamaica and Cuba even if Plaintiffs are located in Florida; and (6) there is no prejudice to Plaintiffs if CMA France is dismissed because CMA America will remain in the case. Mot. at 20–25.

Plaintiffs respond that CMA France is subject to specific jurisdiction because it purposefully availed itself of the privilege of doing business in the United States and Florida, and Plaintiffs' claims arise out of or relate to CMA France's abundant contacts, which include contracts for the shipment of goods from the United States, including Florida, to Cuba. Resp. at 19–25. Plaintiffs also contend that the contacts need not themselves be unlawful to subject CMA France to specific jurisdiction. *Id.* Plaintiffs do not respond to Defendants' argument that CMA France is not subject to general jurisdiction.

As set forth above, the personal jurisdiction analysis begins with a two-part inquiry: "(1) whether personal jurisdiction exists over the nonresident defendant . . . under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton*, 736 F.3d at 1350; *see also* Fed. R. Civ. P. 4(k)(1)(A).

The Eleventh Circuit has explained that a nonresident defendant may be subject to personal jurisdiction under Florida's long-arm statute in one of two ways:

> First, a defendant is subject to "*specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida"—for conduct specifically enumerated in the statute. Second, a defendant is subject to "*general* personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida."

*Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018) (citing *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1203 (11th Cir. 2015)); *see also* Fla. Stat. § 48.193(1)(a) and (2).

If the nonresident defendant is found to be subject to specific or general jurisdiction under Section 48.193(1)(a) or (2), the Court next determines whether the exercise of personal jurisdiction comports with due process under the United States Constitution. *Id.* The benchmark of this analysis is whether the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citations omitted). The minimum contacts inquiry focuses on "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)). This inquiry ensures that a defendant is haled into court in a

forum state based on the defendant's own affiliation with the state, rather than the "random, fortuitous, or attenuated" contacts it makes by interacting with other persons affiliated with the state. *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

In the Amended Complaint, Plaintiffs allege Defendant CMA France is subject to jurisdiction under Florida's long-arm statute, citing Sections 48.193(1) (specific jurisdiction) and (2) (general jurisdiction), and Federal Rule of Civil Procedure 4(k)(1)(A). Am. Compl. at ¶ 55(b). The undersigned addresses general jurisdiction under Florida's long-arm statute first.

1.  <u>General Jurisdiction Under Florida's Long-Arm Statute.</u>

Defendants contend that the only connections between CMA France and Florida alleged in the Amended Complaint occur through subsidiaries, which "is too constitutionally tenuous a connection for general jurisdiction." Mot. at 20.  Although Plaintiffs cite the general jurisdiction provision of the long-arm statute in the Amended Complaint, they do not respond, in their Response to the Motion to Dismiss, to Defendants' argument that general jurisdiction is lacking. The undersigned agrees that Plaintiffs have not sufficiently alleged general jurisdiction in the Amended Complaint nor defended it in their Response.

Under Florida's long-arm statute, a court has general jurisdiction over a "defendant who is engaged in substantial and not isolated activity within this state . . . whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). Such activity can be "wholly interstate, intrastate, or otherwise." *Id.* Florida courts have defined the term "substantial and not isolated activity" as used in Section 48.193(2) to mean "continuous and systematic general business contact" with Florida. *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (citing *Woods v. Nova Cos. Belize Ltd.*, 739 So. 2d 617, 620 (Fla. 4th DCA 1999); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415–16 (1984)). Generally, the contacts required to

establish general jurisdiction are quite rigorous and "must be especially pervasive and substantial" to satisfy Section 48.193(2). *In re Farmland Indus., Inc.*, No. 3:05–CV–587, 2007 WL 7694308, at *3 (M.D. Fla. Mar. 30, 2007).

Therefore, the exercise of general jurisdiction is only proper when the nonresident defendant's contacts with Florida are "so continuous and systematic as to render [the defendant] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (internal quotation marks and citations omitted). Additionally, "a corporation's continuous activity of some sorts within a state is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Id.* at 132 (citations omitted).

In the Amended Complaint, Plaintiffs make a bare bones allegation that Defendant CMA France "engaged in substantial and not isolated activity within this state." Am. Comp. at ¶ 55(b). There are no further statements to support that allegation in the Amended Complaint. On the other hand, Defendants submitted the Declaration of Marc Marling, the Chief Governance Officer for CMA America, who declares, based on his own personal knowledge and a review of records in the possession of CMA America, that CMA France is a French company with its principal place of business in France, that it does not maintain a presence in the United States and has no offices or employees in the United States, and that it is not registered to do business in the United States. [ECF No. 72-1 at 376]. Plaintiffs did not provide affidavits, testimony, or documents to rebut these statements. *See Moale v. Tonno Ltd.*, No. 19-25114, 2020 WL 13389755, at *2 (S.D. Fla. Nov. 30, 2020) (Cooke, J.) (citing *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009)). Thus, the undersigned finds the Amended Complaint fails to allege sufficient facts to demonstrate Defendants' contacts with Florida are so pervasive and substantial as to render them essentially at home

in Florida, and thus, amenable to suit in this action, and Plaintiffs failed to rebut Defendants' evidence to the contrary. *See Bowers*, 2015 WL 2415332, at *3.

Accordingly, Plaintiffs have not demonstrated that this Court may exercise personal jurisdiction over Defendants under the general jurisdiction provision of Florida's long-arm statute, Section 48.193(2).

### 2.  Specific Jurisdiction Under Florida's Long-Arm Statute.

Section 48.193(1)(a) of Florida's long-arm statute permits personal jurisdiction over a nonresident defendant for any cause of action arising from any one of nine enumerated acts. Fla. Stat. § 48.193(1)(a); *see also Hinkle v. Cirrus Design Corp.*, 775 F. App'x 545, 548 (11th Cir. 2019). Plaintiffs allege CMA France is subject to specific jurisdiction because it: (1) carried on a business venture in Florida; (2) committed a tortious act in Florida; and (3) caused injury to persons or property in Florida. Am. Compl. at ¶ 55(b) (citing Fla. Stat. §§ 48.193(1)(a)(1), (2), and (6)). In the Motion to Dismiss, Defendants do not specifically challenge whether Plaintiffs have satisfied any of the bases for specific personal jurisdiction identified in the Amended Complaint, but they do raise objections that appear to be directed at the specific jurisdiction analysis. Plaintiffs point this out in their Response, and, in their Reply, Defendants do not dispute Plaintiffs' statement in the Response that Defendants do not challenge whether the enumerated bases for personal jurisdiction have been satisfied. *See* Resp. at 18 n.11.

A review of the allegations in the Amended Complaint reflects that Plaintiffs have alleged sufficient facts to satisfy the requirements of Section 48.193(1). At a minimum, the undersigned finds Plaintiffs have sufficiently alleged that Defendant CMA France committed a tortious act in Florida by performing acts that caused injury within Florida. *See Del Valle v.*

*Trivago GMBH*, 56 F.4th 1265, 1272-73 (11th Cir. 2022) ("We have consistently held that, under Florida law, a nonresident defendant commits a tortious act in Florida by performing an act outside the state that causes injury within Florida.") (citing *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1216 (11th Cir. 1999); *Licciardello v. Lovelady*, 544 F.3d 1280, 1283–84 (11th Cir. 2008); *Louis Vuitton*, 736 F.3d at 1353). As the *Del Valle* Court also points out, a nonresident defendant need not be physically present in Florida to commit a tortious act there. 56 F.4th at 1273 (citing *Tufts v. Hay*, 977 F.3d 1204, 1211 (11th Cir. 2020); *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)).

Plaintiffs allege that CMA France marketed and sold its shipping services to Florida residents through their website and through their Florida agent, CMA America, and CMA France's services were contracted for in Florida in bills of lading between CMA France and Florida resident entities. Am. Comp. at ¶¶ 29–31. The trafficking alleged in the Amended Complaint involves Florida residents contracting with CMA France through bills of lading entered into in Florida in which CMA France agrees, as the carrier, to transport goods from the Port of Miami, among other United States ports, to Cuba. *See id.* at ¶¶ 26, 28, 38.

The undersigned finds the Eleventh Circuit's recent decision in *Del Valle* is factually analogous. In that case, the plaintiffs alleged that they held claims of ownership of beachfront properties nationalized by the Cuban government, which then built resorts on the properties. 56 F.4th at 1271–72. The plaintiffs alleged that visitors could reserve lodging at the resorts through third-party travel booking websites, including Trivago. *Id.* The *Del Valle* plaintiffs sued the travel booking websites under the Helms-Burton Act, alleging that the defendants trafficked in their properties by facilitating and profiting from reservations at the seized properties. The district court concluded that the tortious acts occurred in Cuba as opposed to

Florida because, although the defendants' activities were directed and sold to Florida residents, the trafficking in confiscated property occurred in Cuba. *See Del Valle v. Trivago GMBH*, No. 19-22619-Civ, 2020 WL 2733729, at *3 (S.D. Fla. May 26, 2020) (Scola, J.). The Eleventh Circuit rejected the district court's conclusion on the grounds the defendants' services were targeted and sold to Florida residents, and, therefore, the alleged trafficking in the confiscated properties took place when the defendants profited from booking activities and contracts or reservations made by Florida residents for stays in Cuba using defendants' services. *Del Valle*, 56 F.4th at 1274.

Like the defendants in *Del Valle*, CMA France trafficked in the Confiscated Property by specifically targeting and contracting for its carrier services to Cuba with Florida residents through their websites and their Florida agent. CMA France profited from contracts and bills of lading generated by Florida resident entities' interest in CMA France's carrier services to Cuba and from bills of lading entered into with Florida residents directly or through a Florida agent for shipments on CMA France's vessels from Florida ports to facilities allegedly located within the Confiscated Property—commercial activities otherwise benefitting from the Confiscated Property. *See Del Valle*, 56 F.4th at 1273–74.

Although not specifically challenged by Defendants, the undersigned finds *Del Valle* supports a finding of personal jurisdiction under Section 48.193(1)(a)(2). Therefore, the undersigned turns to the challenges articulated by Defendants regarding whether the exercise of jurisdiction over CMA France satisfies due process.

       3.  <u>Due Process.</u>

After analyzing the requirements of Florida's long-arm statute, a district court determining personal jurisdiction examines whether the exercise of jurisdiction satisfies due

process. *See Louis Vuitton*, 736 F.3d at 1350; *see also Northrop & Johnson Holding Co. v. Leahy*, No. 16-cv-63008, 2017 WL 4237869, at *4 (S.D. Fla. Sept. 25, 2017) (Bloom, J.).

The Due Process Clause of the Fourteenth Amendment protects a party from being subject to the binding judgment of a forum with which it has established no meaningful "contacts, ties, or relations." *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). A tribunal's authority depends on the defendant having such contacts with the forum that "'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *International Shoe*, 326 U.S. at 316–17). "The law of specific jurisdiction . . . seeks to ensure that States with 'little legitimate interest' in a suit do not encroach on States more affected by the controversy." *Id.* at 1025.

The Eleventh Circuit has set forth a three-part test to determine whether an exercise of specific personal jurisdiction comports with due process. *Louis Vuitton*, 736 F.3d at 1355. Under this test, the Court must examine:

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Id.* (citations omitted). Plaintiffs bear the burden of establishing the first two requirements. *See id.* If they carry that burden, Defendants must then make a "'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

The first inquiry focuses on whether there is a "direct causal relationship between the defendant, the forum, and the litigation." *Id.* at 1355–56 (citation omitted). In *Del Valle*, the Eleventh Circuit pointed out that the Supreme Court has rejected the contention that specific jurisdiction may attach only when the defendant's forum conduct directly gave rise to the plaintiff's claims. 56 F.4th at 1274 (citing *Ford Motor Co.*, 141 S. Ct. at 1026–27 ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that the plaintiff's claim came about because of the defendant's in-state conduct.")).

Again, the *Del Valle* decision, which issued after the briefing on Defendants' Motion to Dismiss was filed, is informative. As to the first part of the due process inquiry, the *Del Valle* Court held:

> This prong is readily met here. Though direct causation is not required, the plaintiffs' Helms-Burton Act claims arise at least in part directly out of the contacts of the Booking Entities and the Expedia Entities with Florida—the promotion targeted at and directed to Florida residents, the accessing of their websites by Florida residents, and the use of those websites by some Florida residents to book accommodations at the Resorts. To borrow the language of *Louis Vuitton*, the ties of the Booking Entities and Expedia Entities "to Florida . . . involve the advertising [and] selling" of accommodations at the Resorts to Florida residents. 736 F.3d at 1356.

*Id.* at 1275.

Likewise, the first prong is readily met in the instant case. Plaintiffs' Helms-Burton Act claims also arise, at least in part, directly out of CMA France's contacts with Florida—the promotion of their carrier services targeted at and directed to Florida resident entities, the accessing of their services (including cargo transport vessels using Florida ports) by Florida residents, and the use of their services by Florida residents to ship cargo to Cuba. In fact, it is undisputed Plaintiffs' claims "arise out of or relate to" at least one of CMA France's contacts with the forum in that Plaintiffs identified a bill of lading entered into with Defendants for the

shipment of goods by CMA France from the Port of Miami to the Port of Mariel. *See* Resp. at 27.

The second inquiry assesses whether the defendant's contacts with the state "(1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Louis Vuitton*, 736 F.3d at 1357. The second inquiry may also be satisfied by an alternative "effects test" pursuant to which a nonresident defendant's single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state. *Id.* at 1356. The effects test is met when the tort was intentional, aimed at the forum state, and caused harm that the defendant should have anticipated would be suffered in the forum state. *Del Valle*, 56 F.4th at 1276 (citing *Lovelady*, 544 F.3d at 1285).

Based on the allegations in the Amended Complaint, the undersigned finds that both the minimum contacts and effects tests are met here.

First, the Florida contacts of CMA France are sufficiently related to Plaintiffs' claims. The alleged trafficking in the Confiscated Property under the Act is based on Defendants' contacts with Florida—that is, the entry into bills of lading in Florida and the use of Florida ports for shipments from Florida to Cuba on CMA France's vessels. And, the effects of the intentional conduct were felt in Florida, where Plaintiffs reside. *See Del Valle*, 56 F.4th at 1276. Second, Defendant CMA France purposefully availed itself of Florida in such a way that it could reasonably foresee being haled into court here. As alleged in the Amended Complaint, CMA France promoted its carrier services and the ability to transport cargo door to door from Florida to Cuba to Florida residents, used Florida's ports for its carrier services, and secured

financial benefit from bills of lading entered into with Florida residents for shipments from Florida's ports to Cuba.[13] *See* Am. Comp. at ¶¶ 29–31. "These contacts, taken collectively, establish that [CMA France] purposefully availed [itself] of the privileges of doing business in Florida and could reasonably foresee being sued there." *Del Valle*, 56 F.4th at 1277. Third, although CMA France submitted a declaration stating that it would be burdened by having to litigate this case in Florida, "modern methods of transportation and communication reduce this burden significantly." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 259 (11th Cir. 1996) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222–23 (1957)). Indeed, the nature of CMA France's business is international, so it is engaged in business and communications globally, also reducing the relative burden for this Defendant. Other mitigating factors also support the exercise of jurisdiction. Florida has a strong interest in adjudicating this dispute given that Florida residents allegedly used CMA France's services to transport goods to Cuba; Plaintiffs, as Florida residents, have an interest in litigating this case in their chosen home forum; and Florida has "significant interests at stake," including "'providing [its] residents with a convenient forum for redressing injuries inflicted by out-of-state actors[.]'" *Ford Motor Co.*, 141 S. Ct. at 1030 (quoting *Burger King*, 471 U.S. at 473).

Accordingly, the undersigned finds that the exercise of personal jurisdiction over Defendant CMA France comports with the Due Process Clause of the Fourteenth Amendment.[14]

---

[13] Defendants' argument that the CMA France should not be subject to personal jurisdiction because it intentionally avoided contact with Florida by using its agent is unavailing where, as discussed herein, CMA France did have direct contacts with Florida in addition to its many contacts through its agent.

[14] Defendants raise due process challenges under both the Fifth and Fourteenth Amendments. In *Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*, 43 F.4th 1303, 1308 (11th

Having determined that Plaintiffs' claims sufficiently allege specific jurisdiction under the Florida long-arm statute and that the exercise of personal jurisdiction over CMA France satisfies due process, the undersigned recommends Defendants' Motion to Dismiss be denied insofar as it is based on a lack of personal jurisdiction over CMA France.[15]

## VII.   RECOMMENDATION

Based on the foregoing, the undersigned respectfully recommends that Defendants' Motion to Dismiss the Amended Complaint [ECF No. 72] be **GRANTED IN PART AND DENIED IN PART** as set forth above. Specifically, the undersigned recommends that:

1. the Motion to Dismiss for failure to state a claim be granted in part, and (a) that the claims on behalf of all Plaintiffs except Plaintiff Odette Blanco De Fernandez be dismissed, and (b) that the claims based on Plaintiffs' rights under the 70-Year Concession be dismissed; and

2. the Motion to Dismiss based on lack of personal jurisdiction over Defendant CMA France be denied.

The undersigned further recommends that Plaintiffs' Motion to Stay Ruling On Collateral Estoppel [ECF No. 119] be **DENIED**.

---

Cir. 2022), the Eleventh Circuit held, in a Helms-Burton Act case, that courts should analyze personal jurisdiction under the Fifth Amendment using the same basic principles that apply under the Fourteenth Amendment.

[15] Because the exercise of personal jurisdiction satisfies the Due Process Clauses of the Fifth and Fourteenth Amendments, the Court need not separately address whether CMA France is subject to jurisdiction under Federal Rule of Civil Procedure 4(k)(2)(A)–(B), which provides that, where a claim "arises under federal law" and the defendant is not subject to jurisdiction in the courts of general jurisdiction of any state, a federal court may exercise personal jurisdiction if it "is consistent with the United States Constitution and laws."

The parties will have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Rodolfo A. Ruiz, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida, this 30th day of April, 2023.

MELISSA DAMIAN
UNITED STATES MAGISTRATE JUDGE

Copies to:
Rodolfo Ruiz, *U.S. District Judge*
Counsel of Record